1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9
CHARLES ALIMENA and
10 CHERYL ALIMENA,
                              NO. CIV. S-12-0901 LKK/JFM
11       Plaintiffs,

12    v.
                                  O R D E R
13 VERICREST FINANCIAL, INC.;
CITIMORTGAGE, INC., LSF7
14 NLP VI TRUST; CR TITLE
SERVICES, INC.; LOAN STAR
15 FUND, and DOES 1 through 50,
inclusive,
16
         Defendants.
17 _____/

18       Plaintiffs Charles and Cheryl Alimena have sued defendants

19 Citimortgage, Inc. ("Citimortgage") and C.R. Title Services, Inc.

20 ("C.R. Title," the "Citi Defendants") and defendants Vericrest

21 Financial, Inc. ("Vericrest"), Lone Star U.S. Acquisitions, LLC

22 ("Lone Star"), and LSF7 NPL VI Trust ("Trust," the "Vericrest

23 Defendants"), alleging that Defendants acted unlawfully in failing

24 to modify their home mortgage and subsequently initiating

25 foreclosure proceedings. Plaintiffs commenced this action on

26 October 6, 2011 by filing a complaint in Sacramento Superior Court.

                                  1

On April 6, 2012, shortly after being named as a "Doe" defendant, Lone Star removed the action to federal court on the basis of diversity jurisdiction. (ECF No. 1.) On May 10, 2012, Plaintiffs filed their First Amended Complaint. ("FAC", ECF No. 11.) The Citi Defendants and the Vericrest Defendants now move to dismiss the FAC under Fed. R. Civ. P. 12(b)(6).

For the reasons stated below, the FAC is dismissed in its entirety, with plaintiffs granted leave to file an amended complaint.

**I. FACTS**

Plaintiffs' home is located at 4497 McRoberts Drive in Mather, California. (FAC ¶ 14.) In early 2010, Plaintiffs contacted defendant Citimortgage, seeking a modification of their home loan. (FAC ¶ 26.) Citimortgage sent Plaintiffs information regarding the Home Affordable Modification Program ("HAMP"). (FAC ¶ 27.) Plaintiffs were eventually notified in writing that they were entering a Home Affordable Modification Trial Period Plan ("First TPP").[1] (FAC ¶ 29.) Under the terms of the First TPP, Plaintiffs were to make three monthly payments of $1667.00, beginning in March 2010, and to submit certain documents to Citimortgage. (Id.)

Plaintiffs made the three payments, and in June 2010, made a fourth payment. (FAC ¶ 34.) In May 2010, Citimortgage confirmed that Plaintiffs had submitted all of the required documents. (FAC ¶ 31.) On June 15, 2010, Plaintiffs called Citimortgage to find out

---

[1] A copy of the First TPP is attached to the FAC as Exhibit 6.

2

1   the status of their HAMP application, and were told to submit a

2   profit & loss statement. (FAC ¶ 35.) They did so. (FAC ¶ 36.)

3       Later that month, they were informed by telephone that

4   Citimortgage had received the profit & loss statement, but that

5   their HAMP application had been canceled. They were given no reason

6   for the cancelation. (FAC ¶ 37.) Plaintiffs were merely told that

7   they could submit another HAMP application if they desired. (Id.)

8   They did so. (FAC ¶ 39.)

9       In early September 2010, Plaintiffs called Citimortgage and

10  confirmed that their HAMP application had been received. (FAC

11  ¶ 40.) In late October, Plaintiffs received a Notice of Default.

12  (FAC ¶ 41.) They called Citimortgage, and were informed that their

13  HAMP application had been denied due to inadequate income, but that

14  they could submit another application. (FAC ¶¶ 41, 43.) After

15  providing Citimortgage with financial information over the

16  telephone, they were told that they could qualify for a loan

17  modification if they sold their 2006 Chrysler 300C. (FAC ¶ 44.)

18  They did so. (FAC ¶¶ 48, 81.)

19      In late November 2010, Plaintiffs were informed by

20  Citimortgage that they had been prequalified for a HAMP

21  modification. (FAC ¶ 47.) Plaintiffs submitted updated financial

22  information to Citimortgage, including proof of the Chrysler's

23  sale. (FAC ¶ 48, 49.) In January 2011, Plaintiffs were notified

24  that their request for a loan modification had been approved.[2] (FAC

25  ─────────────

26      [2] A copy of a document titled "Your Mortgage Modification"
    is attached to the FAC as Exhibit 7. It appears to be a printout

3

¶¶ 50, 51.) On February 7, 2011, Plaintiffs received a letter from Citimortgage informing them that they were entering a second Home Affordable Modification Trial Period Plan ("Second TPP").[3] (FAC ¶ 52.) The Second TPP required Plaintiffs to make three monthly payments of $1687.00, beginning in March 2011. (FAC ¶ 52.) They made their first payment. (FAC ¶ 57.)

On February 24, 2011, Plaintiffs were informed by Citimortgage that the trustee's sale of their home had been postponed. (FAC ¶ 56.) On March 2, 2011, they were informed that the servicing of their loan had been transferred to defendant Vericrest. (FAC ¶ 57.)

On March 16, 2011, Plaintiffs received a notice from Vericrest stating that defendant Trust now owned their note, and Vericrest was their loan servicer. (FAC ¶ 62.) Plaintiffs called Vericrest that same day, and were informed that Citimortgage had reported to Vericrest that Plaintiffs' HAMP modification had been canceled because they (Plaintiffs) had defaulted. (Id.)

On March 25, 2012, Vericrest notified Plaintiffs over the telephone that their account should have been noted as being subject to a HAMP modification, and to make their second payment. (FAC ¶ 64.) Plaintiffs did so. (FAC ¶ 65.)

---

of a webpage; it reads in pertinent part, "01/21/2011 Your request for lower mortgage payments is approved. Expect your mortgage solution package within the next 5-7 business days."

[3] Attached to the FAC as Exhibit 8 are a copy of a letter from Citimortgage Customer Service to Plaintiffs describing the required trial period payments; a set of frequently asked questions regarding the TPP; a document entitled "Additional Trial Period Plan Information and Legal Notices"; and three payments slips to be mailed in with the trial period payments.

On March 28, 2011, Plaintiffs called Vericrest, and were told that they did not qualify for HAMP, and that Vericrest was not bound by any modification offered by Citimortgage. (FAC ¶ 66.) On April 4, 2011, their second payment was returned by mail. (FAC ¶ 68.) The next day, Plaintiffs called Vericrest, and were told they would have to re-apply for a loan modification. (FAC ¶ 69.)

On April 8, 2011, Plaintiffs filed for Chapter 13 bankruptcy protection. (FAC ¶ 70.)

On April 15, 2011, a notice was placed on Plaintiffs' home reading: "This Property Has Gone Through Foreclosure And Is Now Owned By The Mortgage Holder." (FAC ¶ 72.)

Plaintiffs allege that Lone Star has been the sole owner and beneficiary of Plaintiffs' deed of trust since July 2005, and along with Trust, is responsible for Citimortgage's and Vericrest's actions herein. (FAC ¶ 71.) Plaintiffs further allege that the transfer of servicing of their home loan from Citimortgage to Vericrest was for the purpose of denying them a loan modification. (FAC ¶ 72.)

Plaintiffs allege on information and belief that Lone Star owns Citimortgage, Trust, C.R. Title, and Vericrest, and that C.R. Title "purports to be the trustee under the deed of trust [recorded on their home] by virtue of a substitution of trustee dated October 15, 2010." (FAC ¶ 9.)

Plaintiffs have pleaded causes of action for deceit, civil conspiracy, promissory estoppel, breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of

1  contract, wrongful foreclosure under Cal. Civ. Code § 2924, and

2  violations of Cal. Bus. & Prof. Code § 17200.

3  **II. STANDARD ON MOTION TO DISMISS UNDER FED R. CIV. P. 12(b)(6)**

4       A dismissal motion under Fed. R. Civ. P. 12(b)(6)[4] challenges

5  a complaint's compliance with federal pleading requirements. Under

6  Rule 8(a)(2), a pleading must contain a "short and plain statement

7  of the claim showing that the pleader is entitled to relief." The

8  complaint must give the defendant "'fair notice of what the ...

9  claim is and the grounds upon which it rests.'" <u>Bell Atlantic v.</u>

10 <u>Twombly</u>, 550 U.S. 544, 555 (2007), <u>quoting</u> <u>Conley v. Gibson</u>, 355

11 U.S. 41, 47 (1957).

12      To meet this requirement, the complaint must be supported by

13 factual allegations. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

14 Moreover, this court "must accept as true all of the factual

15 allegations contained in the complaint." <u>Erickson v. Pardus</u>, 551

16 U.S. 89, 94 (2007).[5]

17      "While legal conclusions can provide the framework of a

18 complaint," neither legal conclusions nor conclusory statements are

19 themselves sufficient, and such statements are not entitled to a

20 presumption of truth. <u>Iqbal</u>, 556 U.S. at 678. <u>Iqbal</u> and <u>Twombly</u>

21 _____

22      [4] Hereinafter, the term "Rule" refers to the applicable
   Federal Rule of Civil Procedure.

23      [5] Citing <u>Twombly</u>, 556 U.S. at 555-56, <u>Neitzke v. Williams</u>, 490
   U.S. 319, 327 (1989) ("[w]hat Rule 12(b)(6) does not countenance
24 are dismissals based on a judge's disbelief of a complaint's
   factual allegations"), and <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236
25 (1974) ("it may appear on the face of the pleadings that a recovery
   is very remote and unlikely but that is not the test" under
26 Rule 12(b)(6)).

therefore prescribe a two-step process for evaluation of motions to dismiss. The court first identifies the non-conclusory factual allegations, and then determines whether these allegations, taken as true and construed in the light most favorable to the plaintiff, "plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 664.

"Plausibility," as it is used in <u>Twombly</u> and <u>Iqbal</u>, does not refer to the likelihood that a pleader will succeed in proving the allegations. Instead, it refers to whether the non-conclusory factual allegations, when assumed to be true, "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 663. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).[6] A complaint

---

[6] <u>Twombly</u> imposed an apparently-new "plausibility" gloss on the previously well-known Rule 8(a) standard, and retired the long-established "no set of Facts" standard of <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), although it did not overrule that case outright. <u>See</u> <u>Moss v. U.S. Secret Service</u>, 572 F.3d 962, 968 (9th Cir. 2009) (the <u>Twombly</u> Court "cautioned that it was not outright overruling <u>Conley</u> ...," although it was retiring the "no set of Facts" language from <u>Conley</u>). The Ninth Circuit has acknowledged the difficulty of applying the resulting standard, given the "perplexing" mix of standards the Supreme Court has applied in recent cases. <u>See</u> <u>Starr v. Baca</u>, 652 F.3d 1202, 1215 (9th Cir. 2011) (comparing the Court's application of the "original, more lenient version of Rule 8(a)" in <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002) and <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007) (per curiam), with the seemingly "higher pleading standard" in <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005), <u>Twombly</u> and <u>Iqbal</u>), <u>rehearing en banc denied</u>, 659 F.3d 850 (October 5, 2011). See also <u>Cook v. Brewer</u>, 637 F.3d 1002, 1004 (9th Cir. 2011) (applying the "no set of Facts" standard to a Section 1983 case).

1   may fail to show a right to relief either by lacking a cognizable

2   legal theory or by lacking sufficient facts alleged under a

3   cognizable legal theory. <u>Balistreri v. Pacifica Police Dep't</u>, 901

4   F.2d 696, 699 (9th Cir. 1990).

5   **III. ANALYSIS**

6     **A. Request for Judicial Notice**

7     ***1. Publicly-recorded documents***

8     Defendants request that the court take judicial notice of the

9   following documents recorded with the Sacramento County Recorder's

10  Office: a Deed of Trust recorded on July 25, 2005; an Assignment

11  of Deed of Trust recorded on October 19, 2010; a Substitution of

12  Trustee recorded on October 19, 2010; a Notice of Default and

13  Election to Sell Under Deed of Trust recorded on October 19, 2010;

14  a Notice of Trustee's Sale recorded on January 20, 2011; an

15  Assignment of Deed of Trust recorded on April 19, 2011; a Trustee's

16  Deed Upon Sale recorded on April 19, 2011; a Notice of Rescission

17  of Trustee's Deed Upon Sale recorded on May 6, 2011; and a Notice

18  of Trustee's Sale recorded on October 11, 2011. (Citi Defendants'

19  Req. for Jud. Not. ("Citi RJN"), Exs. A-H, K, ECF No. 32-1;

20  Vericrest Defendants' Req. for Jud. Not. ("Vericrest RJN"), Exs.

21  1-7, 11, 13, ECF No. 31-1, 31-2.)

22    "As a general rule, a district court may not consider any

23  material beyond the pleadings in ruling on a Rule 12(b)(6) motion."

24  <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir.2001)

25  (internal quotations and citation omitted). However, a court may

26  consider matters properly subject to judicial notice. <u>Swartz v.</u>

1  KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007). A matter may be

2  judicially noticed if it is either "generally known within the

3  territorial jurisdiction of the trial court" or "capable of

4  accurate and ready determination by resort to sources whose

5  accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

6      Since these nine documents are publicly recorded, they are

7  capable of accurate determination and may be judicially noticed.

8  See W. Fed. Sav. & Loan Ass'n v. Heflin Corp., 797 F.Supp. 790, 792

9  (N.D.Cal. 1992) (taking judicial notice of documents in a county's

10 public record, including deeds of trust). Therefore, Defendants'

11 request for judicial notice of these documents is granted.

12     **2. Bankruptcy Court filings**

13     On April 8, 2011, Plaintiffs filed for Chapter 13 bankruptcy

14 protection as joint debtors in the United States Bankruptcy Court

15 for the Eastern District of California, No. 11-28898 ("Bankruptcy

16 Case"). Defendants request that the court take judicial notice of

17 the following documents: the electronic case docket; Plaintiffs'

18 bankruptcy petition; an amended bankruptcy petition;[7] Plaintiffs'

19 statement of income and summary of schedules; and an order of the

20 bankruptcy court dismissing Plaintiffs' case. (Citi RJN, Exs. I,

21 J; Vericrest RJN, Exs. 8-10, 12, 14.)

22     Courts may "take judicial notice of court filings and other

23

24     [7] Filing of an amended petition appears to have been necessary
   because the initial petition listed the incorrect debtors' names.
25 Plaintiffs argue against taking judicial notice of the initial
   petition because of this error, but it is relevant, as it shows the
26 date on which the Bankruptcy Case was commenced.

matters of public record[, as they] are readily verifiable and, therefore, the proper subject of judicial notice." <u>Reyn's Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (internal citation omitted). <u>See</u> <u>also</u> <u>Headwaters Inc. v. United States Forest Service</u>, 399 F.3d 1047, 1051 n. 3 (9th Cir. 2005) (taking judicial notice of the docket of a proceeding in another tribunal). Accordingly, the court will take judicial notice of the docket, Plaintiffs' filings, and the court's order in the Bankruptcy Case.

Plaintiffs object generally to the court taking judicial notice of the contents of these various documents.[8] The court is well aware of the limitations on its ability to accept the truth of matters asserted in materials of which it takes judicial notice and will proceed accordingly. <u>See</u>, <u>generally</u>, 21B Charles Alan Wright & Arthur Miller, <u>Federal Practice and Procedure</u> § 5106.4 ("Facts Judicially Noticeable; Indisputability— 'Ascertainable Facts'—Court Records") (2d ed. 2012).

### B. Judicial Estoppel

The Vericrest Defendants allege that Plaintiffs are judicially estopped from bringing this action because they failed to disclose

---

[8] Plaintiffs' citation to state law in support of these objections is inapt. Although the court is sitting in diversity and applying state law as to substantive matters, judicial notice is governed by the Federal Rules of Evidence and case law interpreting those Rules. <u>See</u> <u>Wray v. Gregory</u>, 61 F.3d 1414, 1417 (9th Cir. 1995) ("[T]he Federal Rules of Evidence ordinarily govern in diversity cases," except "where a state evidence rule is intimately bound up with the rights and obligations being asserted.")

1    the claims herein in any filing made in their Chapter 13 bankruptcy

2    proceeding. According to the Ninth Circuit:

> Judicial estoppel is an equitable doctrine that
> precludes a party from gaining an advantage by asserting
> one position, and then later seeking an advantage by
> taking a clearly inconsistent position. This court
> invokes judicial estoppel not only to prevent a party
> from gaining an advantage by taking inconsistent
> positions, but also because of general consideration[s]
> of the orderly administration of justice and regard for
> the dignity of judicial proceedings, and to protect
> against a litigant playing fast and loose with the
> courts.
> ...
> This court has restricted the application of judicial
> estoppel to cases where the court relied on, or
> "accepted," the party's previous inconsistent position.
> The application of judicial estoppel is not limited to
> bar the assertion of inconsistent positions in the same
> litigation, but is also appropriate to bar litigants
> from making incompatible statements in two different
> cases.

14   Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782-783 (9th

15   Cir. 2001) (internal citations and quotations omitted). According

16   to the Supreme Court, courts may consider three factors in deciding

17   whether to bar a party from proceeding under the doctrine. First,

18   that party's later position "must be clearly inconsistent with its

19   earlier position." New Hampshire v. Maine, 532 U.S. 742, 751, 121

20   S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal citations and

21   quotations omitted). Second, the party must have "succeeded in

22   persuading a court to accept that party's earlier position, so that

23   judicial acceptance of an inconsistent position in a later

24   proceeding would create the perception that either the first or the

25   second court was misled." Id. Third, the party "seeking to assert

26   an inconsistent position [may] derive an unfair advantage or impose

1  an unfair detriment on the opposing party if not estopped." <u>Id.</u>
2  These factors are not exhaustive; "[a]dditional considerations may
3  inform the doctrine's application in specific factual contexts."
4  <u>Id.</u> In general, "a party is judicially estopped from asserting a
5  cause of action [in a later proceeding] not raised in a
6  reorganization plan or otherwise mentioned in the debtor's
7  schedules or disclosure statements." <u>Hamilton</u>, 270 F.3d. at 783.

8      The Vericrest Defendants point out that many courts have
9  recently invoked judicial estoppel to bar plaintiffs who have
10 previously sought bankruptcy protection from subsequently suing on
11 undisclosed unlawful conduct related to foreclosures and/or denial
12 of loan modifications. And, as the Ninth Circuit has noted, the
13 bankruptcy court need not "actually discharge debts before the
14 judicial acceptance prong may be satisfied. The bankruptcy court
15 may 'accept' the debtor's assertions by relying on the debtor's
16 nondisclosure of potential claims in many other ways." <u>Hamilton</u>,
17 270 F.3d at 784. Examples of such acceptance include a discharge
18 of debt that is later vacated, the lifting of a bankruptcy stay
19 based on nondisclosure of claims, and approval of a debtor's plan
20 of reorganization. <u>Id.</u> But in each of these examples, the
21 petitioners "succeeded in persuading [the bankruptcy] court to
22 accept that party's earlier position" in some way.

23     By contrast, Plaintiffs' Chapter 13 proceedings seem to have
24 been an utter failure.[9] None of the orders issued by the court

25 _____

26     [9] The court takes judicial notice of the filings in the
   Bankruptcy Case of its own accord. Fed.R.Evid. 201(c).

appear to have relied on the schedules submitted by Plaintiffs, and at no point did the bankruptcy court confirm their Chapter 13 plan. Instead, the bankruptcy trustee twice moved for an order denying confirmation of Plaintiffs' plan and dismissing the case. In response to the trustee's first motion (Bankruptcy Case, ECF No. 32), for failure to properly notice a motion to value collateral, the bankruptcy court denied confirmation of Plaintiffs' plan. (Bankruptcy Case, ECF No. 38.) In response to the trustee's second such motion (Bankruptcy Case, ECF No. 56), for failure to make required monthly plan payments,[10] the court dismissed Plaintiffs' case. (Bankruptcy Case, ECF No. 59.) The latter order was entered on September 15, 2011. On December 15, 2011, the court discharged the trustee and closed the case. (Bankruptcy Case, ECF Nos. 69, 70.) Plaintiffs do not appear to have filed for bankruptcy protection again.

There is little doubt that, by asserting claims herein that were not listed in their bankruptcy filings, Plaintiffs have adopted inconsistent positions in the two proceedings. Nevertheless, as the Ninth Circuit has restricted application of judicial estoppel to "cases where the [bankruptcy] court relied on, or 'accepted,' the party's previous inconsistent position,"

---

[10] Payments are required even before the bankruptcy court considers whether to approve the debtors' plan. According to section 2.01 of form EDC 3-080, entitled "Chapter 13 Plan" (published by the U.S. Bankruptcy Court for the Eastern District of California), "Monthly plan payments must be received by Trustee not later than the 25th day of each month beginning the month after the petition is filed."

1   Hamilton, 270 F.3d at 783, and no such reliance or acceptance seems

2   to have occurred, it does not appear that Plaintiffs will "derive

3   an unfair advantage or impose an unfair detriment on the opposing

4   party  if  not  estopped."  New Hampshire,  532  U.S.  at  751.

5   Accordingly, Plaintiffs' failure to set forth the instant claims

6   in their bankruptcy filings will not estop them from proceeding

7   herein.

8       **C. State law claims under HAMP**

9       Plaintiffs  allege  state  law  claims  based  on  Defendants'

10  conduct in handling their trial loan modifications under HAMP.

11      Defendants  counter  that,  because  HAMP  does  not  provide  a

12  private right of action, Plaintiffs may not assert state law claims

13  predicated on alleged violations of HAMP.

14      Neither the Emergency Economic Stabilization Act of 2008,

15  Pub.L. 110-343, 122 Stat. 3765, which created HAMP, nor HAMP's

16  guidelines, give rise to a private right of action under federal

17  law to obtain or enforce a mortgage loan modification under HAMP.

18  Lucia v. Wells Fargo Bank, N.A., 798 F.Supp.2d 1059, 1066 (N.D.Cal.

19  2011).

20      Nevertheless, state law claims alleging HAMP violations may

21  be cognizable. Courts have split on this question. See Sutcliffe

22  v. Wells Fargo Bank, N.A., 283 F.R.D. 533 (N.D. Cal. 2012)

23  (conducting national survey of cases and "finding more persuasive

24  the reasoning in the line of cases that has found, at least at the

25  pleading stage, that the [HAMP Trial Period Plan ("TPP")] offers

26  a  sufficient  basis  to  show  the  existence  of  an  enforceable

1  agreement").

2      It appears that the key point of disagreement in these cases

3  lies in the interpretation of the TPP's terms: does the TPP

4  constitute an enforceable agreement to permanently modify a

5  mortgage (assuming the borrower satisfies the requirements

6  therein), or does the TPP merely set out a process for applying for

7  a permanent loan modification? Courts taking the latter position

8  are of the view that an enforceable agreement does not arise until

9  a permanent loan modification is in place.

10      One of the earliest cases to assess whether a TPP gives rise

11  to an enforceable contract under California law was decided in this

12  judicial district. See Grill v. BAC Home Loans Servicing LP, No.

13  10-CV-03057-FCD/GGH, 2011 WL 127891 (E.D.Cal. Jan. 14, 2011)

14  (Damrell, J.) (holding that a TPP does not give rise to an

15  enforceable contract for a loan modification). Former Judge Damrell

16  based his decision on three clauses in the TPP.[11] The first clause

17  provides: "If I am in compliance with this Trial Period Plan...then

18  the Servicer will provide me a...Modification Agreement that would

19  amend...the Loan Documents."

20      The second clause provides:

21      I understand that the Plan is not a modification of the
       Loan Documents and that the Loan Documents will not be
22      modified unless and until (i) I meet all of the
       conditions required for modification, (ii) I receive a

23

----

24      [11] Although the TPP in Grill was issued by BAC Home Loans
   Servicing LP, and the TPP at issue in this case was issued by
25  defendant Citimortgage, the provisions in question (as well as the
   provisions considered in the other cases discussed in this section)
26  are largely identical.

1      fully executed copy of a Modification Agreement.... I
further understand and agree that the Servicer will not
2      be obligated or bound to make any modification of the
Loan Documents if I fail to meet any one of the
3      requirements under this Plan.

4 The third clause provides:

5      If I comply with the requirements in Section 2 and ...
Section 1, the Servicer will [determine the new payment
6      amount and] send me a Modification Agreement for my
signature which will modify my Loan Documents.... Upon
7      execution of a Modification Agreement by the Servicer
and me, this Plan shall terminate and the Loan
8      Documents, as modified by the Modification Agreement,
shall govern the terms between the Servicer and me.

9

10 According to Judge Damrell, these three clauses, and the TPP as a

11 whole, set forth an application process that the borrower follows

12 in the hopes of obtaining a loan modification. Grill, 2011 WL

13 127891 at *4. A binding contract for a loan modification arises

14 only when (i) the servicer determines that the applicant has

15 complied with the requirements outlined in the TPP, and

16 (ii) thereafter "send[s the borrower] a modification agreement,

17 including a new monthly payment amount, which both [the borrower

18 and the servicer] would execute." Id. The holding in Grill was

19 endorsed by, among others, the court in Lucia, 798 F.Supp.2d at

20 1067-68.[12]

21    A contrary view is taken in Gaudin v. Saxon Mortg. Services,

22 Inc., 820 F.Supp.2d 1051 (N.D.Cal. 2011) (Seeborg, J.) (holding

23 that the TPP may give rise to enforceable obligations under

24 California law). Gaudin is careful to distinguish between, on the

25 _____

26    [12] Lucia is currently on appeal to the Ninth Circuit.
(N.D.Cal. No. 3:10-cv-04749-JSW, ECF No. 58.)

1   one hand, the provisions in the TPP that arguably create an

2   enforceable agreement to grant a permanent loan modification, and

3   on the other, the technical requirements for putting in place a

4   permanent loan modification. In Judge Seeborg's view, the TPP "sets

5   out various conditions that must be fulfilled before the lender is

6   obligated to provide a permanent loan modification...the

7   implication is that upon satisfaction of those conditions, the

8   lender will (and must) provide the borrower with a permanent loan

9   modification agreement." Id. at 1053. By contrast, the requirement

10  that the parties both execute a permanent loan modification "are

11  best understood as explaining that the modification will not take

12  legal effect until such a document is signed, but do not serve as

13  a condition precedent to the lender's obligation to provide such

14  an executed document." Id. at 1054 n.5. Conditioning the granting

15  of a permanent loan modification on the servicer's discretion to

16  issue and sign such a document (the position taken by Grill and

17  Lucia, supra), rather than on the borrower's compliance with the

18  TPP's terms, "would render the other apparent promises in the

19  document illusory." Id. at 1054. This view has been endorsed by,

20  among other courts, the Seventh Circuit: "[A] borrower who did all

21  the TPP required of her would be entitled to a permanent

22  modification only when the bank exercised its unbridled discretion

23  to put a Modification Agreement in the mail...turn[ing] an

24  otherwise straightforward offer into an illusion." Wigod v. Wells

25  Fargo Bank, 673 F.3d 547, 563 (7th. Cir. 2012) (finding that

26  borrower had stated breach of contract claim against bank under

17

1  Illinois law for failure to follow TPP).

2      The court is persuaded by the reasoning in the line of cases

3  which includes <u>Gaudin</u> and <u>Wigod</u> finding that, at least at the

4  pleading stage, the TPP provides a basis for an enforceable

5  agreement to grant a permanent loan modification based on the

6  borrower's compliance with the terms therein. The alternative is

7  to grant banks, lenders, and loan servicers carte blanche to

8  arbitrarily deny loan modifications despite borrowers' good faith

9  compliance with the TPP's terms and conditions. As the <u>Wigod</u> court

10  put it, if the TPP is unenforceable, a bank "could simply refuse

11  to send a [permanent loan modification agreement] for any reason

12  whatsoever – interest rates went up, the economy went sour, it

13  didn't like [the borrower] – and there would still be no breach."

14  673 F.3d at 563.[13]

15      Accordingly, the court finds that Plaintiffs herein may allege

16  properly-pleaded state law causes of action against the Defendants

17  for their acts and omissions in connection with HAMP loan

18  modifications. In reaching this conclusion, the court respectfully

19  declines to follow its former colleague Judge Damrell's decision

20  in <u>Grill</u>.

21  ////

22

23      [13] Considering that many borrowers seeking loan modifications
   are in strained financial circumstances and are desperate to retain
24  ownership of their homes, to hold that lenders may arbitrarily deny
   permanent loan modifications despite borrowers' good-faith
25  compliance with the TPP would arguably invite those lenders to
   extract what little money these borrowers have left and then
26  foreclose on their homes.

18

1        **D. Pleading Standards under Rule 8**

2        Turning to Defendants' motions to dismiss, the court is unable

3   to assess their substantive merits because the FAC fails to meet

4   even minimal federal pleading standards.

5        Under Rule 8(a)(2), a complaint "must contain...a short and

6   plain statement of the claim showing that the pleader is entitled

7   to relief." As noted above, the complaint must give the defendant

8   "'fair notice of what the ... claim is and the grounds upon which

9   it rests.'" <u>Twombly</u>, 550 U.S. at 555 (<u>quoting</u> <u>Conley</u>, 355 U.S. at

10  47).

11       The FAC fails to meet the Rule 8 standard. In pleading each

12  of their causes of action, Plaintiffs repeatedly use the generic

13  term "Defendants" to refer to the party allegedly acting. This term

14  encompasses all five of the named defendants herein. Accordingly,

15  it is impossible for the court (and, more than likely, the

16  individual defendants) to determine which defendant is alleged to

17  have done what. For example, Plaintiffs plead a cause of action for

18  promissory estoppel against Citimortgage, Lone Star, and Trust,

19  alleging in pertinent part: "Plaintiffs' reliance on Defendants'

20  representations was reasonable, justified, and foreseeable, as

21  Defendants represented to Plaintiffs that they were the servicer

22  and/or owner of the Subject Loan." (FAC ¶ 121.) But the paragraphs

23  that immediately precede this allegation refer only to

24  Citimortgage's representations regarding a loan modification, and

25  make no reference to any representations by Lone Star or Trust,

26  much less any of the other Defendants. If Plaintiffs wish to

1  proceed against Lone Star or Trust on a promissory estoppel theory,

2  they must make clear what actions each of these defendants

3  undertook to make themselves liable. Plaintiffs must also not

4  inadvertently implicate Vericrest or C.R. Title through use of the

5  term "Defendants," as occurs dozens of times in the FAC. As it

6  stands, the FAC is simply too vague and indefinite to allow this

7  action to proceed.

8      **E. Pleading Standards under Rule 9(b)**

9      Plaintiffs' failures in pleading are especially acute when

10 considering their first cause of action, for deceit. Under

11 California law, an action for deceit arises out of fraud. <u>Small v.</u>

12 <u>Fritz Companies, Inc.</u>, 30 Cal.4th 167, 173 (2003). Federal pleading

13 standards require a party alleging fraud to "state with

14 particularity the circumstances constituting fraud...." Fed. R.

15 Civ. P. 9(b). Rule 9(b) "does not allow a complaint to merely lump

16 multiple defendants together but 'require[s] plaintiffs to

17 differentiate their allegations when suing more than one defendant

18 ... and inform each defendant separately of the allegations

19 surrounding his alleged participation in the fraud.'" <u>Swartz v.</u>

20 <u>KPMG LLP</u>, 476 F.3d 756, 764–765 (9th Cir. 2007) (internal citations

21 and quotations omitted). "In the context of a fraud suit involving

22 multiple defendants, a plaintiff must, at minimum, identify the

23 role of each defendant in the alleged fraudulent scheme." <u>Id</u>.

24 (internal citations and quotations omitted).

25     As currently pleaded, Plaintiffs' claim for deceit is

26 allegedly maintained against Citimortgage, Lone Star, and Trust,

1   but only describes concrete actions taken by Citimortgage. Lone

2   Star and Trust's involvement is pleaded in the vaguest terms:

3   "Defendants and each of them knew that Plaintiffs would not receive

4   a permanent HAMP modification because LONE STAR and TRUST intended

5   to frustrate, impede, and prevent the modification from occurring

6   by transferring the servicing of the Subject Loan from CITI to

7   VERICREST before Plaintiffs could make the three mortgage

8   payments." (FAC ¶ 94.) One cannot discern the specific "role of

9   each in the alleged fraudulent scheme," <u>Swartz</u>, 476 F.3d at 765,

10  because it is unclear what steps Lone Star and the Trust

11  individually took in propagating the alleged deceit. In short, the

12  FAC fails to meet applicable pleading standards under both Rule 8

13  and Rule 9.

14       "[L]eave to amend should be granted 'if it appears at all

15  possible that the plaintiff can correct the defect.'" <u>Breier v.</u>

16  <u>Northern California Bowling Proprietors' Ass'n</u>, 316 F.2d 787, 790

17  (9th Cir. 1963) (quoting 3 Moore, Federal Practice, § 15.10 at 838

18  (2d ed. 1948). The court grants Plaintiffs leave to amend their

19  First Amended Complaint. If Plaintiffs file an amended complaint,

20  they are directed to plead with the requisite specificity, as it

21  is exceedingly unlikely that the court will grant them leave to

22  amend another deficient complaint.

23  **IV. CONCLUSION**

24       The court orders as follows:

25            Plaintiffs' First Amended Complaint, ECF No. 11, is

26            DISMISSED without prejudice. Plaintiffs are granted

1        leave to file an amended complaint no less than twenty-

2        eight (28) days after entry of this order. This amended

3        complaint may not allege any causes of action beyond

4        those already pleaded in Plaintiffs' First Amended

5        Complaint.

6    IT IS SO ORDERED.

7    DATED:   December 18, 2012.

8

9

10

11                LAWRENCE K. KARLTON
                     SENIOR JUDGE

12               UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26