JOHN S. SARGETIS (SBN: 80630)
JULIE B. GUSTAVSON (SBN: 139060)
UNITED LAW CENTER
3013 Douglas Blvd., Suite 200
Roseville, CA 95661
Office: (916) 367-0630
Facsimile:   (916) 265-9000
Email: jgustavson@unitedlawcenter.com

Attorneys for Plaintiffs
CHARLES ALIMENA and CHERYL ALIMENA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ALIMENA and CHERYL ALIMENA, <br><br> Plaintiff, <br><br> vs. <br><br> VERICREST FINANCIAL, INC., CITIMORTGAGE, INC.; LSF7 NPL VI TRUST; CR TITLE SERVICES, INC.; LONE STAR FUND; and DOES 1 through 50, inclusive, <br><br> Defendants. | **Case No.: 2:12-cv-00901-LKK-JFM** <br><br> SECOND AMENDED COMPLAINT FOR: <br><br> 1. Deceit <br> 2. Civil Conspiracy <br> 3. Promissory Estoppel <br> 4. Promissory Estoppel <br> 5. Breach of Contract <br> 6. Breach of Covenant of Good Faith & Fair Dealing <br> 7. Bad Faith Denial of Contract <br> 8. Wrongful Foreclosure in Violation of Civil Code §§ 2924 <br> 9. Violations of Business & Professions Code §17200 et seq. <br><br> **[JURY TRIAL DEMANDED]** |

Plaintiffs CHARLES ALIMENA and CHERYL ALIMENA (hereinafter referred to collectively as "Plaintiffs") allege as follows:

## I. THE REAL PROPERTY AND PARTIES

1.     Plaintiffs are, and at all times herein relevant were, individuals residing at 4497 McRoberts Drive, Mather, California, in the County of Sacramento (hereinafter referred to as "the

Subject Property").  The action is for equitable and injunctive relief and damages resulting from the Defendants' acts or omissions as set forth herein concerning the residential mortgage loan transaction for the Subject Property  (hereinafter the loan shall be referred to as "the Subject Loan").  The Subject Loan is comprised of a promissory note (hereinafter referred to as "the Note") and a deed of trust (hereinafter referred to as "the Deed of Trust") which is recorded against the Subject Property and serves AS the security instrument for the Loan.

2.     Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendant CITIMORTGAGE, INC. (hereinafter referred to as "CITI") claimed to have an interest in the Subject Loan by virtue of an Assignment of Deed of Trust recorded on October 19, 2010.  Plaintiffs are informed and believe and thereon allege that CITI was the servicer of the Subject Loan from January of 2010 through approximately mid-March of 2011.  Plaintiffs are informed and believe and thereon allege that CITI claimed to be the beneficiary under the Deed of Trust in 2010 through April 15, 2011.  Plaintiffs are informed and believe and thereon allege that CITI regularly engages in mortgage-related activities in the State of California and the County of Sacramento.

3.     Plaintiffs are informed and believe and thereon allege that CITI is an affiliate of CITIBANK, N.A. and is under the direction and control of CITIBANK, N.A.

4.     Plaintiffs are informed and believe and thereon allege that Defendant LSF7 NPL VI TRUST (hereinafter referred to as "TRUST") claims to be the current beneficiary under the Deed of Trust by virtue of an Assignment of Deed of Trust from CITI recorded on April 19, 2011.  Plaintiffs are informed and believe and thereon allege that TRUST regularly engages in mortgage-related activity and the acquisition of mortgage instruments and real property in the State of California.

5.     Plaintiffs are informed and believe and thereon allege that Defendant VERICREST FINANCIAL, INC. (hereinafter referred to as "VERICREST") is the current servicer of the Subject Loan and has been since approximately mid-March of 2011.

6.     Plaintiffs are informed and believe and thereon allege that Defendant CR TITLE SERVICES, INC. (hereinafter referred to as "CR Title") is a subsidiary of Defendant LONE

STAR U.S. ACQUISITIONS, LLC (hereinafter referred to as "LONE STAR").  CR TITLE purports to be the trustee under the Deed of Trust by virtue of a Substitution of Trustee dated October 15, 2010.

7.   Plaintiffs are informed and believe and thereon allege that CITI, TRUST, CR TITLE and VERICREST are owned by LONE STAR.

8.   Plaintiffs are informed and believe and thereon allege that LONE STAR regularly does business in the State of California, directly and indirectly, including servicing of residential mortgages through its related businesses, VERICREST and CITI.  LONE STAR was erroneously named in the Caption and original Complaint as LONE STAR FUND.

9.   All references to Defendants' capacity in recorded documents set forth in this Second Amended Complaint (hereinafter referred to as "the SAC") f are purported, whether specifically stated or not.

10.   Whenever reference is made in this SAC to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this SAC through its officers, directors, employees, agents and/or representatives while acting within the actual and ostensible scope of their authority.

11.   The Court herein has previously ruled that all Defendants named as DOES have been dismissed, and any further reference herein to any DOE Defendant is unintentional.

**II. JURISDICTION AND VENUE**

12.   Plaintiffs are, and at all times herein relevant were, individuals the County of Sacramento, State of California, and, as stated in paragraph 1, above, the Subject Property is located in the County of Sacramento, State of California.

13.   Defendants, and each of them, at all times herein relevant, regularly engaged, and engage, in business in the State of California, County of Sacramento. The majority of the transactions and events that are the subject matter of this SAC occurred within the County of Sacramento, State of California.

/ / /

/ / /

### III. GENERAL ALLEGATIONS

**Recorded Documents**

14.    The recorded documents, including the Assignments of Deed of Trust, Substitution of Trustee, Notice of Default and Notice of Trustee's Sale, relative to the Subject Property are false, fraudulent, and the product of unsound and unlawful conduct.  Further, CITI was bound by a Consent Order, executed on April 13, 2011 (a copy of which is attached hereto and incorporated herein as **Exhibit 1**) which prohibited CITI from engaging in the very acts which form the basis of this lawsuit.

15.    The first Assignment of Deed of Trust (hereinafter referred to as Assignment #1") relative to the Subject Property purports to be executed on October 15, 2010 by "Lisa Markham, Assistant Secretary" of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., also known as MERS. A copy of Assignment #1 is attached hereto and incorporated herein as **Exhibit 2).**  Plaintiffs are informed and believe and thereon allege that Assignment #1 is void and fraudulent; 1) Lisa Markham is/was nothing more than a "robo-signer", i.e. one who signs stacks of legal documents without any knowledge of their content and without any legal standing in the company or corporation that has hired him or her for the sole purpose of mass-signing documents, in this case, foreclosure-related documents, and 2) Lisa Markham has never been an officer of MERS, as represented on **Exhibit 2**.

16.    In addition, Plaintiffs are further informed and believe and thereon allege that at the time **Exhibit 2** was purportedly executed and recorded, the Note and Deed of Trust had already been transferred to LONE STAR in July of 2005, and MERS had no interest in either document that it could assign to anyone, including CITI, in October of 2010.

17.    The Substitution of Trustee (hereinafter referred to as "the Substitution") was purportedly executed on October 15, 2010, by "Lisa Markham, Assistant Vice President" of CITI.  A copy of the Substitution is attached hereto and incorporated herein as **Exhibit 3**. Plaintiffs are informed and believe and thereon allege that the Substitution is void and fraudulent; 1) Lisa Markham is/was nothing more than a "robo-signer", and 2) Lisa Markham has never been an officer of CITI, as represented on **Exhibit 3.**  Furthermore, since Assignment

#1 is void, as MERS had no interest to assign to CITI, CITI did not have authority to execute or record a Substitution, or to even appoint a new Trustee, since CITI had neither a beneficial interest nor authority from the holder of the beneficial interest.

18.   The second Assignment of Deed of Trust (hereinafter referred to as "Assignment #2") was purportedly executed on April 15, 2011, by "Lisa Markham, Assistant Vice President" of CITI.  A copy of Assignment #2 is attached hereto and incorporated herein as **Exhibit 4.** Plaintiffs are informed and believe and thereon allege that Assignment #2 is void and fraudulent; 1) Lisa Markham is/was nothing more than a "robo-signer", and 2) Lisa Markham has never been an officer of CITI, as represented on **Exhibit 4**.

19.   In addition, Plaintiffs are further informed and believe and thereon allege that at the time **Exhibit 4** was purportedly executed and recorded, the Note and Deed of Trust remained under the ownership LONE STAR, as they had since July of 2005, and CITI had no interest in either document that it could assign to anyone, including TRUST, in April of 2011.

20.   A Trustee's Deed Upon Sale (hereinafter referred to as "the Trustee's Deed") was purportedly executed on April 15, 2011, by "Lisa Markham, Assistant Vice President" of CR TITLE and recorded on April 19, 2011.  A copy of the Trustee's Deed is attached hereto and incorporated herein as **Exhibit 5**.  Plaintiffs are informed and believe and thereon allege that the Trustee's Deed is void and fraudulent; 1) Lisa Markham is/was nothing more than a "robo-signer";  and 2) Lisa Markham has never been an officer of CR Title as represented on **Exhibit 5.**

21.   On April 13, 2011, two days prior to the purported execution Assignment #2 and the Trustee's Deed, CITI executed a Consent Order by which CITI agreed to cease and desist unsound practices, including:

● filing documents in state and federal courts and recording documents as part of non-judicial foreclosure proceedings that were executed by persons who claimed to have personal knowledge or belief of the assertions contained therein when the person executing the documents had no such personal knowledge or basis for belief in support of the assertions;

● filing or recording documents in recorders' offices and land records that were not

properly executed or notarized;

● initiating foreclosure proceedings without ensuring that the promissory note had been properly assigned to the appropriate party;

● failing to oversee the foreclosure process and ensure that it is properly performed by trained personnel. (**Exhibit 1, pp. 2-3**).

22.     Pursuant to the Consent Order, CITI was to cease and desist all unsound practices (**Exhibit 1, p. 1**) and was to implement a mortgage servicing plan that was to "ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) [] ensure continuity in the handling of borrowers' loan files during Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii)[] ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention, where appropriate; and (iv) [] ensure that decisions concerning Loss Mitigation or loan modification continue to be made and communicated in a timely fashion. (**Exhibit 1, p. 19**)

23.     Lisa Markham was not an Assistant Vice President of CR TITLE, CITI, and MERS at the time she executed the recorded documents attached hereto as **Exhibits 2, 3, 4,** and **5**.

24.     Defendant CITI acted contrary to the Consent Order at the time it conducted foreclosure proceedings against Plaintiffs' home and continues to act contrary to the Consent Order.

**Loan Modification Events**

25.     All discussions between Plaintiffs and CITI, and Plaintiffs and VERICREST were initiated by Plaintiffs from their home in Mather, California, or were received by Plaintiffs at their home in Mather California.

26.     Plaintiffs contacted CITI on January 13, 2010, by telephone to inquire about a loan modification.  Plaintiffs spoke with CITI representative Chris Amos ("Amos") who promised to send them a modification application package.

27.     On or about January 15, 2010, Plaintiffs received correspondence from CITI regarding the Home Affordable Modification Program ("HAMP").

28.     On January 22, 2010 Plaintiffs called CITI (877-202-6502) and spoke with Felicia (extension 1803256) regarding the modification packet received on January 15.

29.     On February 9, 2010, Plaintiffs called CITI (877-443-6067) and spoke with Simmon regarding a letter they had received from CITI shortly before that.

30.     Not satisfied with the conversation with Simmon, on February 10, 2010 Plaintiffs called CITI (866-272-4749) and spoke with Robin.

31.     On February 12, 2010, Plaintiffs had gathered the required documents and completed the application form, in accordance with instructions from Amos and they submitted the entire package to CITI.

32.     On February 13, 2010, Plaintiffs found a note on their front door requesting that they call CITI.  They did so and spoke with Norma at (916) 940-5787, explaining that they had just submitted a HAMP loan modification application.

33.     On February 23, 2010, Plaintiffs received two separate and different letters from CITI, both dated February 15, 2010, regarding loan modification.  The letters informed Plaintiffs that they would be starting a HAMP Trial Period Plan (hereinafter referred to as "the First Trial Plan") and demanded submission of documents by March 1, 2010.

34.     On February 24, 2010, Plaintiffs received two more letters from CITI, each dated February 17, 2010.  These letters were identical to the letters dated February 15, and received by Plaintiffs on February 23, 2010.

35.     The 2/15/20 and 2/17/10 letters included an Agreement for the First Trial Plan and notified Plaintiffs that they would be required to make three monthly payments, each in the amount of  $1667 and due on March 1, April 1 and May 1, 2010.  The letters also stated that Plaintiffs could call CITI and get an extension, as they had been given very short notice of the commencement of their trial modification.  A copy of the First Trial Plan Agreement is attached hereto and incorporated herein as **Exhibit 6**.  Plaintiffs did call and were given an extension.

36.     Plaintiffs made their March payment for the First Trial Plan on March 8, 2010, as permitted by the extension they had been granted.  At the same time, Plaintiffs submitted another modification package to CITI, as demanded. Pursuant to the First Trial Plan Agreement, Plaintiffs

and their loan were to be evaluated in good faith and in accordance with HAMP guidelines.

37.    On April 1, 2010, Plaintiffs called CITI to confirm that their modification review was on track, and spoke with Samuel.  Samuel suggested that Plaintiff call back each week for an update on the status of their modification.

38.    On April 5, 2010, Plaintiffs received a delinquency letter, dated April 1, 2010, from CITI.

39.    On April 6, 2010, Plaintiffs made their second trial plan payment under the First Trial Plan (again, pursuant to the extension granted).  Plaintiffs called CITI and spoke with Mohammed about the modification status; they were again told to just call back each week to check on it.

40.    On April 10, 2010, Plaintiffs called CITI (866-524-9911) for status and spoke with Meg Allen (636-261-3044, ext. 1804402).  She had nothing new to tell them.

41.    On April 17, 2010, another note was left on Plaintiffs' door regarding their delinquency.

42.    On April 27, 2010, Plaintiffs received an email from CITI demanding more documents. Plaintiffs called CITI and were on hold, waiting to speak with a customer service representative for 38 minutes.

43.    On May 1, 2010, Plaintiffs called CITI (866-272-4749) for an update and were on hold for 40 minutes, after which the call was cut off without Plaintiffs having been able to speak with anyone.

44.    On May 3, 2010, Plaintiffs called CITI (866-272-4749) and were again left on hold and then cut off.  They called back and were eventually connected with David, who  instructed Plaintiffs that he needed their March and April bank statements as well as a Profit and Loss Statement ("P&L").

45.    On May 10, 2010, Plaintiffs received a letter stating that CITI had received all of the documents that had been requested by CITI in connection with the HAMP application.

46.    On May 13, 2010, Plaintiffs received a letter from CITI dated May 3, 2010, reminding them that their loan was still delinquent.  They called CITI (866-272-4749) and spoke with Steve (#FL06162) about the letter notice.

47.     On May 14, 2010, Plaintiffs called CITI (866-272-4749) to check on the status of their modification.  They were put on hold for ten minutes and then disconnected.  They called back and eventually spoke with Darryl, who stated that there was no progress to report on their final modification.  He also told them to just keep calling back.

48.     On May 17, 2010, another note was left on Plaintiffs' door about their delinquency.

49.     On May 18, 2010, Plaintiffs made the third and final trial plan payment, pursuant the terms of the First Trial Plan, again, filed after the contract date by agreed extension

50.     On May 19, 2010, Plaintiffs called CITI (866-272-4749) and spoke with Matt, who had nothing to report on their modification, but told them to keep checking back.

51.     On May 22, 2010, Plaintiffs received a letter from CITI dated May 17, 2010, reminding them that their loan was still delinquent.

52.     On May 21, 2010, Plaintiffs called CITI (866-272-4749) and spoke with Andrea, who finally told them they could fax their documents, and gave them the fax number to use.

53.     On May 24, 2010, May 28, 2010, and June 4, 2010, Plaintiffs received letters from CITI stating that CITI had received all requested documents from Plaintiffs, but that CITI might need more.

54.     On June 11, 2010, Plaintiffs made a fourth trial payment of $1667, even though Plaintiffs' First Trial Plan was for three months, only, because CITI told them the final modification was not completed.

55.     On June 15, 2010, Plaintiffs contacted CITI (866-524-9911) and spoke with Mike Watson (extension 1804400) to learn the status of their modification.  Plaintiffs were told to submit a new profit and loss statement.  Mr. Watson gave Plaintiffs two weeks to submit the new P&L.

56.     On June 17, 2010, CITI left another note on Plaintiffs' door about their delinquency on their mortgage.

57.     On June 28, 2010, before the deadline set by Mike Watson, Plaintiffs faxed the new P&L to CITI.

58.     On June 30, 2010, Plaintiffs received a telephone call from Lon from CITI's Outreach Center (866-413-4560) telling them the CITI was waiting for them to submit their P&L.  Plaintiffs

informed him that they had sent it by fax on June 28, and after checking their recorded, Lon admitted that the P&L was there and had been received on June 28, 2010.  However, he also informed Plaintiffs that their modification had been cancelled on June 22, 2010.  He verified that CITI's records showed that they had been given two weeks from June 15 to submit the P&L, and that it was received within that time, and further stated that he could not understand or explain why the modification had been cancelled.  Lon advised Plaintiffs to open a Dispute with CITI regarding the cancellation.

59.    On July 5, 2010, Plaintiffs called CITI to open a Dispute regarding cancellation of their modification and were told that they could not file a Dispute, but would have to submit an entirely new application, despite the fact that they had made all payments, including an additional fourth payment, and had submitted all documents requested by CITI, pursuant to the First Trial Plan.

60.    On July 6, 2010, Plaintiffs received an email from CITI asking them to call to discuss their mortgage options.

61.    On July 8, 2010, Plaintiffs received a letter from CITI dated July 1, 2010, stating that their loan was in default.

62.    On July 9, 2010, Plaintiffs called CITI (800-422-1498) and spoke with Suzanne Roman (extension 1800077) regarding submission of a new modification application; she promised to send them a new HAMP package.

63.    On July 14, 2010, Plaintiffs again called CITI (800-422-1498) and spoke with Suzanne Roman (extension 1800077), as they had not received the application package promised during the July 9 conversation with her.

64.    On July 16, 2010, CITI left another note on Plaintiffs' door concerning their loan deficiencies.

65.    On July 16, 2010, Plaintiffs again called CITI (800-422-1498) and spoke with Suzanne Roman (extension 1800077), as they still had not received the modification package, which Ms. Roman had stated was mailed on or about July 14.

66.    On July 21, 2010, Plaintiffs called CITI to discuss their account status.

67.    On July 23, 2010, Plaintiffs received a letter from CITI dated July 16, 2010, demanding

payment of the arrearages on their account.  That same day Plaintiffs called CITI (800-422-1498) and spoke with Kevin Gless (extension 1802692), who could not explain why they had not yet received the new modification package.  After making the phone call, the new modification package arrived.

68.   With no other choice following their July 5, 2010, conversation with CITI'S representative, and after waiting for nearly three weeks for the application package to arrive, Plaintiffs submitted a new HAMP loan modification package on July 28, 2010, including updated versions of all of the documents they had been asked to provide during the previous modification application process.  Plaintiffs later called CITI (800-422-1498) and spoke with Suzanne Roman (extension 1800077), again, and confirmed that the package and all of its contents had arrived at CITI.

69.   On August 5, 2010, Plaintiffs received an email from CITI asking for more documents, and requesting that they call to discuss the application, which they did.

70.   On August 10, 2010, Plaintiffs received a letter from CITI dated July 30, 2010, stating that they were not approved for loan modification [referring to the First Trial Plan].  The reason stated was failure to provide requested documents, which was incorrect, as Plaintiffs timely submitted each and every document requested by CITI, even when the same documents were requested over, and over again.

71.   On August 18, 2010, CITI once again left a note on Plaintiffs' door.  CITI also sent Plaintiffs an email instructing Plaintiffs to call to discuss their account.

72.   On August 19, 2010 Plaintiffs called CITI (800-422-1498) and spoke with Kevin Gless (extension 1802692), who told Plaintiffs that he would be submitting their new modification application to underwriting the following day, August 20.

73.   On August 25, 2010, Plaintiffs received another email from CITI demanding that they call to discuss their account.

74.   On August 27, 2010, Plaintiffs called CITI in response to the email, and then also spoke with Kevin Gless concerning progress on the modification.  There was nothing for him to report.

75.   On September 6, 2010, Plaintiffs called CITI (866-749-0150) for an update on their

modification application and spoke with Mohammed.   There was no news regarding their application.

76.   On September 8, 2010, Plaintiffs received another email from CITI wanting to discuss their loan account.

77.   On September 9, 2010, Plaintiffs called CITI (866-413-4560) and spoke first with Sara Scott and then with Sharon Heally (800-422-1498 ext. 1801374).

78.   On September 9, 2010, Plaintiffs called CITI, again, and spoke with Joseph (866-239-6466) who informed them that CITI had received all of the documents that they needed.

79.   On September 15, 2010, Plaintiffs received another email from CITI wanting to discuss their loan account.  Plaintiffs responded by calling CITI (800-888-6001) and speaking with Ken in Outreach.

80.   Despite Joseph's assurances just one week previously, on September 16, 2010, CITI sent Plaintiffs an email asking for additional documents.  CITI also left another note on Plaintiffs' door that day.

81.   On September 21, 2010, putting the absolute lie to Joseph's statements of September 9, Plaintiffs received a letter from CITI dated September 14, 2010, demanding additional documents, this time asking for paystubs or a benefit letter.  Plaintiffs complied with the demand.

82.   On September 23, 2010, Plaintiffs received a letter dated September 16, 2010, suggesting that Plaintiffs call CITI for help resolving their mortgage issues.  Plaintiffs did call CITI (800-666-6001) for an update, but received no help.  They called again and spoke with Sheila (800-422-1498, ext. 1801357) for an update, but received nothing.  Finally, they called CITI at (816) 413-4560 and were told that no information on their latest application was available, yet.

83.   On September 24, 2010, Plaintiffs received another email from CITI wanting to discuss their account.

84.   On September 30, 2010, Plaintiffs called CITI (800-422-1492) and spoke with Sheila (extension 1801357) for an update, but no information was provided.

85.   On October 1, 2010, Plaintiffs called CITI for an update and were told that their loan modification application was going to be submitted to underwriting between October 4 and

October 7, 2010; Plaintiffs had been told by Kevin Gless on August 19 that he was going to submit the package to underwriting the following day!  For the following 40 days Plaintiffs were led to believe, and did believe that their second modification application package had been submitted to underwriting and was being reviewed.

86.    On October 6, 2010, CITI sent Plaintiffs yet another email stating that Plaintiffs needed to call CITI to discuss their loan account.

87.    On October 13, 2010, Plaintiffs received a letter from CITI stating that in order for CITI to open a file to review a potential modification, Plaintiffs needed to submit financial information, a statement of hardship, verification of income, and all of the other documents and information that Plaintiffs had already submitted multiple times.  Confused and concerned, Plaintiffs called CITI (866-749-0150) and spoke with Crystal, who stated that the letter had been sent to Plaintiffs by mistake.

88.    On October 16, 2010, CITI again left a note on Plaintiffs' door, which prompted them to call for an update on their modification.  No information was available.

89.    On October 22, 2010, Plaintiffs received a letter from CITI listing all the ways the CITI could help them with their mortgage issues.

90.    On October 27, 2010, Plaintiffs called CITI (800-422-1498) to speak with Sheila Cotell (1801357).  She was unavailable, so Plaintiffs left her a voice message.  They did not receive a return call.

91.    On October 28, 2010, Plaintiffs called CITI (866-751-6913) to speak with Annabell Annekigs, an underwriter for CITI.  She was unavailable, so Plaintiffs left her a voice message. They did not receive a return call.

92.    On October 29, 2010, Plaintiffs again called CITI to speak with Annabell Annekigs and again had to leave a message; again, their call was not returned.  Since they were unsuccessful in reaching Annabell Annekigs, Plaintiffs called CITI (800-422-1498), again, to speak with Sheila Cotell (1801357), and were once again unable to reach her and left a message.

93.    On October 29, 2010, Plaintiffs were served with a Notice of Default and Election to Sell Under Deed of Trust (hereinafter referred to as "the NOD").  This was a shock to them, as they

had been keeping up regular conversations with several departments at CITI, including the Collections Department, and were told that foreclosure proceedings would not be pursued while they were in a modification review.   Plaintiffs called CITI (800-422-1498) and were finally able to reach and speak with Sheila Cotell (extension 1801357) who informed Plaintiffs that their HAMP application had been denied because the only income showing in their documentation was CHARLES ALIMENA'S Social Security benefits.

94.    Plaintiffs called Ms. Cotell's attention to the P&L they had submitted on two separate occasions, and were told there was no P&L in the file, and that "it must have gone into the package with the previous modification documents" – despite the fact that the P&L in question was submitted to CITI again after CITI had cancelled the First Trial Plan.

95.    Plaintiffs submitted a P&L with their modification package and were never asked for another one.   Furthermore, no one had bothered to call Plaintiffs to inform them that the modification had been declined.  Ms. Cotell told Plaintiffs that they could not appeal, but could submit a new application.  Plaintiffs were rather distraught and terminated the conversation.

96.    Somewhat recovered from their shock, but no less dismayed, on November 1, 2010, Plaintiffs called CITI (800-422-1498) and once again spoke with Sheila Cotell (extension 1801357) to discuss their loan modification.  Ms. Cotell told Plaintiffs to submit another HAMP application. This time, however, Plaintiffs were allowed to provide CITI with their income information over the telephone.

97.    During the November 1, 2010, telephone conversation, Ms. Cotell told Plaintiffs that they had to reduce their financial obligations to qualify for a loan modification.   After further discussion it was determined that they would have to sell their 2006 Chrysler 300C sedan. However, Ms. Cotell assured them that without that payment obligation, they would qualify for the modification.   She informed Plaintiffs that the modification for which they qualified, based upon the sale of the vehicle, would have a monthly mortgage payment of approximately $1,749.15 including principal, interest taxes and insurance ("PITI") and an annual interest rate of 2%.

98.    In reliance on Ms. Cotell's representation that they would qualify and be given a permanent modification if they divested themselves of their financial obligation with regard to the

Chrysler, Plaintiffs sold the vehicle, receiving far less than its Blue Book value due to the need for a very quick sale to qualify for the modification.

99.   Before terminating the telephone conversation, Ms. Cotell told Plaintiffs that a new modification package would be sent to them, and should take approximately two-and-a-half weeks to arrive.  She said they should call her if the package had not arrived by November 15, 2010.

100.  On November 2, 2010, Plaintiffs were able to log onto CITI'S website to review their account information.  The modification program shown on CITI'S website stated they were to receive a modification with the following terms: 5/1 Adjustable Rate Mortgage ("ARM") amortized over 40 years with a starting interest rate of 2.00% per annum and a reduction in the principal balance from $402,998.96 to $375,764.09.  The total monthly payment for PITI was to be $1,749.15.

101.  When the modification package had not arrived by November 14, 2010, Plaintiffs called CITI (800-422-1498) and was transferred to Sheila Cotell's department.  After five minutes on h old the call was disconnected.  Plaintiffs called back and spoke with Bryan (ID #BW72080, extension 1801357 (extension 1801357), who informed them that the modification package could take two to three weeks to arrive.  Since that was longer than Sheila Cotell had originally stated, Plaintiffs continued to try to reach her, leaving her three messages that day, informing her that neither the modification package nor the decline letter for our previous application had arrived.

102.  On November 16, 2011, Plaintiffs placed four calls throughout the day to Ms. Cotell and left four voicemail messages, none of which was answered.  On the next call Plaintiffs were connected with Bernetta, who informed them that the modification package had never been sent. She did, however, inform Plaintiffs of the information and documents they needed to submit and also told them that they could fax everything to CITI.  No one from CITI had ever bothered to inform Plaintiffs that they could submit the initial application package so easily, without waiting. That same afternoon Plaintiffs sent to CITI by facsimile transmission every piece of information and every document that Bernetta had told them were needed for them to submit their third application for a HAMP modification.

103.  Also on November 16, 2010, Plaintiffs received a letter from CITI stating that CITI

1   would not authorize any third party to discuss our account on Plaintiffs' behalf.

2   104.   On November 19, 2010, Plaintiffs checked online and found a Document Summary

3   posted on their account.  Plaintiffs sent to CITI by fax every single document listed on the their

4   account's Document Summary, and then called CITI and spoke with Derrick in Customer Service,

5   who confirmed that CITI had received all of the documents.  Plaintiffs also received a fax from

6   CITI stating that the correspondence was received.  CITI did not, however, ever update Plaintiffs'

7   account to show that any of the documents was received.  CITI'S failure to reflect its receipt of any

8   of those documents on Plaintiffs' account was discussed repeatedly with CITI, both via telephone

9   and through online messaging, with CITI reassuring Plaintiffs each time that the account would be

10   updated to show receipt of the documents; to this day their account does not show that CITI every

11   received those documents.

12   105.   On November 22, 2010, Plaintiffs received another letter from CITI marketing different

13   house options allegedly offered by CITI.

14   106.   On November 23, 2010, Plaintiff CHERYL ALIMENA had another "live chat" over

15   the internet with CITI, "speaking" with Jennifer.  Jennifer confirmed that Plaintiffs had been

16   prequalified for a HAMP modification over the telephone during their conversation with Sheila

17   Cotell on November 1, 2010.  Jennifer also verified that Plaintiffs' financial information and

18   documents had been received by CITI.

19   107.   On November 26, 2010, Plaintiffs received yet another marketing letter presenting

20   housing options.

21   108.   On November 29, 2010, Plaintiffs called CITI and spoke with Nicholaus who stated

22   that their file was being handled by Jennifer in Fulfillment and should be submitted to underwriting

23   within two weeks.  When asked, Nicholaus told Plaintiffs that their second modification application

24   was denied on the basis of insufficient income; the only evidence of income CITI had in their file

25   was CHARLES ALIMENA'S Social Security awards letter.  This information matched what

26   Plaintiffs had been told by Sheila Cotell in October.

27   109.   At Nicholaus' request, following their telephone conversation, Plaintiffs faxed to CITI

28   an updated P&L, updated social security award/benefits letter, and a statement regarding the sale of

the Chrysler.

110.   On November 30, 2010, CITI informed Plaintiffs that they had to complete a new modification application and provide yet more documents.

111.   On December 4, 2010, Plaintiffs called (877) 576-0472 about the documents they had faxed to CITI on November 29, and spoke with Tim, who was an employee of CR Title.  Tim told Plaintiffs to call Terri at (866) 713-4784.  They did so, and Terri confirmed that she had received the documents.

112.   On December 6, 2010 Plaintiffs had an online conversation with Crystal at CITI Customer Service regarding the status of their modification.  It was still under review.

113.   On December 17, 2010, CITI left another note on Plaintiffs' door about their loan.

114.   On December 20, 2010, Plaintiffs received yet another marketing letter presenting housing options.

115.   On December 20, 2010, Plaintiffs had an online conversation with Mecca at CITI Customer Service regarding the status of their modification.  It was still under review.

116.   On December 27, 2010, Plaintiffs had an online conversation with Derick at CITI Customer Service regarding the status of their modification.  It was still under review.

117.   On January 5, 2011, Plaintiffs called CITI (866-272-4749); they were told to call Andre at (800) 422-1498.  Plaintiffs asked what Customer Service or Loss Mitigation representative was assigned to their loan, and were given the name of "Sammy."

118.   On January 10, 2011, Plaintiffs called CITI (866-751-6913) and spoke with Sammy (extension 20305), who asked them to fax him their tax returns (again), their personal and business bank statements (again) and a rental agreement (again).  The following day Plaintiffs spoke with Sammy again and confirmed that all of those documents were received by CITI.  He informed them that he was submitting their application package to underwriting and expected to have an answer within seven days.

119.   On January 11, 2011, Plaintiffs called CITI and left a message for Sammy asking for an update.  The same day Plaintiffs submitted to CITI proof that the Chrysler had been sold.

120.   On January 14, 2011, Plaintiffs called CITI to speak with Andre, but had to leave a

message.  Later they called and spoke with both Jerad and Fred (866-940-5787) and were informed by both that their file had finally been submitted to underwriting.  Plaintiffs reminded Andre that a Trustee's Sale was scheduled for February 10, 2011, and that time was of the essence.

121.   On January 18, 2011, CITI left another note on Plaintiffs' door about their loan.

122.   On January 20, 2011, Plaintiffs received yet another of CITI's endless stream of marketing letters presenting housing options.  That morning they also received a phone call from Sammy, who requested more documents, including a new Hardship Letter, an updated P&L, and bank statements for the previous three months.

123.   At approximately noon on January 20, 2011, a Notice of Trustee's Sale (hereinafter referred to as "the NTS") was posted on Plaintiffs' front door.  Plaintiffs immediately called CITI and spoke with Doris (ID #31922), who told them there was nothing she could do about the Notice or the trustee's sale, itself.  Plaintiffs were able to reach Sammy a short time later, and he agreed to send instructions to the trustee to continue the sale date for 30 days so that the modification could be completed.  He sent those instructions to CR Title that afternoon.

124.   Relieved for the reprieve, on January 21, 2011, Plaintiffs logged onto the CITI website to look at the status of their loan modification and account.  CITI had posted the following on Plaintiffs' account: "Your request for lower mortgage payments is approved.  Expect your mortgage solution package within the next 5-7 business days."  (**Exhibit 7**, copy of Plaintiffs' account from CITI website).  The website stated with particularity the material terms of the HAMP modification.

125.   On January 24, 2011, Plaintiffs received an email from CITI stating: "**Status as of 01/21/2011.  Your mortgage assistance request has been approved**.  Expect your mortgage solution package within the next 5-7 business days."

126.   On January 25, 2011, Plaintiffs called CITI and left two messages for Sammy asking whether approval of the loan modification would stop the February 10, 2011 trustee's sale.

127.   On January 30, 2011, Plaintiffs left another message for Sammy asking whether the trustee's sale was cancelled as a result of the modification approval.  Plaintiffs then called CITI and informed Dee that they had not yet received the modification package.  Dee assured Plaintiffs that

they should receive the package by the end of the week.  She also informed Plaintiffs that the first payment under the new modification was due on March 1, 2011, and that the sale date had, indeed, been cancelled.

128.   On January 31, 2011, Plaintiffs' euphoria was destroyed when they opened their mail to find a letter from CITI dated January 24, 2011, stating that their application for a HAMP modification was declined.  Totally confused and dispirited, Plaintiffs called CITI, only to be told "not to worry about it.  It must have been sent by mistake, as you are definitely approved and your package is being sent to you."  Since Plaintiffs never received a written notice that their second modification application was declined in October of 2010, it is probable that the January 24, 2011, letter was a product of CITI'S utter lack of attention to communication of important details to customers.

129.   By February 3, 2011, Plaintiffs still had not received the modification package and called Sammy at CITI to inform him and inquire about the delay.  He suggested they should receive it by February 10.

130.   On February 7, 2011, Plaintiffs finally received a letter from CITI dated February 2, 2011, which stated: "Congratulations! You are approved to enter into a trial plan under the Home Affordable Modification Program."  The terms of this second plan were that Plaintiffs were to make three trial payments of $1,687.60,  one  on March 1, 2011, the second on April 1, 2011, and the final payment on May 1, 2011.  Plaintiffs were told: "**If you make your new payments timely, we will not conduct a foreclosure sale.**" "Once you make all of your trial payments on time, we will send you a modification agreement detailing the terms of the modified loan."  "**The terms of your trial period plan below are effective on the day you make your first trial period payment, providing you have paid it on or before 3/1/11.**" The correspondence and terms of the HAMP modification Trial Plan ("the Second Trial Plan") are attached hereto as **Exhibit 8**.

131.   On February 7, 2011, Plaintiffs logged on to CITI's website and accessed their posted account information to see the details of the modification.  The terms were 5/1 ARM (interest only for the first five years); loan term 40 years; beginning interest rate of 2.00% per annum; loan principal balance reduced to $344,260.81; monthly payment of $1687.60, including an amount of

$645.09 to be placed in an escrow account for payment of property taxes and insurance.

132.   Plaintiffs' loan representative, Sammy, told Plaintiffs on February 7, 2011 that they had been approved for a permanent modification, that they need not submit any more paperwork, and that they would be sent final papers once they made their three trial plan payments. Elated, Plaintiffs felt at that moment that the trauma and stress of the previous twelve months were almost worth enduring, since they finally had reached their goal.

133.   On February 19, 2011, Plaintiffs received a letter from CITI reminding them to make their first payment pursuant to the Second Trial Plan.

134.   On February 24, 2011, Plaintiffs spoke with Angela at CITI who said that the trustee's sale of their home had been postponed and that Plaintiffs had been approved for a modification, which was information they had already received.

135.   On March 2, 2011, Plaintiffs contacted Cheryl at CITI to confirm that CITI had received the first payment pursuant to the Second Trial Plan and that there would be no foreclosure sale of their home.  Plaintiffs were informed that their loan servicing had been transferred to VERICREST.

136.   On March 9, 2011, Plaintiffs contacted VERICREST, CITI, and CR TITLE to inform them of the modification that had been approved of CITI's promise not to foreclose on the Subject Property, and to obtain assurances that the foreclosure would not take place.

137.   On March 9, 2011, Plaintiffs spoke with James, I.D. No. 5931, who stated that the modification was still in "good status" and that the trustee's sale had been canceled.

138.   Plaintiffs wished to confirm that the trustee's sale had been postponed.  On March 10, 2011 Plaintiffs spoke with Mark, I.D. No. 34904, at CITI who said that the investor in their home loan was LONE STAR and that VERICREST was the servicer.

139.   On March 10, 2011, Plaintiffs contacted CR TITLE and spoke with Kristen.  Kristen informed Plaintiffs that the trustee's sale had been postponed to April 11, 2011.

140.   On March 16, 2011, Plaintiffs received a notice from VERICREST stating that TRUST was now the owner of their note and that VERICREST was the servicer.  Plaintiffs contacted VERICREST to confirm that their modification was still in place.  Plaintiffs spoke with Charles

Thompson in the Acquired Loan Department.  Charles informed Plaintiffs that CITI had reported to VERICREST that he HAMP modification had been canceled because Plaintiffs had defaulted.

141.   On March 21, 2011, Plaintiffs spoke with Alex, I.D. No. AC99566, in VERICREST's Loss Mitigation Department.   Plaintiffs were informed by Alex that, despite the written confirmation of a HAMP modification, that they had been offered by CITI a "traditional" modification through CITI itself.

142.   On March 25, 2011, Plaintiffs again spoke with Charles at VERICREST.   Charles informed Plaintiffs that their account should have been noted as a HAMP modification.   Charles provided Plaintiffs with an address to overnight their next trial plan payment.

143.   Plaintiffs timely made their second payment pursuant to the Second Trial Plan.

144.   On March 28, 2011, Plaintiffs contacted VERICREST for an update, to ensure that the status of the Second Trial Plan was confirmed.  Plaintiffs spoke with Mary O'Campo who reported that Plaintiffs did not qualify for HAMP and stated that VERICREST was not bound by the terms and conditions of CITI's in-house modification.

145.   On March 30, 2011, Plaintiffs contacted CITI and spoke with Robert, I.D. No. RM47753 to inquire about their loan origination and investor.  **Plaintiffs were informed that LONE STAR had acquired their note in July 2005.**

146.   On April 4, 2011, Plaintiffs received their Second Trial Plan  payment which was returned to them by mail.   VERICREST stated that the payment was refused because of "Insufficient funds to cure default."

147.   On April 5, 2011, Plaintiffs contacted VERICREST and spoke to Karen, I.D. No. 5854, of the foreclosure department. Karen told Plaintiffs that they would have to apply for a loan modification again.

148.   On April 8, 2011, Plaintiffs filed for bankruptcy protection under Chapter 13.

149.   On April 14, 2011, Plaintiffs contacted VERICREST.  Nancy in VERICREST's REO department told Plaintiffs that "VERICREST" had purchased the Subject Property, Plaintiffs' home, on April 11, 2011, at auction.  Plaintiffs explained to VERICREST that they had filed for bankruptcy protection on April 8, 2011.

150.   Plaintiffs found a sign on their door on April 15, 2011 that stated: "This Property Has Gone Through Foreclosure And Is Now Owned By The Mortgage Holder."   Upset and embarrassed, Plaintiffs contacted VERICREST and spoke with Claudette.   Plaintiffs again told VERICREST about the bankruptcy petition and demanded that all notices and eviction proceedings be stopped.

151.   On April 18, 2011, VERICREST violated that automatic stay of the bankruptcy court by serving Plaintiffs with a three-day notice to quit the premises.

152.   On May 8, 2011, after Plaintiffs informed VERICREST of the Bankruptcy, the "sale" of the Subject Property was posted on page D5 of the Sacramento Bee newspaper. Plaintiffs were embarrassed because their neighbors began questioning them about the foreclosure sale of their home after reading about it in the newspaper.

153.   Defendant LONE STAR has been the sole investor and true beneficiary of Plaintiffs' deed of trust since July 2005.  Defendants LONE STAR and TRUST are responsible for the actions of the servicer of the Loan, including CITI and VERICREST.

154.   The so-called transfer of the servicing of Plaintiffs' loan never occurred.  LONE STAR owns TRUST, CITI and VERICREST.  The so-called transfer of the servicing of the Subject Loan was for the sole purpose of denying Plaintiffs the HAMP modifications pursuant to the First Trial Plan and Second Trial Plan.  Plaintiffs qualified for one or both of the Trial Plans at the time each Trial Plan was initiated.

155.   Further, as a servicer of the Subject Loan, VERICREST could not reject or refuse to comply with or be bound by the Second Trial Pan, which LONE STAR/TRUST approved, when CITI was the servicer of the Subject Loan.

**Plaintiffs' Detrimental Reliance**

156.   CITI represented to Plaintiffs that it was the servicer of the Subject Loan, the agent of the investor in the Subject Loan, and that it had the authority to convey the offer regarding a loan modification.

157.   Plaintiffs justifiably relied on the representations of CITI because CITI was the servicer of the Subject Loan.

158.   Plaintiffs were told by Sheila Cotell of CITI on or about November 1, 2010 that they needed to sell their 2006 Chrysler 300C in order to qualify for a HAMP modification.  Plaintiffs were told by CITI that they had to reduce their liabilities by selling  the vehicle and that they would qualify for and obtain the HAMP modification if they did so.

159.   In reliance on CITI's representations that they would obtain a HAMP modification if they sold their vehicle, Plaintiffs sold the Chrysler in or about December or 2010. Because Plaintiffs needed to sell the vehicle quickly, Plaintiffs were unable to obtain the full Blue Book value of the vehicle and took a loss of between $5,000 and $10,000 as a result of the quick sale.

160.   Plaintiffs were told that they would be considered in good faith for a HAMP modification if they made three monthly payments as stated in **Exhibit 8**.  Plaintiffs were told that they qualified for a HAMP modification, that they would receive a permanent modification, that the Second HAMP modification had been approved by the investor, and that all they had to do to receive the permanent modification was to make their three monthly payments of $1,687.60, each.

161.   Because Plaintiffs relied on CITI'S representations that they would receive a permanent HAMP modification in accordance with the First Trial Plan and Second Trial Plan, Plaintiffs did not take other actions that they would otherwise have taken to save their home from foreclosure but for CITI'S promises.  Such action included selling their vehicle quickly and incurring a loss thereon, and not filing for bankruptcy protection at a time and in a manner when they would have been able to retain their home without the onus of an unmanageable Chapter 13 repayment plan.

162.   Had Plaintiffs not relied on CITI'S representations, Plaintiffs would have been able to retain their home by discharging their unsecured debt and obtaining protection through a confirmed Chapter 13 bankruptcy plan.

## FIRST CAUSE OF ACTION

### Deceit
### (As Against CITIMORTGAGE, LONE STAR and VERICREST, Separately, According to the Counts Specified Below.)

163.   Plaintiffs incorporate by reference the allegations, statements and facts set forth above and below as though set forth herein.

164.  California Civil Code §1709 provides that: one who willfully deceives another with intent to induce them to alter their position to their injury or risk, is liable for any damages that they thereby suffer.

165.  Deceit within the meaning of California Civil Code §1709 can take any of these forms (California Civil Code §1710): (a) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true, commonly referred to as intentional misrepresentation; (b) The assertion, as a fact, of that which is not true, by one who has no reasonable grounds for believing it to be true, commonly referred to as negligent misrepresentation; (c) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact commonly referred to as concealment; or (d) A promise, made without any intention of performing it, commonly referred to as a false promise.

166.  The elements for a cause of action for fraud and deceit based on concealment are: (1) defendant concealed or suppressed a material fact, (2) the defendant had a duty to disclose the fact to the plaintiff, (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of that fact and would not have acted as he did had he known that fact, and (5) plaintiff sustained damage(s) as a result of the concealment or suppression of that fact.  *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.

167.  The elements for a cause of action for intentional misrepresentation are a false representation of a material fact, knowledge of its falsity by the party making the misrepresentation, intent to induce reliance on that misrepresentation, reasonable reliance, injury to plaintiff(s) caused by their reliance on the misrepresented fact(s).  *Wilhelm v. Pray, Price, William & Russell* (1986) 186 Cal. App. 3d. 1324, 1331.

**Count One – Intentional Misrepresentation and Deceit -- (As Against CITI)**

168.  Between January 13, 2010, when Plaintiffs first contacted CITI about a possible loan modification, speaking with Chris Amos, and February 12, 2010, when Plaintiffs submitted their first HAMP modification application package to CITI, Plaintiffs made numerous calls to CITI to

obtain information about the program, asking questions about different aspects and clarifying their understanding of the requirements.  During these conversations they were led to believe that they should qualify for a modification, but were advised that they needed to submit the application and required documents before a decision could be made.

169.   By February 12, 2010, Plaintiffs had gathered all of the documents the CITI stated in the packet sent to Plaintiffs were needed to submit the application.  The application itself was completed and Plaintiffs submitted the entire package to CITI for loan modification consideration.

170.   Within three days of submitting their application, Plaintiffs were approved for a trial modification and entered into the First Trial Plan with CITI by both oral and a written agreement. Plaintiffs were given an extension of the due dates on the trial payments because they were given such short notice of the commencement of the First Trial Plan, and about two weeks later they made their first of three required payments under the First Trial Plan while simultaneously submitting the signed Home Affordable Trial Period Plan Agreement (hereinafter referred to as "the First Agreement").  In relevant part, the First Agreement states as follows:

> If I am in compliance with this Trial Period Plan ("the Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property and (2) the Note secured by the Mortgage.
>
> 1. **My Representations.**  I certify, represent to Lender and agree:
>     A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;
>     B.  I live in the Property as my principal residence, and the Property has not been condemned;
>     C.  There has been no change in the ownership of the Property since I signed the Loan Documents;
>     D. I am providing or already have provided documentation for all income that I receive…
>     E.  . . .
>     F.  If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender

determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct at any time during the Trial Period; or (iv) I do not provide all information and documentation required by the Lender, the Loan Documents will not be modified and this Plan will terminate. …

G.   I understand that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. . . .

. . .

171.   Between the date of submission of their modification application package and June 29, 2010, Plaintiffs complied with every request made by CITI's loan modification department, providing information on the telephone when requested, submitting multiple copies of the same documents despite the frustration of having to send the same things over and over.  They made their Trial Payments timely, and made a fourth trial payment that was not required under the First Trial Plan, because CITI demanded a P&L at the last moment, which pushed the trial period beyond the promised three months.

172.   During this time period Plaintiffs made dozens of telephone calls to CITI, mostly concerning the status of the modification.  Nearly every time they called they had to speak with a different representative, and had to go through the same explanation, as though CITI'S files did not contain any records of previous conversations.  With each unsuccessful attempt to learn the status of their modification, Plaintiffs were assured that everything would be fine, so long as Plaintiffs made their trial payments timely and submitted all of the information and documents requested by CITI.  The dates of these communications and the names of persons with whom Plaintiffs spoke are set forth in Paragraphs  26-59, above.

173.   When Plaintiffs spoke with Mike Watson on June 15, 2010, and were told that CITI needed a new, updated P&L, Mr. Watson also told them that they would have until June 29, 2010 to submit that document.  [See ¶¶ 56 and 58, above.]  Plaintiffs had to gather their income and expense information for the period requested and prepare the new P&L, but they were able to comply with the demand, and submitted the P&L one day before the deadline.

174.   Without waiting for the deadline to pass, CITI cancelled the First Trial Plan and

rejected Plaintiffs' modification application without basis.  Lon of CITI's Outreach Center called Plaintiffs on June 30, 2010, and after learning that he was incorrect about their "missing" P&L [and confirming that in CITI'S own files] Lon told Plaintiffs that they had provided all information and documents required, and that he could see no reason for the First Trial Plan to have been cancelled; it should have been finalized.  He suggested that Plaintiffs appeal the cancellation by filing a Dispute, but when Plaintiffs tried to do so, their request was flatly denied, and their only option was to file a new modification application and start the process over again.

175.   Before Plaintiffs submitted their first HAMP modification package, they were told by the CITI representatives with whom they spoke [¶¶26-30, above] that if they submitted the application and the required documents, CITI would honestly consider the application.  After the package was submitted, they were repeatedly reassured that CITI was working on their modification and that compliance with the First Trial Plan assured them of a permanent modification, as stated in the written Agreement [¶¶ 32-58, above].

176.   The oral representations made by the CITI representatives with whom Plaintiffs spoke were supported by the written Agreement, itself, which says virtually the same thing; if they complied with the terms of the "Plan", CITI would give them a permanent modification.  [The relevant portions of the Agreement are set forth above, and the entire Agreement is **Exhibit 6** attached hereto.]

177.   Plaintiffs are informed and believe and thereon allege that CITI intended that Plaintiffs rely on their representations, as Plaintiffs were barraged with correspondence stating that CITI wanted to help them solve their mortgage issues, and most of the correspondence encouraged Plaintiffs to apply for a loan modification.

178.   In addition, CITI approved the Trial Period Plan, and made repeated representations both in the Agreement and through its employees that a permanent modification would be the end result if Plaintiffs simply followed the requirements of the Agreement.  While the Agreement states that the Trial Period Plan is not, of itself, a modification of the Subject Loan, the Agreement is written in such a way that persons such as Plaintiffs, who do not have vast experience with mortgages or mortgage contracts, and have no previous experience with loan modification, would

interpret the Agreement as a guarantee of a permanent modification if they 1) made the required trial payments timely;  2) submitted all documents and provided all information requested by CITI; and 3) remained in the same position with regard to the representations set forth in the document and made effective upon execution by the borrowers.

179.   Plaintiffs are informed and believe and thereon allege that everything during the modification process, from the written correspondence and oral communications by CITI employees to the written Agreement was specifically designed and calculated to induce Plaintiffs to rely on the representations and believe they would be given a permanent modification.

180.   Plaintiffs are informed and believe and thereon allege that all of the policies and procedures followed by CITI regarding loan modification were established and directed by LONE STAR, both as the parent company and as the investor holding ownership of the Note and Deed of Trust.

181.   The scheme created by LONE STAR and effectuated by CITI was successful; Plaintiffs *did* rely on the oral and written representations, and every day clung to the belief that after making their three trial payments and submitting financial and other documents by the ream, CITI would provide them with the written permanent modification promised.  For five months Plaintiffs danced to the tune and tempo set by CITI.  They were told to check on the status every week, and they checked in at least that often.  They were told to provide financial documents, applications, and numerous other documents, to none of which was CITI otherwise entitled, and each time they stopped what they were doing, chased down or configured the documentation, as appropriate in each instance.  They spent endless hours on the telephone on hold for a Customer Service representative – *any* customer service representative -- in the modification department, only to be disconnected or to finally make contact and learn that there was no news, but that they should not worry; "just call back in a week".

182.   Between early February of 2010 and June 29 of 2010, CITI and its employees acting on its behalf specifically represented that 1) CITI would honestly (i.e., "in good faith") review the HAMP modification application submitted by Plaintiffs; 2) CITI would give Plaintiffs a permanent modification on the same or very similar terms as the First Trial Plan so long as Plaintiffs made the

three Trial Payments timely and submitted the information and documentation requested by CITI during the Trial Period; and 3) there were no other requirements that Plaintiffs were required to meet or obligations that they were required to perform.  These representations were made in writing in **Exhibit 6,** and orally on the dates and by the persons as set forth in Paragraphs 26-57, above; these representations were false.

183.   The truth was that CITI would not and did not honestly or in good faith review or consider Plaintiffs application for loan modification.  Although CITI put Plaintiffs into a trial plan, Plaintiffs are informed and believe and thereon allege that CITI never had any intention of performing its obligation to provide the permanent modification to which Plaintiffs were entitled by virtue of their performance and satisfaction of all terms and conditions of the Trial Plan.  This is evidenced by CITI'S cancellation of the Trial Plan despite Plaintiffs' completion and satisfaction of all of the terms and conditions, thereunder.  The truth was that CITI would manufacture additional requirements are the process went on in order to prevent Plaintiffs from satisfying the terms of the Trial Plan.

184.   Plaintiffs' reliance on the representations of CITI and its employees was foreseeable and justified.  CITI was the servicer of the Subject Loan and made it clear through its numerous written correspondence that it had the ability and authority to approve loan modifications with borrowers such as Plaintiffs.  Even while the First Trial Plan was in process, Plaintiffs continued to receive notices from CITI offering mortgage solutions, including loan modifications.

185.   Plaintiffs originally became delinquent on their mortgage payments shortly before seeking the loan modification as a result of the termination of a contract that produced the majority of their self-employment income.  During the months that they were spending dozens of hours on the telephone trying to make progress with their loan modification, they could have been spending those same hours obtaining new contracts to replace their lost income.

186.   As a direct and proximate result of their justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs lost income due to the hours they were required to spend satisfying CITI'S demands.  Had Plaintiffs known that CITI'S representations were false and that CITI would refuse to perform under the Agreement, Plaintiffs would not have

bothered submitting the HAMP application or any of the documents they provided to CITI.  Nor would Plaintiffs have given CITI any of the private financial documents or information to which CITI was not entitled.  Instead, Plaintiffs would have had those dozens and dozens of wasted hours available for them to secure the self-employment contracts that they ultimately acquired, and which replaced the income lost when their previous self-employment contract was not renewed.

187.   As a direct and proximate result of Plaintiffs' justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs fell further behind on their mortgage payments as they made the Trial Payments under the First Trial Plan, and were unable to cure the arrearages when CITI refused to honor its commitment to give Plaintiffs a permanent modification because they had not been able to spend sufficient time securing their new self-employment contracts and were without substantial income longer than they would otherwise have been.

188.   As a direct and proximate result of Plaintiff's justifiable reliance on these false representations made CITI and its employees, Plaintiffs have sustained damages in amount according to proof at the time of trial, including, but not limited to, costs of preparing and copying hundreds of pages of documents that were demanded by CITI, the costs of faxing and mailing documents to CITI, the expenditure of dozens and dozens of hours of time gathering and preparing those documents and calling CITI to check on the status of their modification, which resulted in further loss of income to Plaintiffs, the increase in loan arrearages, fees and penalties assessed against the Subject Loan by CITI when it failed honor its obligation to provide the permanent modification, the increase in loan arrearages, fees and penalties when trial payments were not applied against the amounts owing on the Subject Loan, destruction of Plaintiffs' credit, and other damages to be proven at trial.

189.   CITI'S aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to CITI and its employees with the intention on the part of CITI and its employees of thereby depriving Plaintiffs of property and/or legal rights or otherwise causing injury to Plaintiffs.  CITI acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of the CITI,

knowing CITI'S conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of CITI and to prevent the repetition of such conduct in the future.

WHEREFORE, Plaintiffs pray for judgment against CITI as hereinafter set forth.

**Count Two – Intentional Misrepresentation and Deceit – (As Against CITI)**

190.   After CITI wrongly cancelled the First Trial Plan, Plaintiffs had no viable choice but to submit another modification application.  On July 9, 2010, Plaintiffs spoke with CITI employee Suzanne Roman and started the process of submitting their second loan modification application. [See ¶63, above.]  Ms. Roman promised that she would immediately send them a modification package, but it was more than two weeks before Plaintiffs received the package.

191.   Once again, Plaintiffs gathered information and personal financial documents, updated information where necessary, and completed a new HAMP modification application, submitting the entire package to CITI on July 28, 2010.  Plaintiffs confirmed the CITI received the package and all of its contents.  [See ¶69, above.]

192.   Although Plaintiffs had submitted updated versions of all of the information and documentation that had been requested during the five months of the processing of the First Trial Plan, within days of receipt of Plaintiffs' new modification application, CITI requested additional documents.

193.   Between July 28, 2010, and September 9, 2010, Plaintiffs regularly called CITI to check on the status of their application, and each time were told that the application was being processed or was under review, except on August 19, when Kevin Gless told Plaintiffs that he would be submitting the modification application package to the underwriters the following day.

194.   During those six weeks, CITI asked for additional documents, and Plaintiffs immediately complied with CITI'S request each time.  [See ¶¶ 69-79, above.]  On September 9, 2010, Joseph informed Plaintiffs that CITI had receive all of the documents it needed. [¶ 79.] However, less than a week later Plaintiffs received yet another demand for additional documents from CITI.  And yet again, Plaintiffs immediately provided the documentation requested.

195.   On October 1, 2010, Plaintiffs learned that Kevin Gless had lied to them on August 19;

their application package was not submitted to underwriting on August 20, 2010, as he had represented, but was yet to be submitted. During those 40 days that Plaintiffs believed their application was in final review by CITI'S underwriters, they called and spoke with numerous CITI employees requesting the status of their modification, and even asking if the package was out of underwriting yet. In none of those conversations did any CITI representative correct them about the status of the application. In each instance they were told that the application was "still under review", or that it was "still being processed," or some other placating phrase was used which gave Plaintiffs no information, but kept them believing that their application was being given serious consideration by the underwriting department.

196.   Plaintiffs are informed and believe and thereon allege that their second loan modification application was never submitted to the underwriting department for review.

197.   While Plaintiffs were tirelessly pursuing approval of their second modification application, they continued to receive correspondence from CITI offering help with their mortgage issues and suggesting that Plaintiffs submit an application for a loan modification. While Plaintiffs understood these were form letters, they found the marketing letters insulting, as they demonstrated just how little regard CITI held for its borrowers as individuals; it did not even bother to withhold the bombardment of marketing materials from borrowers who were already trying very hard to obtain the assistance all of those marketing letters promised were so readily available.

198.   Despite the fact that Plaintiffs spoke with a loss mitigation representative at CITI more than once a week between July 28, the day they submitted their second modification application, and October 29, 2010, each time asking about the status of the modification, not once during that time did anyone from CITI inform Plaintiffs that CITI did not have their P&L in the second modification file. Not once during that time did anyone attempt to inform Plaintiffs that they needed to submit a new P&L in order for their application to be processed.

199.   During that time, Plaintiffs made numerous calls to CITI during which they were unable to speak with anyone about the modification, and their voice messages requesting a return call were never acknowledged. Had Plaintiffs not been served with the Notice of Default on October 29, 2010, they might never have learned that their second modification application had

been denied, or that the reason for the denial was their failure to submit a document that that they had, indeed submitted, and that they had not been told was missing from their file.

200.    Between late July of 2010 and October 29, 2010, CITI and its employees, acting on its behalf, specifically represented that 1) CITI would honestly (i.e., "in good faith") review Plaintiffs' second HAMP modification application; 2) the complete application package had been submitted to the underwriters for final review and approval; and 3) the application was under review.   On October 29, 2010, CITI represented that it did not have the P&L submitted by Plaintiffs.   These representations were made orally on the dates and by the persons as set forth in Paragraphs 63-96, above; these representations were false.

201.    Plaintiffs are informed and believe and thereon allege that the truth was that CITI never intended to review Plaintiffs' second modification application, honestly or otherwise, and that CITI did not review the application honestly or in good faith. Plaintiffs are informed and believe and thereon allege that the truth was that Plaintiffs' second modification package was never submitted to underwriting for final review and approval.

202.    Plaintiffs' reliance on the representations of CITI and its employees was foreseeable and justified.   CITI was the servicer of the Subject Loan and made it clear through its numerous written correspondences that it had the ability and authority to approve loan modifications with borrowers such as Plaintiffs.   While their second modification application was in process, Plaintiffs continued to receive notices from CITI offering mortgage solutions, including loan modifications. Furthermore, Plaintiffs had received the previous trial modification, and only through what they believed at the time was a major clerical error was the First Trial Plan cancelled.   They had no reason to believe that CITI was not going to be more careful and more forthcoming with the second application.

203.    As a direct and proximate result of their justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs lost income due to the hours they were required to spend satisfying CITI'S demands.   Had Plaintiffs known that CITI'S representations were false and that CITI would not honestly review their second modification application, Plaintiffs would not have bothered submitting the that  application or any of the documents they provided to

CITI.  Nor would Plaintiffs have given CITI any of the private financial documents or information to which CITI was not entitled.  Instead, Plaintiffs would have had those dozens and dozens of wasted hours available for them to work on their new self-employment contracts to rebuild their income.

204.   As a direct and proximate result of Plaintiffs' justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs fell further behind on their mortgage payments, and were unable to cure the arrearages that had grown while they awaited the outcome of CITI'S alleged modification application review.

205.   As a direct and proximate result of Plaintiff's justifiable reliance on these false representations made CITI and its employees, Plaintiffs have sustained damages in amount according to proof at the time of trial, including, but not limited to, costs of preparing and copying hundreds of pages of documents that were demanded by CITI, the costs of faxing and mailing documents to CITI, the expenditure of dozens and dozens of hours of time gathering and preparing those documents and calling CITI to check on the status of their modification, which resulted in further loss of income to Plaintiffs, the increase in loan arrearages, fees and penalties assessed against the Subject Loan by CITI while it failed to honestly review the application, destruction of Plaintiffs' credit, and other damages to be proven at trial.

206.   CITI'S aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to CITI and its employees with the intention on the part of CITI and its employees of thereby depriving Plaintiffs of property and/or legal rights or otherwise causing injury to Plaintiffs.  CITI acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of the CITI, knowing CITI'S conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of CITI and to prevent the repetition of such conduct in the future.

WHEREFORE, Plaintiffs pray for judgment against CITI as hereinafter set forth.

/ / /

**Count Three – Intentional Misrepresentation and Deceit – (As Against CITI)**

207.   In or about November  of 2010, CITI represented to Plaintiffs orally that they would qualify for a HAMP loan modification so long as they sold their Chrysler, thus eliminating that financial obligation.   This representation was made by Sheila Cotell a representative of CITI.  [See ¶¶ 96-97.]

208.   On January 21, 2011, January 24, 2011, and February 2, 2011, CITI represented to Plaintiffs in writing that they had been approved for a permanent HAMP modification.  Sammy, a CITI employee, informed Plaintiffs that the only precondition to their being in a permanent modification was the timely payment of their three trial plan payments, as set forth in **Exhibit 8**.

209.   Between November 1, 2010 and March 1, 2011, CITI and its employees, acting on its behalf, specifically represented that 1) if Plaintiffs divested themselves of their Chrysler, they would qualify for and be given a loan modification;  2) Plaintiffs were approved for a permanent modification;  3) the only requirement before Plaintiffs' existing loan was permanently modified was for Plaintiffs to make three trial plan payments under the Second Trial Plan; 4) the holder of the Subject Loan authorized CITI to commit to a permanent modification of the Loan; and 5) CITI was dealing honestly with Plaintiffs with the purpose of helping Plaintiffs keep their home through a loan modification.   These representations were made orally and in writing, as set forth in on the dates and by the persons as set forth in Paragraphs 96-135, above; these representations were false.

210.   In addition, CITI repeatedly represented to Plaintiffs that CITI wanted to help Plaintiffs resolve their mortgage problems.   CITI repeatedly represented to Plaintiffs that CITI was able to help Plaintiffs resolve their mortgage problems through loan modification programs, including HAMP.   These representations were made in writing month after month after month, as CITI delivered marketing piece after marketing piece after marketing piece to Plaintiffs' door, to their mailbox and to their email.   Plaintiff cannot identify the specific person or persons who worked for CITI and caused these written representations to be delivered to Plaintiffs.   That information is exclusively known by CITI, who must have hired the designers of the marketing pieces and must have hired the persons who were responsible for dissemination of the market pieces to CITI'S customers.   These representations were made on made dates, many of which are set forth above,

1   including July 21, 2010, September 23, 2010, November 22, 2010, November 26, 2010, December

2   20, 2010 and January 20, 2011.

3       211.   Plaintiffs are informed and believe and thereon allege that the truth was that CITI never

4   intended to give Plaintiffs a loan modification.  CITI strung Plaintiffs along for months, making no

5   progress on the modification review, and providing no updates to Plaintiffs.   Suddenly, CITI

6   announced that the permanent modification was approved, subject only to payment of the three trial

7   payments.   However, as soon as Plaintiffs made their first trial payment, the loan servicing rights

8   were transferred to an affiliated company that immediately refused to honor the modification

9   agreement, despite CITI'S prior representation that the holder of the Subject Loan had authorized

10  the permanent modification of the Subject Loan.

11      212.   As earlier alleged, Plaintiffs are informed that LONE STAR is the parent corporation

12  and both CITI and VERICREST are its subsidiaries.  Plaintiffs are also informed that LONE STAR

13  is also the holder of all beneficial interests in the Subject Loan by way of an unrecorded assignment

14  in July of 2005.  As such, LONE STAR is the entity that would have either permitted or denied the

15  possibility of loan modification for the Subject Loan, whether serviced by CITI or VERICREST.

16  Plaintiffs and their Loan are but pawns on the chessboard controlled by LONE STAR.   CITI

17  represented, as detailed above, that the holder of the Subject Loan had approved the permanent

18  modification.  Were that true, transfer of the servicing rights to VERICREST would have had no

19  impact on the modification contract executed on behalf of the beneficiary of the loan and deed of

20  trust by the authorized agent of that beneficiary.

21      213.   If VERICREST'S refusal to acknowledge or adhere to the Second Trial Plan and/or the

22  permanent modification that was to flow therefrom were justified, then CITI did not have the

23  authority to enter into a modification agreement on behalf of the holder, and CITI's representations

24  to the contrary were outright lies.

25      214.   Plaintiffs are informed and believe and thereon allege that CITI intended that Plaintiffs

26  rely on their representations, as Plaintiffs were barraged with correspondence stating that CITI

27  wanted to help them solve their mortgage issues, and most of the correspondence encouraged

28  Plaintiffs to apply for a loan modification, even while Plaintiffs already had applications submitted.

215.   In addition, CITI told Plaintiffs even before they submitted the application for their third attempt to obtain the modification exactly what they had to do to qualify, and told them once that was accomplished – the car sold – Plaintiffs *would* be given a permanent modification.   How better to rope someone in than to tell them they already had exactly what they desired and that the final approval was a mere formality?

216.   Plaintiffs' reliance on the representations of CITI and its employees was foreseeable and justified.   CITI was the servicer of the Subject Loan and made it clear through its numerous written correspondences that it had the ability and authority to approve loan modifications with borrowers such as Plaintiffs.   While their third modification application was in process, Plaintiffs continued to receive notices from CITI offering mortgage solutions, including loan modifications. In addition, Plaintiffs had received the previous trial modification, and only through what they believed at the time was a major clerical error was the First Trial Plan cancelled.   When they applied for the third time, Plaintiffs were told that they *did* qualify, and told that the only impediment was their financed vehicle.   Once ridding themselves of the vehicle, Plaintiffs had every reason to believe that CITI was playing straight with them, as they seemed to have progressed farther in a shorter period of time than on their previous two submissions.   Furthermore, by the time of the third modification application Plaintiffs had so much invested in obtaining a modification, they really had no choice but to continue, especially when told that they definitely qualified.

217.   In justifiable reliance on CITI'S representations Plaintiffs made the first trial payment to CITI under the Second Trial Plan in the amount specified in **Exhibit 8**, and attempted to make the second trial payment, which was refused and returned by VERICREST.   Plaintiffs provided CITI with confidential financial information to which CITI was not otherwise entitled, Plaintiffs incurred costs in sending documents and other information to CITI, and Plaintiffs did not file for bankruptcy protection at a time when they still would have been able to make payments pursuant to a Chapter 13 plan.   In addition, at the insistence of CITI, Plaintiffs sold a vehicle that they would not otherwise have sold, and suffered a financial loss in doing so as well as the loss of the use, comfort and convenience of a second vehicle that was relatively new and with low mileage, and

which they cannot now replace due to the financial position CITI'S machinations have forced upon Plaintiffs.

218.   Plaintiffs are informed and believe and thereon allege that CITI knew that Plaintiffs would not receive a permanent loan modification, regardless of whether or not one was ever approved, because LONE STAR intended to frustrate, impede, and prevent the modification from occurring by attempting to assign the Subject Loan to TRUST and by transferring the servicing of the Subject Loan from CITI to VERICREST before Plaintiffs could make the three trial payments.

219.   Plaintiffs are informed and believe and thereon allege that CITI never had any intention of honoring either the Second Trial Plan or the permanent modification the flowed therefrom.  The instant the servicing rights were transferred to VERICREST, CITI falsely represented to VERICREST that Plaintiffs were in default under the terms of the Second Trial Plan and that as a result the Second Trial Plan had been cancelled and no permanent modification was completed.

220.   Plaintiffs made the first trial payment under the Second Trial Plan prior to the date due.  When the called CITI just days after the first payment was due to confirm that CITI had received the payment and that the payment had been credited to Plaintiffs' account, CITI informed Plaintiffs that CITI was no longer servicing the loan.  Plaintiffs attempted to make the second trial payment a few weeks later and CITI  and VERICREST both refused to accept the payment.  VERICREST return the payment to Plaintiffs.

221.   As a direct and proximate result of their justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs lost income due to the hours they were required to spend satisfying CITI'S demands.  Had Plaintiffs known that CITI'S representations were false about the permanent modification, Plaintiffs would not have bothered submitting the third  application or any of the documents they provided to CITI.  Nor would Plaintiffs have given CITI any of the private financial documents or information to which CITI was not entitled. Instead, Plaintiffs would have had those dozens and dozens of wasted hours available for them to work on their new self-employment contracts to rebuild their income.

222.   As a direct and proximate result of Plaintiffs' justifiable reliance on the representations of CITI, under the mandates of LONE STAR, Plaintiffs fell further behind on their mortgage

payments, and were unable to cure the arrearages that had grown while they awaited the outcome of CITI'S alleged modification application review.

223.   As a direct and proximate result of Plaintiff's justifiable reliance on these false representations made CITI and its employees, Plaintiffs have sustained damages in amount according to proof at the time of trial, including, but not limited to, costs of preparing and copying hundreds of pages of documents that were demanded by CITI, the costs of faxing and mailing documents to CITI, the expenditure of dozens and dozens of hours of time gathering and preparing those documents and calling CITI to check on the status of their modification, which resulted in further loss of income to Plaintiffs, the increase in loan arrearages, fees and penalties assessed against the Subject Loan by CITI while it failed to honestly review the application, destruction of Plaintiffs' credit, and other damages to be proven at trial.

224.   CITI'S aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to CITI and its employees with the intention on the part of CITI and its employees of thereby depriving Plaintiffs of property and/or legal rights or otherwise causing injury to Plaintiffs.   CITI acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of the CITI, knowing CITI'S conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of CITI and to prevent the repetition of such conduct in the future.

**WHEREFORE**, Plaintiffs pray for judgment against CITI as hereinafter set forth.

**Count Four – Intentional Misrepresentation and Deceit – (As Against VERICREST)**

225.   Plaintiffs are informed and believe and thereon allege that LONE STAR and TRUST have a practice of transferring servicing of residential mortgage loans back and forth between CITI and VERICREST when loan modification trial plans are in progress.   This practice is for the purpose of frustrating and hindering the modification process, and the practice is quite successful at achieving its goals.

226.   CITI lied to Plaintiffs about the reason for the denial of the First Trial Plan and HAMP

modification when CITI's representative, Lon, told Plaintiffs on June 30, 2010, that their application had been cancelled ostensibly for their failure to provide a required P&L; the due date for that P&L had not yet arrived when CITI made an anticipatory strike and cancelled the application.

227.   When CITI'S own employees told Plaintiffs that there was no reason for cancellation of applications or trial plans and the Plaintiffs should file a Dispute with CITI for the erroneous termination of those application processes, the CITI employees who were allegedly the persons who were responsible for starting the Dispute process for modification applicants who felt they had been wronged flat refused to accept an application for a Dispute, telling Plaintiffs that they would just have to start over at the beginning and go through the entire frustrating, nerve-wracking, stress-inducing procedure again, and treating Plaintiffs as though they were the ones defrauding CITI

228.   CITI deceived Plaintiffs for the purpose of obtaining federal money as a special loan servicer of a delinquent loan, known as a troubled asset.  CITI'S profits double when the loan they service goes from a performing loan to a troubled asset, and moving loans into that category has become a major source of profits for banks and other loan servicers.

229.   CITI deceived Plaintiffs by informing them that they would obtain a loan modification if they made three mortgage payments as stated in **Exhibit 8**.  The true facts were that Defendants never had any intention of granting Plaintiffs a HAMP modification, and that each of CITI's representatives was lying to Plaintiffs and knew that no modification would be granted.

230.   Plaintiffs are informed and believe and thereon allege that putting a troubled asset loan into a modification is the very last option that CITI or VERICREST would want, because that move would stop their collect of double bonuses on their troubled accounts.  As their parent corporation, LONE STAR too benefits from keeping loans in a troubled status.  They have received hundreds of millions of dollars in federal funds to "compensate" them for their "losses" and for the specific purpose of making funds available for loan modification.  Plaintiffs are informed and believe and thereon allege that in most circumstances, the banks do not lose money when they take a property in foreclosure that is valued at less than the balance due on the loan, because, first, the holder of the note has usually already been compensated for any loss by an

insurance company, second, the holder of the troubled loan has multiple subdivision or subsidiary company who service loans and are constantly bringing in double the normal servicing fee by keeping the borrowers in default.

231.   Plaintiffs are informed and believe and thereon allege that when VERICREST took over the servicing of the Subject Loan, it was well aware that Plaintiffs were not in default under the Second Trial Plan.  Plaintiffs are informed and believe and thereon allege that VERICREST was well aware that Plaintiffs had performed as required under the First Trial Plan, as well, and that CITI had doctored its files during the second application, destroying a necessary document so that the application could be rejected for "failure to supply a requested document".  Defendants acted in bad faith in failing to notify Plaintiffs of the status of the modification, misrepresented the reasons for the denials of the modifications, and strung Plaintiffs along with the false promise of a modification, all with the intent of foreclosing on the Subject Property.

232.   Plaintiffs justifiably relied on Defendants' promises to their detriment.

233.   The true facts were that CITI knew, or should have known, at the time that it represented to Plaintiff that he would grant Plaintiff a permanent loan modification because he was not employed.

234.   As a consequence of Defendants' fraud and deceit, Plaintiffs have suffered actual injury, including the value of their vehicle at a loss which they sold in reliance on Defendants' promises and representations, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection because of Defendants' false promises.  In addition, Plaintiffs have incurred attorneys' fees and costs associated with this lawsuit and have incurred costs in sending numerous documents and applications to Defendants in furtherance of the promise of a modification, all in an amount within the jurisdiction of this Court.

235.   Defendants' conduct was willful, wanton, reckless, oppressive, and without regard for Plaintiff's welfare such that Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

### SECOND CAUSE OF ACTION

### Civil Conspiracy
### (As To CITI, VERICREST, LONE STAR and TRUST)

236.   Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

237.   Plaintiffs are informed and believe, and thereon allege, that Defendants conspired and agreed to implement a scheme to defraud and victimize Plaintiffs, and others similarly situated, through deception and misrepresentation and by manipulation of the loan modification application process.

238.   Plaintiffs are informed and believe, and thereon allege, that LONE STAR and TRUST are in the practice of regularly – and secretly -- assigning the beneficial interests in loans back and forth between them for the purpose of defrauding borrowers. When it is to their benefit to publicly transfer ownership, as in the case at bar, they record an assignment of deed of trust, regardless of whether or not the beneficial interest is actually going to change hands.

239.   Plaintiffs are informed and believe, and thereon allege, that LONE STAR is the parent corporation of VERICREST and CITI, as well as a significant number of other lenders and loan servicers, and that that the relationship between LONE STAR and its many subsidiaries is kept as quiet as possible to avoid tracing the bad acts and conspiracies back to the original source, which may be LONE STAR or the well-hidden company that pulls its strings.

240.   Plaintiffs are informed and believe and thereon allege that LONE STAR, TRUST, VERICREST and CITI jointly conspired among themselves, and possibly with other, unidentified loan servicers, to create a plan that would capitalize on the economic crisis into which the banking and other finance communities threw the world with their clever and oh so fraudulent lending schemes that created a buying and borrowing frenzy between approximately 2003 and 2007 or 2008.

241.   Plaintiffs are informed and believe and thereon allege that this plan came to fruition and was implemented between and among these four institutions, among others.

242.   Plaintiffs are informed and believe, and thereon allege, that step one of this plan

involves moving as many borrowers as possible into delinquent positions and keeping them in those positions for as long as possible.  Immediately, those loans are characterized as troubled assets under the servicing agreements for the loans.  The servicer is paid double the normal servicing fee for servicing a troubled asset.  Even if the servicer were only paid $10.00 for each performing loan it services, if it is servicing 3,000,000 loans, and half of them become troubled assets, the servicing company, is suddenly making a huge profit off of those loans.  Obscene fortunes have been made in months through similar conspiracies among other lenders and servicers.

243.   Before the craziness of the previous decade, banks typically wanted to be money-lenders, not property owners.  When a loan went into default and foreclosure proceedings were undertaken, the lender prayed fervently that someone else would bid at the trustee's sale and would take the property, paying the bank the amount owed on the loan, usually, since values were usually going up and the bank's position was usually protected by an equity margin held by the defaulting borrower.  The banks absolutely did not want to own those properties.  But that was before the banks got clever with their lending practices and discovered that they could make far more money securitizing and selling interests in loan pools (REMICs) than they ever would simply making loans and collecting their interest payments.  And when the economy crashed as a result of the games banks were playing with underwriting guidelines and loan to value ratios, a new concept was born – that of the government bailout.

244.   Through loopholes and very clever, brilliant minds, banks figured out that it was better to make money servicing bad loans, for which they receive double the normal fee, and buying loans that were not performing, for which they received funds (through T.A.R.P. and such) from the government to cover their "losses".    Meanwhile, the banks also collected from insurance companies for their losses when more and more borrowers could not afford the payments on the homes they bought at ridiculously inflated prices.

245.   As the economy unravels further, the government steps up and again with programs such as HAMP, and others, designed to help homeowners remain in their homes.  However, since lenders are not required to modify loans, programs like HAMP simply opened a whole new area

from which conspirators such as these four Defendants could prosper at the expense of the poor struggling borrowers who are just trying to keep food on the table and a roof over their heads.

246.   Plaintiffs are informed and believe, and thereon allege, that these four Defendants conspired to manipulate the loan modification process to maximize the amount of time that a borrower could be kept in the "review" process", which involves requiring documents to be provided over and over, because they have become too "aged", even though the replacement document is identical to the one already in the file.  An example would be the IRS form 4506-T which is a request for a transcript of the taxpayers' tax return, used to verify that the tax returns submitted by the borrower are true copies, and the verify income.  By churning the file and having different documents expire every month, servicers have managed to create a system whereby the modification file is almost incapable at any time of having a complete set of up to date documents.

247.   Plaintiffs are informed and believe, and thereon allege, that this is the basic plan put into play by the co-conspirators.  They went a step further, however.  When a borrower really is qualified under HAMP guidelines and it appears that the servicer might have to offer a permanent modification either the loan is sold (from LONE STAR to TRUST or visa versa), and the servicing contract is moved from VERICREST to CITI, or visa versa.  When the loan is sold or otherwise transferred, the new holder simply refuses to acknowledge any modification that wasn't finalized prior to transfer, such as Plaintiffs' Second Trial Plan.  The new owner claims not to be bound by the acts of the previous owner's agent, and there is nothing the borrower can do about the rejection, other than file a lawsuit.

248.   The same occurs when the servicing rights are reassigned to a different servicer. Either the new servicer claims that the trial plans are not binding on the new servicer, since they were not fully performed, or, as is the situation in this case, the new servicers claims that the trial plan was termination because the previous servicer declared the borrower in default under the trial plan, and no one has to honor the modification which evaporated with the creation of the phony default.

249.   Plaintiffs are informed and believe, and thereon allege, that these Defendants' wrongful practices were part of a scheme to mislead and defraud borrowers by making false

statements and false promises of loan modifications.  The object of the conspiracy was to induce borrowers to submit confidential financial documents and information, pretend to consider Plaintiffs for a loan modification, induce Plaintiffs not to file for bankruptcy protection, all so that Defendants could obtain federal money as a "special servicer" of distressed loan, and ultimately, obtain the Subject Property through foreclosure.  By the time most borrowers have been strung out by the bank and the servicer for 12 to 24 months, they are so far under, financially, that the give up and just let the bank take the house.

250.   Plaintiffs are informed and believe, and thereon allege, that these four Defendants have perfected this scheme and have defrauded thousands upon thousands of luckless borrowers, taking their homes when they could have as easily put the borrowers into modification programs that the borrowers could have performed successfully, and all so that those at the top can make even greater fortunes, while the rest of the country continues to wonder how they will even make it back to even, let alone get ahead.

251.   Among the specific acts engaged in by the Defendants was the fraudulent and wrongful transfer of the Subject Loan from CITI to VERICREST in order to provide a plausible reason for denying Plaintiffs the loan modification which had been approved in writing. (**Exhibit 7**).  Said transfer was facilitated by LONE STAR, which, on information and belief, owns the other Defendants, including CITI, VERICREST, and CR TITLE.

252.   Plaintiffs are informed and believe, and thereupon allege, that Defendants did the acts and things alleged herein pursuant to, and in furtherance of, their conspiracy to defraud and victimize Plaintiffs and others similarly situated, as alleged herein.

253.   Plaintiffs are informed and believe, and thereon allege, that each of these four Defendants agreed to the object of the conspiracy.  Plaintiffs are informed and believe, and thereon allege, that these four Defendants agreed amongst themselves to take the illegal and improper actions described herein, including taking actions that violated state law, to reach the goal of maximizing their financial benefit from the Subject Loan, and other such loans, at the expense of the Plaintiffs and other borrowers similarly situated.  These Defendants' actions were undertaken with actual malice in that they were motivated by a desire to deceive Plaintiffs.

254.   Each of these four Defendants committed acts in furtherance of the conspiracy and/or ratified the acts committed in furtherance of the conspiracy.

255.   The statute of limitations does not begin to run on any part of a Plaintiff's claim of civil conspiracy until the "last overt act" pursuant to the conspiracy has been completed.  In this case, the last overt act in furtherance of the conspiracy occurred in 2011.

256.   As a proximate result of the conduct of these four Defendants, as herein alleged, Plaintiffs have suffered and will continue to suffer damages, the exact amount of which has not been fully ascertained but ais within the jurisdiction of this Court. Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.

257.   As a further consequence of these four Defendants' fraud and deceit, Plaintiffs have suffered actual injury, including the loss of the value of their vehicle which they sold in reliance on Defendants' promises and representations, the loss of the use and enjoyment of that vehicle, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection by Defendants' false promises.

258.   The aforementioned conduct of these Defendants in furtherance of the conspiracy consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to them with the intention on their part, as set forth above.  These Defendants acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of Defendants, knowing that their conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of Defendants.

**WHEREFORE**, Plaintiffs pray for judgment against these four Defendants as set forth below.

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**Promissory Estoppel**
**(As Against CITI, LONE STAR and TRUST)**

259.   Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

260.   Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, and which does induce such action or forbearance, is binding on the promisor if injustice can be avoided only by enforcement of the promise.   Promissory estoppel is a doctrine that employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.

**Count One – (As Against CITI and LONE STAR)**

261.   As set forth above in the general allegations preceding the First Cause of Action, CITI promised Plaintiffs a loan modification in March of 2010 and subsequently canceled the First Trial Plan without cause or justification. Plaintiff fully complied with all requirements for receipt of a permanent modification under that Plan as set forth above. The terms of the promised permanent modification are set forth in **Exhibit 6.**

262.   As set forth above, Plaintiffs relied to their detriment on CITI's promise of a permanent loan modification, and   CITI's representation of a good faith review and consideration for a HAMP modification.   CITI's continued promises and assurances that Plaintiffs could qualify for and did qualify for a HAMP modification, led Plaintiffs to rely on its representations and, as a result of CITI's promises Plaintiffs did not file for bankruptcy protection at a time when they could have made payments pursuant to the a repayment plan.

263.   Plaintiffs' reliance on CITI'S representations was reasonable, justified, and foreseeable, as Defendants represented to Plaintiffs that they were the servicer and/or owner of the Subject Loan.

264.   As a proximate result of CITI'S conduct, as herein alleged, Plaintiffs have suffered and will continue to suffer damages, the exact amount of which have not been fully ascertained

but are within the jurisdiction of this Court.   Plaintiffs have been denied the benefit of the promise.   In addition, Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.

265.   As a further consequence of CITI'S wrongful acts, Plaintiffs have suffered actual injury, including the value of their vehicle which they sold in reliance on CITI'S promises and representations, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection because of CITI'S false promises, all in an amount according to proof at the time of trial.

**WHEREFORE**, Plaintiffs pray for judgment as set forth below.

## FOURTH CAUSE OF ACTION

### Promissory Estoppel
### (As Against CITI and TRUST)

266.   Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

267.   As set forth in detail, above, CITI promised Plaintiffs a loan modification (Second Trial Plan, **Exhibit 8**) and frustrated and obstructed Plaintiffs' ability to comply with all of the terms of said plan.   Plaintiffs made their first trial payment under the Second Trial Plan, which was accepted by CITI.   Learning that the loan servicing was transferred to VERICREST, Plaintiffs submitted a second trial plan payment to VERICREST, which refused the payment and returned it to Plaintiffs in bad faith.   VERICREST and CITI were obligated to comply with the Second Trial Plan that had been authorized and approved by LONE STAR, the beneficiary of the Subject Loan at the time the Second Trial Plan was created.

268.   Plaintiffs relied to their detriment on CITI's promise of a permanent loan modification, and representations that CITI would review and consideration in good faith Plaintiffs' application.   CITI's continued promises and assurances that Plaintiffs could qualify for and were approved for a permanent modification led Plaintiffs to rely on its representations and, as a result of CITI's promises, Plaintiffs did not file for bankruptcy protection at a time

when they could have made payments pursuant to the a repayment plan.

269.   Plaintiffs' reliance on CITI'S representations was reasonable, justified, and foreseeable,  as CITI represented to Plaintiffs that it was the servicer and/or owner of the Subject Loan.

270.   Plaintiffs are informed and believe, and thereon allege, that LONE STAR attempted to assign its beneficial interest in the Subject Loan to TRUST at or about the time that the servicing rights were transferred from CITI to VERICREST, and the TRUST has also refused to acknowledge the permanent modification agreement in which it holds a beneficial interest as successor in interest to LONE STAR.

271.   As a proximate result of the conduct of these Defendants, as herein alleged, Plaintiffs have suffered and will continue to suffer damages, the exact amount of which have not been fully ascertained.  Plaintiffs have been denied the benefit of the promise.  In addition, Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.

272.   As a further consequence of these Defendants' wrongful acts, Plaintiffs have suffered actual injury, including the value of their vehicle which they sold in reliance on CITI'S promises and representations, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection because of CITI'S false promises, in an amount to be proven at the time of trial.

**WHEREFORE**, Plaintiffs pray for judgment against these Defendants as set forth below.

### FIFTH CAUSE OF ACTION

**Breach of Written Contract**
**(Against CITI, LONE STAR and TRUST)**

273.   Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

274.   Plaintiffs entered into a written agreement with Defendants CITI, acting on behalf of

its principal, LONE STAR, the material terms of which are set forth in **Exhibit 7**.

275.   Plaintiffs performed by making the first trial payment according to the terms of the agreement.  Thereafter, Plaintiffs' performance in accordance with the terms of said agreement was excused by LONE STAR's frustration of performance by its refusal to accept payment through its agent, VERICREST.  Plaintiffs' performance was further prevented when LONE STAR transferred the Subject Loan to TRUST and TRUST also refused to accept payment through its agent, VERICREST.

276.   Neither CITI'S, LONE STAR'S nor TRUST'S performance was excused.

277.   These Defendants breached the agreement by refusing to honor the terms and accept Plaintiffs' payment.

278.   As a proximate result of the conduct of these Defendants, as herein alleged, Plaintiffs have suffered and will continue to suffer damages, the exact amount of which have not been fully ascertained.   Plaintiffs have been denied the benefit of the agreement.   In addition, Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.

279.   As a further consequence of these Defendants' wrongful acts, Plaintiffs have suffered actual injury, including the value of their vehicle which they sold in reliance on CITI'S promises and representations, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection because of CITI'S false promises, in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SIXTH CAUSE OF ACTION

### Breach of Covenant of Good Faith and Fair Dealing
### (As Against CITI and LONE STAR)

280.   Plaintiffs incorporate by reference the allegations above and below as though fully set forth herein.

281.   Plaintiffs entered into a written agreement with Defendants CITI and LONE STAR,

the material terms of which are set forth in **Exhibit 7**.

282. Plaintiffs' performed by making a payment according to the terms of the agreement. Thereafter, Plaintiffs' performance in accordance with the terms of said agreement was excused by Defendants' frustration of performance by refusing to accept payment.

283. Neither Defendant's performance was excused.

284. These Defendants breached the agreement by refusing to honor the terms and accept Plaintiffs' payment.

285. Defendants frustrated and interfered with Plaintiffs' right to obtain the benefit of the agreement by transferring the servicing of the Subject Loan from CITI to VERICREST.   The transfer was made with fraudulent intent and for the specific purpose of denying Plaintiffs the permanent loan modification which had been agreed upon.

286. As a proximate result of the conduct of these Defendants, as herein alleged, Plaintiffs have suffered and will continue to suffer damages, the exact amount of which have not been fully ascertained.   Plaintiffs have been denied the benefit of the agreement.   In addition, Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be proven at the time of trial.

287. As a further consequence of these Defendants' wrongful acts, Plaintiffs have suffered actual injury, including the value of their vehicle which they sold in reliance on CITI'S promises and representations, and have lost the opportunity to obtain the protection of the Bankruptcy Court through an affordable Chapter 13 plan because they were induced to delay filing for Bankruptcy protection because of Defendants' false promises, in an amount to be determined at trial.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Bad Faith Denial of Contract**

**(Against CITI, VERICREST, TRUST, and LONE STAR)**

288. Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

289. Plaintiffs entered into a written agreement with Defendants CITI and LONE STAR,

the material terms of which are set forth in **Exhibit 7**.

290.   Plaintiffs' performed by making a payment according to the terms of the agreement. Thereafter, Plaintiffs' performance in accordance with the terms of said agreement was excused by these four Defendants' frustration of performance by refusing to accept payment.

291.   No Defendant's performance was excused.

292.   Defendants breached the agreement by refusing to honor the terms and accept Plaintiffs' payments.

293.   Defendants have denied any liability for breaching the written contract and have denied, without probable cause, the existence of the written contract.

294.   As a proximate result of these Defendants' conduct in breaching the contract Plaintiffs have suffered injury, including damage to their credit, and have been denied the benefit of the contract, pain, suffering, emotional distress, general and compensatory damages, all within an amount according to proof at trial.

**WHEREFORE**, Plaintiffs pray for judgment against these Defendants as set forth below.

## EIGHTH CAUSE OF ACTION

### Wrongful Foreclosure in Violation of Civil Code §§ 2924

### (Against CITI, CR TITLE, TRUST, LONE STAR)

295.   Plaintiffs incorporate by reference the allegations set forth above and below as though fully set forth herein.

296.   Plaintiffs seek legal redress against Defendants for an unlawful foreclosure, including an order canceling and rescinding the Notice of Default, and all documents related to the improper non-judicial foreclosure.

297.   Civil Code 2924 exclusively limits who has authority to issue a Notice of Default as follows:

> Where, by a mortgage …. of any estate in real property, … a power of sale is conferred upon the mortgagee, trustee, or any other person, to be exercised after a breach of the obligation for which that mortgage or transfer is a security… (1) The trustee, mortgagee, or beneficiary, or any of their authorized agents shall first file for record, in the office of the recorder of each county wherein the mortgaged or

trust property or some part or parcel thereof is situated, a notice of default.

298.   A notice of default ("NOD") is null and void if issued by any person or entity other than those described in CC §2924.

299.   CITI represented that it had the right to issue foreclosure documents. CITI was not the real party in interest because it is not the legal trustee, mortgagee or beneficiary.  The interest in the deed of trust had been transferred to LONE STAR.

300.   LONE STAR directed the actions involved in the transfer of the note and servicing at a time when it had no authority to do so.

301.   Whether a party holds the status of any of the above referred-to capacities   is governed and restricted by the terms of the Note and Deed of Trust and the capacities of the parties to those documents.

302.   The NOD is defective for a second reason:  MERS had no authority to assign any interest in the Deed of Trust because MERS was a mere nominee of the original lender.  MERS did not have authority from the beneficiary under the deed of trust or the holder of the note to assign the interest n the note and deed of trust to CITI.  Lisa Markham was not an agent, employee or officer of MERS when the First Assignment of Deed of Trust was recorded and the interest in the deed of trust was purportedly transferred to CITI.

303.   LONE STAR is the true investor and has been the investor since 2005.  LONE STAR did not cause the NOD to be issued, therefore, the NOD is null and void and of no legal effect.

304.   Since the NOD is void  Plaintiffs are entitled to a permanent injunction prohibiting all named Defendants and their agents and employees  from conducting a Trustee's Sale, issuing a Trustee's Deed or selling, transferring or conveying the "Subject Property" pursuant to the subject Deed of Trust based on the said void NOD.

305.   The NOD and Notice of Trustee's sale and any purported sale is, and/or would be wrongful for a third reason: Plaintiffs entered modification, the terms of which were highly specific and set forth in writing.  Defendants represented to Plaintiffs and agreed not to foreclose on the Subject Property so long as Plaintiffs performed according to the terms of the

agreement.  Plaintiffs attempted to perform according to the agreement, but were frustrated by Defendants CITI and VERICREST's refusal to permit them to perform, including their refusal to accept Plaintiffs' payments.

306.   Plaintiffs performed all terms of the agreement prior to Defendants' CITI and VERICREST's refusal to accept their mortgage payments.

307.   In violation of said agreement, Defendants foreclosed on the Subject Property.

308.   VERICREST purported to sell the Subject Property at auction on April 8, 2011. Said purchase was in violation of the Bankruptcy Court's automatic stay and in violation of the agreement, whether said agreement was enforceable under theories of contract or equity and estoppel.

309.   Pursuant to Civil Code § 1511, Plaintiffs are not required to allege tender because of Defendants' wrongful actions and because they challenge the validity of the documents upon which the proceedings depend.

310.   Plaintiff unconditionally offers to tender to the extent required by law any amount due and owing after offset for damages, to the true beneficiary under the deed of trust or holder of the note in due course.

**Nod Issued By Entity That Was Not Trustee Of The Deed Of Trust
At Time Of Issuance Of The Nod**

311.   The subject Notice of Default was issued by CR Title.

312.   Although the NOD states it was issued by CR Title as the agent for the beneficiary and does not state its capacity is as a substitute trustee, the claim that it is the agent for the beneficiary is a sham. The only plausible basis for CR Title's  capacity is as a substitute trustee of the Deed of Trust which as described herein is false. Otherwise there would have been no need to issue the Substitution of Trustee.

313.   The Deed of Trust states that MERS has the right to foreclose. However, the Notice of Default was not issued by MERS but by CR Title. Therefore since MERS did not issue the NOD defendant cannot claim CR Title was allowed to issue the NOD per the terms of the Deed of Trust. Therefore, the NOD is void.

**Wrongful Foreclosure - Nod Issued By Entity That Was
Not The Agent Of Beneficiary**

314.   Who may issue a Notice of Default is governed by Civil Code section 2924(a)(4), which states a "person authorized to record the notice of default or the notice of sale" shall include an agent for the mortgagee or beneficiary, an agent of the named trustee, any person designated in an executed substitution of trustee, or an agent of that substituted trustee.

315.   Whether a party holds the status of any of the above referred to capacities is also governed and restricted by the terms of the Note and Deed of Trust and the capacities of the parties to those documents.

316.   A NOD is null and void if issued by any person or entity other than those described in Civil Code section 2924.

317.   As of the date of the issuance of the NOD, CR Title was not the agent for the beneficiary. The allegation of an agency is based solely on the Substitution of Trustee. In other words it is the Substitution of Trustee document in which CR Title bases its agency relationship referred to in the NOD and since that Substitution of trustee is void as described above there is no agency for CR Title to base its authority to issue the NOD. Therefore, as of the date of the NOD CR Title was absolutely not the agent of the beneficiary and therefore, its issuance of the NOD was void because it was not party authorized by CC 2924 to issue the NOD. Therefore CR Title statement in the NOD that it was the agent of the beneficiary is false.

318.   There was no independent agency agreement between CR Title and the beneficiary or owner of the Note as of the time CR Title issued the NOD.  There is no document recorded, or otherwise, that CR Title was the agent of the current note holder, or agents of the true beneficiary of the Deed of Trust, granting it authority to and directing them to initiate foreclosure proceedings or to issue the NOD.

319.   Any claim by CR Title that it is the agent of the beneficiary and issued the NOD in that capacity is false.  The foreclosing entity lacked standing to issue the Notice of Default as agent for the beneficiary. Therefore, the NOD is void.

/ / /

**Wrongful Foreclosure – Mers Had No Independent Authority To Issue**
**The Assignment Of Deed Of Trust And Note Or Substitution Of**
**Trustee And Did Not Obtain Proper Authority To Do So**

320.   MERS was named as the beneficiary on Plaintiff's Deed of Trust.

321.   In the said Deed of Trust, MERS' legal status is solely as nominee for the Lender.

322.   Although the Deed of Trust states MERS has the right to foreclose and take any action required of Lender, since its legal capacity is that of a "nominee", as  such, it must still obtain the separate authorization and direction from the current note holder or Deed of Trust beneficiary in order to issue any recorded document.  This requirement exists by 1) virtue of the fact that it is only a nominee, 2) the right to "take any action" to the extent that includes the right to issue an Assignment of the Note and Deed of Trust or a Substitution of Trustee is subject to the provision "required of lender" which means what the lender is requiring MERS to do, and 3) the fact that the MERS agreement with the noteholder requires it to obtain the direction of the noteholder to issue any recorded document in the foreclosure chain.

323.   As nominee, MERS carries as a matter of law no independent right to issue an Assignment of the Note and Deed of Trust or to substitute a trustee.  A nominee has no real ownership in the Deed of Trust and has no standing or right to issue a Notice of Default on its own.

324.   The mortgage instrument states that MERS functions "solely as nominee" for the lender, and lender's successors and assigns.  The word "nominee" is defined nowhere in the mortgage document, and the functional relationship between MERS and the lender is likewise not defined.  The absence of a contractual definition subjects it to judicial interpretation.  Black's Law Dictionary defines a nominee as "[a] person designated to act in place of another, usu. in a very limited way" and as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others."  Black's Law Dictionary 1076 (8th ed. 2004).  This definition suggests that a nominee possesses few or no legally enforceable rights beyond those of a principal whom the nominee serves.

325.   The legal status of a nominee then depends on the context of the relationship of the

nominee to its principal.  A nominee of the owner of a note and mortgage may not effectively assign the note and mortgage to another for want of an ownership interest in said note and mortgage by the nominee.

326.   The right to foreclose upon breach is described only in Plaintiffs' Deed of Trust, not the Note.  The terms of the Note alone, without more, does not grant any foreclosure rights.

327.   Therefore, MERS had no authority to issue any recorded document unless they were directed to do so by the current note holder or legal deed of trust beneficiary as their agent, which the MERS was not directed to so do.

328.   The beneficiary of the subject Deed of Trust is MERS, but the beneficiary of the Note was the Lender.  Therefore, the beneficiary of the deed of trust cannot foreclose or issue any document of its own volition through the alleged power in the deed of trust because it does not own the Note, and was not given the independent and subsequent authority by the current Note beneficiary, to issue the Assignment of Deed of Trust and Note thereon.

329.   Because MERS was not the original holder of the Promissory Note and because the original or current Note holder never authorized MERS to transfer the Note, the Assignment of the Deed of Trust purporting to transfer the Deed of Trust and Promissory Note was ineffective and void.

330.   Per the Assignment, MERS purportedly assigned both the Deed of Trust and the Promissory Note.   However, MERS did not own the Promissory Note, nor was given the authority to assign the Note.  MERS had no power in its own right to assign the Note since it had no interest in the Note to assign.

331.   MERS is not an economic 'beneficiary' under the Deed of Trust.  It is owed and will collect no money from Debtors under the Note, and it will not realize the value of the Property through foreclosure of the Deed of Trust in the event the Note is not paid.

332.   MERS wrongfully assigned the Note and Deed of Trust  because MERS lacked the authority to make an assignment of the underlying Promissory Note.

333.   MERS did not purport to act for its own interests in assigning the Note.  Rather, the assignment of Deed of Trust states that MERS was acting as nominee for the lender, which is

the only entity to possess an assignable interest.

334.   The extent of MERS' authority as a nominee was defined by its agency agreement with the lender.

335.   Whether MERS had the authority to assign the lender's interest in the note must be determined by reference to that agency agreement.

336.   An agency typically arises by express agreement, and the existence and extent of agent's duties are determined by the agreement between agent and principal.  The agent has such authority as the principal confers upon agent.

337.   The purported Assignment by MERS to BAC of either the Deed of Trust or the Note, pursuant to the subject Assignment of Deed of Trust, is void since MERS never received such permission or direction from the lender to make the said Assignment, which pursuant to the agreement between MERS and the lender, MERS was required to obtain said direction before it issued any Assignment of the Deed of Trust or Note.

338.   The purported assignee of the Note, TRUST, did not receive a valid assignment of the Subject Loan by the said Assignment in any manner.

339.   Therefore, although the Deed of Trust states:  MERS "holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender, including, but not limited to, releasing and canceling this Security Instrument".

340.   MERS did not have the right to foreclose on its own, without the permission and direction of the lender because the right to foreclose is subject to the terms of the MERS/lender agreement.  The right to foreclose is modified by the said MERS/lender agreement and pursuant thereto; MERS cannot foreclose on its own.

341.   MERS further did not have authority under the DOT to self-initiate the foreclosure proceeding by issuing the Assignment or Substitution of Trustee because per the DOT, only the Lender can "invoke the power of sale", and MERS could not assign the Note because it was

1  never the beneficiary thereof.

2  342. The DOT is a four-party instrument among the borrowers, lender, trustee, and

3  beneficiary. The Lender's rights regarding the Loan are pervasive. The Lender is entitled to

4  receive all payments under the Note, to control enforcement of the DOT under its terms, and

5  only the Lender is entitled to invoke the power of sale per the DOT.

6  343. MERS has none of these rights under the DOT, and is not even mentioned in the

7  Note. MERS is not given any independent authority to enforce the DOT under its terms, and its

8  status as beneficiary under the DOT is only "nominal." While the Borrowers acknowledge in the

9  DOT that MERS can exercise the Lender's rights as "necessary to comply with law or custom,"

10 this acknowledgement is not accompanied by any actual allocation of authority to non-judicially

11 foreclose on the Property, nor is such authority allocated in any other document in the record.

12 344. Since MERS could not assign any enforcement rights under the Note or DOT

13 because it held none, TRUST could not rely on the invalid MERS assignment to enforce the

14 DOT.

15 **WHEREFORE**, Plaintiffs pray for judgment against these Defendants as set forth

16 below.

17 ## NINTH CAUSE OF ACTION

18 **Unlawful Business Practices in Violation of Bus. & Prof. Code §17200, et seq.**

19 **(As Against All Defendants with the exception of CR Title)**

20 345. Plaintiffs incorporate by reference the allegations set forth above and below as

21 though fully set forth herein.

22 346. Plaintiffs allege that the unlawful acts and practice of Defendants alleged herein in

23 the General Allegations constitute unlawful, fraudulent and/or unfair business practices within

24 the meaning of California Business and Professions Code § 17200, et seq.

25 347. By engaging in the above-described acts and practices which include intentionally

26 misleading borrowers, including Plaintiffs, to their detriment by making false promises and

27 representations that a loan modification would be granted to Plaintiffs and borrowers similarly

28 situated, these Defendants engaged in acts likely to deceive borrowers such as Plaintiffs and the

general public in violation of California Business and Professions Code §§ 17200, et seq.

**Conduct of CITI in Violation of B & P §§ 17200, et seq.:**

- Falsely representing to borrowers that CITI will honestly and in good faith review loan modification applications and consider the applicant(s) for a permanent modification;

- Falsely representing to borrowers that CITI requires additional documentation in order to drag out the time required to "review" a modification application, all with the purpose of causing borrowers to rely on the promise of a modification and to refrain from taking other actions could resolve their mortgage problems, such as the filing of a Chapter 13 bankruptcy petition;

- Falsely representing to borrowers that CITI does not have documents in the file which CITI has received, with the purpose of delaying the review process;

- Falsely representing to borrowers that they will be given a permanent modification;

- Falsely representing to borrowers that the borrower(s) did not timely submit information or documentation, giving rise to cancellation or termination of a modification review, trail plan or permanent modification contract;

- Falsely representing to borrowers that CITI wants to help them resolve their mortgage issues, when what it truly wants is to cause their mortgage issues to grow worse;

- Conspiring to defraud borrowers;

- Defaming borrowers by publishing that they have default on a contract when they have not;

- Demanding that modification applicants divest themselves of assets in order to obtain a loan modification knowing full well that CITI has no intention of giving the borrower a loan modification;

- Denying the existence of contracts that is has created;

- Making modification applicants speak with a different representative each time they call CITI, which requires the borrower to go through the entire explanation each time he/she calls;

- Refusing to allow the performance of a contract by a party to whom CITI owes an

obligation of contract performance; and

- Failing to respond to inquiries from modification applicants and failing to notify applications of any aspect of the application that might be a problem, such as a missing document, as well as failing to notify the applicant that the application has been denied.

**Conduct of LONE STAR in Violation of B & P §§ 17200, et seq.:**

- Conspiring to defraud borrowers;
- Denying the existing of contracts that it has approved;
- Transferring servicing contracts in order to prevent a modification contract from being performed;
- Transferring its beneficial interest in loans in order to prevent a modification contract from being performed;
- Refusing to allow the performance of a contract by a party to whom LONE STAR owes an obligation of contract performance.

**Conduct of TRUST in Violation of B & P §§ 17200, et seq.:**

- Conspiring to defraud borrowers;
- Denying the existing of contracts that it has assumed by taking assignment of the loan under which the new contract has been created;
- Transferring servicing contracts in order to prevent a modification contract from being performed;
- Transferring its beneficial interest in loans in order to prevent a modification contract from being performed;
- Refusing to allow the performance of a contract by a party to whom TRUST owes an obligation of contract performance.

**Conduct of VERICREST in Violation of B & P §§ 17200, et seq.:**

- Conspiring to defraud borrowers;
- Denying the existing of contracts that it have been created and approved by its principal;
- Transferring servicing contracts in order to prevent a modification contract from being performed;

- Refusing to allow the performance of a contract by a party to whom VERICREST owes an obligation of contract performance.

348.   As a result of these Defendants' wrongful conduct in violation of B & P §§ 17200 et seq., Plaintiffs and the public at large have suffered and will continue to suffer damages and injuries and unless this wrongful conduct is enjoined and these Defendants made to pay restitution to all who have been harmed by their wrongful activities.

///

**WHEREFORE**, Plaintiff prays for judgment as follows:

///

**ON THE FIRST AND SECOND CAUSES OF ACTION:**

    a.   For compensatory damages in an amount to be determined by proof at trial;

    b.   For special damages in an amount to be determined by proof at trial;

    c.   For general damages in an amount to be determined by proof at trial;

    d.   For punitive damages;

**ON THE THIRD AND FOURTH CAUSES OF ACTION:**

    a.   For compensatory damages in an amount to be determined by proof at trial;

    b.   For special damages in an amount to be determined by proof at trial;

    c.   For general damages in an amount to be determined by proof at trial;

    d.   For the benefit of the promises made and broken – a permanent loan modification that is equivalent to the promised permanent modification

**ON THE FIFTH CAUSE OF ACTION:**

    a.   For compensatory damages in an amount to be determined by proof at trial;

    b.   For special damages in an amount to be determined by proof at trial;

    c.   For general damages in an amount to be determined by proof at trial;

**ON THE SIXTH CAUSE OF ACTION:**

    a.   For compensatory damages in an amount to be determined by proof at trial;

    b.   For special damages in an amount to be determined by proof at trial;

    c.   For general damages in an amount to be determined by proof at trial;

**ON THE SEVENTH CAUSE OF ACTION:**

    a.      For compensatory damages in an amount to be determined by proof at trial;

    b.      For special damages in an amount to be determined by proof at trial;

    c.      For general damages in an amount to be determined by proof at trial;

**ON THE EIGHTH CAUSE OF ACTION:**

    a.      For compensatory damages in an amount to be determined by proof at trial;

    b.      For special damages in an amount to be determined by proof at trial;

    c.      For general damages in an amount to be determined by proof at trial;

    d.      For declaratory and injunctive relief, including a declaration that Plaintiffs are the prevailing party and that Defendants are prevented from engaging in any sale, transfer, conveyance, actions or any conduct adverse to Plaintiffs' interest in the Subject Property;

    e.      For expungement of any and all foreclosure instruments relating to the Subject Property;

**ON THE NINTH CAUSE OF ACTION:**

    a.      For restitution damages restoring to Plaintiffs what has been taken, including , but not limited to, restoring their good credit, all in an amount to be determined by proof at trial;

    b.      For injunctive relief preventing Defendants from any future conduct that violates Business & Professions Code §§ 17200 et seq., including, but not limited to, the violations listed herein;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

SECOND AMENDED COMPLAINT

**ON ALL CAUSES OF ACTION:**

    a.    For removal of any and all derogatory information reported to any and all credit reporting agencies and/or bureaus relating to the transaction involved herein;

    b.    For any prejudgment or other interest according to law; and

    c.    For such other relief as the Court deems just and proper.

DATED:  January 18, 2013

                                    **UNITED LAW CENTER**
                                    A Professional Law Corporation

                        By:   /s/ John S. Sargetis       ,
                            JOHN S. SARGETIS,
                            Attorney for Plaintiffs