JOHN S. SARGETIS (SBN: 80630)
JULIE B. GUSTAVSON (SBN: 139060)
UNITED LAW CENTER
3013 Douglas Blvd., Suite 200
Roseville, CA 95661
Office: (916) 367-0630
Facsimile:   (916) 265-9000
Email: jgustavson@unitedlawcenter.com

Attorneys for Plaintiffs
CHARLES ALIMENA and CHERYL ALIMENA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ALIMENA and CHERYL ALIMENA, <br><br> Plaintiff, <br><br> vs. <br><br> VERICREST FINANCIAL, INC., CITIMORTGAGE, INC.; LSF7 NPL VI TRUST; CR TITLE SERVICES, INC.; LONE STAR FUND; and DOES 1 through 50, inclusive, <br><br> Defendants. | **Case No.: 2:12-cv-00901-LKK-JFM** <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1. Deceit <br> 2. Civil Conspiracy <br> 3. Promissory Estoppel <br> 4. Promissory Estoppel <br> 5. Breach of Contract <br> 6. Breach of Covenant of Good Faith & Fair Dealing <br> 7. Bad Faith Denial of Contract <br> 8. Wrongful Foreclosure in Violation of Civil Code §§ 2924 <br> 9. Violations of Business & Professions Code §17200 et seq. |

# EXHIBIT 1

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

|  |  |
|---|---|
| **In the Matter of:**            ) | |
| ) | AA-EC-11-13 |
| Citibank, N.A.               ) | |
| Las Vegas, Nevada      ) | |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of Citibank, N.A., Las Vegas, Nevada ("Bank"). The OCC has identified certain

deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's

initiation and handling of foreclosure proceedings. The OCC has informed the Bank of the

findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes. The Bank has begun implementing procedures to remediate the practices addressed in this Order.

## ARTICLE I

### COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1) The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 4,000,000 residential mortgage loans. During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions. The Bank's foreclosure inventory grew substantially from January 2009 through December 2010.

(2) In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2

(c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3) By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

## ARTICLE II

### COMPLIANCE COMMITTEE

(1) The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of the Bank or any of its subsidiaries or affiliates. In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge"). The Compliance Committee shall be responsible for monitoring and coordinating the

3

Bank's compliance with the provisions of this Order. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2) Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3) The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.

## ARTICLE III

## COMPREHENSIVE ACTION PLAN

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan"). In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge. Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

4

(2)  The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Board shall:

(a)  require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b)  follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c)  require corrective action be taken in a timely manner for any non-compliance with such actions.

(3)  The Action Plan shall address, at a minimum:

(a)  financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b)  organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

5

(c) metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d) governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4) The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order. The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

## ARTICLE IV

## COMPLIANCE PROGRAM

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the

6

requirements of this Order and are conducted in a safe and sound manner ("Compliance Program"). The Compliance Program shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe in the Compliance Program that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The Compliance Program shall include, at a minimum:

(a) appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure operations;

(b) processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;

(c) processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements;

(d) processes to review and approve standardized affidavits and declarations for each jurisdiction in which the Bank files foreclosure actions to ensure compliance with applicable laws, rules and court procedures;

(e) processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security,

7

and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f) processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g) processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h) processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i) processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j) ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k) measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

8

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed.  Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews.  An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V

## THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the

10

appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c)  measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d)  processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e)  processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f)  processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g)  processes to review customer complaints about Third-Party Provider services;

(h) processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i) a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j) a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORP's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan"). The MERS Plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timetable that is in excess of one

12

hundred twenty (120) days must be approved by the Examiner-in-Charge. The MERS Plan shall include, at a minimum:

(a) processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b) processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c) processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d) processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e) processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports. Unresolved items must be maintained on open-item aging reports and tracked until resolution. The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f) an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2) The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

## ARTICLE VII

### FORECLOSURE REVIEW

(1) Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2) Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a) the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques. In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank. The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b) expertise and resources to be dedicated to the Foreclosure Review;

(c) completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3) The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a) whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

(b) whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c) whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d) whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f) whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g) whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

16

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

17

ARTICLE VIII

MANAGEMENT INFORMATION SYSTEMS

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management

information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities

to ensure the timely delivery of complete and accurate information to permit effective decision-

making. The MIS plan shall be implemented within one hundred twenty (120) days of this

Order. Any corrective action timeframe that is in excess of one hundred twenty (120) days must

be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) a description of the various components of MIS used by the Bank for

foreclosure and Loss Mitigation or loan modification activities;

(b) a description of and timetable for any needed changes or upgrades to:

(i) monitor compliance with all applicable Legal Requirements and

supervisory guidance, and the requirements of this Order;

(ii) ensure the ongoing accuracy of records for all serviced mortgages,

including, but not limited to, records necessary to establish ownership and the right to foreclose

by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to

the borrower; and

(iii) measures to ensure that Loss Mitigation, loan foreclosure, and

modification staffs have sufficient and timely access to information provided by the borrower

regarding loan foreclosure and modification activities;

18

(c) testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

## ARTICLE IX

### MORTGAGE SERVICING

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities: (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion. Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices discourage Loss Mitigation or loan modifications. The plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe that is in excess of

19

one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b) appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c) establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d) a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e) measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f) measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

(g) procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or

20

permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h)  procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that: (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i)  policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j)  procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k)  policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

21

(m) policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n) policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified. Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

## ARTICLE X

## RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1) Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2) The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior

management, and the Board. The assessment and plan shall be provided to the Deputy

Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.

## ARTICLE XI

### APPROVAL, IMPLEMENTATION AND REPORTS

(1) The Bank shall submit the written plans, programs, policies, and procedures required

by this Order for review and determination of no supervisory objection to the Deputy

Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles

II through X. The Bank shall adopt the plans, programs, policies, and procedures required by

this Order upon submission to the OCC, and shall immediately make any revisions requested by

the Deputy Comptroller or the Examiner-in-Charge. Upon adoption, the Bank shall immediately

implement the plans, programs, policies, and procedures required by this Order and thereafter

fully comply with them.

(2) During the term of this Order, the required plans, programs, policies, and procedures

shall not be amended or rescinded in any material respect without the prior written approval of

the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3) During the term of this Order, the Bank shall revise the required plans, programs,

policies, and procedures as necessary to incorporate new or changes to applicable Legal

Requirements and supervisory guidelines.

(4) The Board shall ensure that the Bank has processes, personnel, and control systems

to ensure implementation of and adherence to the plans, programs, policies, and procedures

required by this Order.

(5) Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof. The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC. The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6) All communication regarding this Order shall be sent to:

    (a) Vance S. Price
        Deputy Comptroller
        Large Bank Supervision
        Office of the Comptroller of the Currency
        250 E Street, SW
        Washington, DC 20219

    (b) John C. Lyons
        Examiner-in-Charge
        National Bank Examiners
        880 Third Avenue, 5th Floor,
        New York, NY, 10022-4730

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

(1) If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief. Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require

24

the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2) All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies. The Deputy Comptroller's decision concerning a request is final and not subject to further review.

## .ARTICLE XIII

## OTHER PROVISIONS

(1) Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2) In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a) authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b) require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c) follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

25

(d) require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3) If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4) This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order.  Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5) This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6) Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7) The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

26

(8)  This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States. Nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.

IT IS SO ORDERED, this 13th day of April, 2011.


___/s/_____
Vance S. Price
Deputy Comptroller
Large Bank Supervision

27

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

|  |  |
|---|---|
| In the Matter of:<br>Citibank, N.A.<br>Las Vegas, Nevada | )<br>)<br>)   AA-EC-11-13<br>)<br>)<br>) |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller")

intends to impose a cease and desist order on Citibank, N.A., Las Vegas, Nevada

("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking practices

relating to mortgage servicing and the initiation and handling of foreclosure proceedings.

The Bank, in the interest of compliance and cooperation, enters into this

Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents

to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized

representative, and the Bank, through its duly elected and acting Board of Directors,

stipulate and agree to the following:

ARTICLE I
JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the

Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et*

*seq.*

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)     The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, on of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

2

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order.  However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations.  This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the

Consent Order.

## ARTICLE III
## WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C.

§ 1818(b);

(b)     any and all procedural rights available in connection with the

issuance of the Consent Order;

(c)     all rights to a hearing and a final agency decision pursuant to 12

U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)     all rights to seek any type of administrative or judicial review of

the Consent Order;

(e)     any and all claims for fees, costs or expenses against the

Comptroller, or any of his agents or employees, related in any way to this enforcement

matter or this Consent Order, whether arising under common law or under the terms of

any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504

and 28 U.S.C. § 2412; and

(f)     any and all rights to challenge or contest the validity of the

Consent Order.

## ARTICLE IV
## OTHER PROVISIONS

(1)    The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)    Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

(3)    The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set his hand on behalf of the Comptroller.

/s/                                                   April 13, 2011
_____         _____

Vance S. Price                                Date
Deputy Comptroller
Large Bank Supervision

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


/s/
Timothy C. Collins

_March 29, 2011_
Date


/s/
Jerry A. Grundhofer

_March 29, 2011_
Date


/s/
Robert L. Joss

_March 29, 2011_
Date


/s/
Eugene M. McQuade

_March 29, 2011_
Date


/s/
Michael E. O'Neill

_March 29, 2011_
Date


/s/
Lawrence R. Ricciardi

_3/29/11_
Date


/s/
Robert L. Ryan

_March 27, 2011_
Date


/s/
Anthony M. Santomero

_3/29/11_
Date


6

___/s/_____
Ernesto Zedillo

___*March 29, 2011*___
Date

7

# EXHIBIT 2



Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK **20101019** PAGE **0121**
Check Number  1885
Tuesday, OCT 19, 2010  8:20:50 AM
Ttl Pd   $21.00        Nbr-0006548317

TMH/74/1-2

Requested and Prepared by:
CR Title Services, Inc.

## Stewart Title

When Recorded Mail To:
CR Title Services, Inc.
**1000 TECHNOLOGY DRIVE MS 314**
**O'FALLON, MO 63368**

APN: 067-0310-021-0000

_____
SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No: T10-69024-CA                    Order No: 7742-338235

### ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

CitiMortgage, Inc.

all beneficial interest under that certain Deed of Trust dated: **07-14-2005** executed by
**CHARLES E. ALIMENA AND CHERYL P. ALIMENA, HSUBAND AND WIFE
AS JOINT TENANTS.**, as Trustor(s), to **FIRST AMERICAN TITLE.**, as Trustee,
recorded **07-25-2005**, as Instrument No. , in Book **20050725**, Page **0506**, , of Official
Records, in the office of the County Recorder of **SACRAMENTO** County,
**CALIFORNIA** together with the Promissory Note secured by said Deed of Trust and
also all rights accrued or to accrue under said Deed of Trust.

Date: October 15, 2010

TS: T10-69024-CA

"MERS" IS MORTGAGE
ELECTRONIC REGISTRATION
SYSTEMS, INC.

Lisa Markham
**Assistant Secretary**

State of AZ }ss
County of PIMA}ss

On October 15, 2010 before me, Stephanie G. Abcede Notary Public, personally
appeared Lisa Markham, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____(seal)
Stephanie G. Abcede Notary Public

OFFICIAL SEAL
STEPHANIE G. ABCEDE
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. April 6, 2014

# EXHIBIT 3

RECORDING REQUESTED BY:

STEWART TITLE OF CA

AND WHEN RECORDED MAIL TO:

CR TITLE SERVICES INC.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK 20101019 PAGE 0122

Check Number 1885
Tuesday, OCT 19, 2010  8:20:50 AM
Ttl Pd   $21.00          Nbr-0006548318

TMH/74/1-2

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.: T10-69024-CA                    Order No.: 7742-338235

## SUBSTITUTION OF TRUSTEE

**WHEREAS, CHARLES E. ALIMENA AND CHERYL P. ALIMENA, HSUBAND AND WIFE AS JOINT TENANTS.** was the original Trustor, **FIRST AMERICAN TITLE.** was the original Trustee, and **"MERS" IS MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.** was the original Beneficiary under that certain Deed of Trust dated **07-14-2005** and recorded on **07-25-2005** as Instrument No. , in book **20050725**, page **0506** , of Official Records of **SACRAMENTO** County, CALIFORNIA; and

    **WHEREAS,** the undersigned is the present Beneficiary under said Deed of Trust, and

    **WHEREAS,** the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

    **NOW, THEREFORE,** the undersigned hereby substitutes **CR Title Services, Inc.,** as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated: October 15, 2010

T10-69024-CA

## Substitution of Trustee

CitiMortgage, Inc.

By: _____

Lisa Markham
Assistant Vice President

State of AZ }
County of PIMA }

On October 15, 2010 before me, Stephanie G. Abcede Notary Public, personally appeared Lisa Markham, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____(seal)

Stephanie G. Abcede Notary Public

OFFICIAL SEAL
STEPHANIE G. ABCEDE
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. April 6, 2014

# EXHIBIT 4

Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK **20110419** PAGE **0228**

Check Number  5928
Tuesday, APR 19, 2011  8:49:56 AM
Ttl Pd    $21.00        Nbr-0006776452

**MLB/11/1-2**

Requested and Prepared by:
CR Title Services, Inc.

**Stewart Title**

When Recorded Mail To:
**Vericrest Financial, Inc.**
**16745 W. Bernardo Drive, Suite 300**
**San Diego, CA 92127**

APN: 067-0310-021-0000

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No: **T10-69024-CA**                    Order No: **7742-338235**

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

**LSF7 NPL VI Trust**

all beneficial interest under that certain Deed of Trust dated: **07-14-2005** executed by
**CHARLES E. ALIMENA AND CHERYL P. ALIMENA, HSUBAND AND WIFE
AS JOINT TENANTS.**, as Trustor(s), to **FIRST AMERICAN TITLE.**, as Trustee,
recorded **07-25-2005**, as Instrument No. , in Book 20050725, Page 0506, , of Official
Records, in the office of the County Recorder of **SACRAMENTO** County,
**CALIFORNIA** together with the Promissory Note secured by said Deed of Trust and
also all rights accrued or to accrue under said Deed of Trust.

Date: April 15, 2011

**TS:** T10-69024-CA

CitiMortgage, Inc.

_____
Lisa Markham
Assistant Vice President

State of AZ }ss
County of PIMA}ss

On April 15, 2011 before me, Xochitl Pizarro Notary Public, personally
appeared Lisa Markham who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____(seal)
        Xochitl Pizarro Notary Public

XOCHITL PIZARRO
Notary Public - Arizona
PIMA COUNTY
My Commission Expires
4-6-2014

# EXHIBIT 5

Stewart Title



Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK **20110419** PAGE **0229**

RECORDING REQUESTED BY:
CR Title Services, Inc.

Check Number  5928
Tuesday, APR 19, 2011  8:49:56 AM
Ttl Pd    $24.00        Nbr-0006776453

AND WHEN RECORDED TO:
Vericrest Financial, Inc,
ATTN: REO DEPARTMENT
Forward Tax Statements to
the address given above

**MLB/11/1-3**

SPACE ABOVE LINE FOR RECORDER'S USE

TS #: T10-69024-CA
APN: 067-0310-021-0000

Order #: 7742-338235
Investor #: 2002973826

## TRUSTEE'S DEED UPON SALE

A.P.N.: 067-0310-021-0000

Transfer Tax: $0.00

The Grantee Herein was The Foreclosing Beneficiary.
The Amount of The Unpaid Debt was $429,919.89
The Amount Paid By the Grantee Was $327,983.00
Said Property Is In the City of MATHER, County of SACRAMENTO

**CR Title Services, Inc.,** as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

### LSF7 NPL VI Trust

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of **SACRAMENTO**, State of California, described as follows:

See Attached Legal Description

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **CHARLES E. ALIMENA AND CHERYL P. ALIMENA, HSUBAND AND WIFE AS JOINT TENANTS.** as Trustor, dated **07-14-2005** and recorded on **07-25-2005**, instrument number , Book 20050725, Page 0506 of the Official Records in the office of the Recorder of **SACRAMENTO**, California under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default and Election to Sell under the Deed of Trust of Official records. Trustee having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b.

## TRUSTEE'S DEED UPON SALE

TS #: T10-69024-CA
Order #: 7742-338235

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on **04-11-2011**. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being **$327,983.00**, in lawful money of the United States, in pro per, receipt thereof is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **CR Title Services, Inc.**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws.

Date: **April 15, 2011**

CR Title Services, Inc.

BY: _____

Lisa Markham, Assistant Vice President

State of AZ      }ss
County of Pima}

On April 15, 2011 before me, Xochitl Pizarro Notary Public, personally appeared  Lisa Markham, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ARIZONA that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____ (seal)
       Xochitl Pizarro Notary Public

XOCHITL PIZARRO
Notary Public - Arizona
PIMA COUNTY
My Commission Expires
4-6-2014

TS #: T10-69024-CA
Order #: 7742-338235

**Legal Description**

LOT 297, AS SHOWN ON THE "FINAL MAP OF THE INDEPENDENCE AT MATHER VILLAGE 4C"
FILED IN THE OFFICE OF THE COUNTY RECORDER OF SACRAMENTO COUNTY, CALIFORNIA
ON AUGUST 16, 2000 IN BOOK 274 OF MAPS, AT PAGE 4.

# EXHIBIT 6

# HELPING YOU STAY IN YOUR HOME.

You may be able to make your payments more affordable.
## Act now to get the help you need!

**Investor Loan #: 2002973826**

# HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN
### (Step One of Two-Step Documentation Process)

Trial Period Plan Effective Date: __03/01/10__

Borrower ("I"): __Charles E Allmena__

Lender ("Lender"): __CitiMortgage, Inc.__

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): __7/14/05__

Loan Number: __2002973826__

Property Address ("Property"): __4497 MCROBERTS DRIVE__

City: __MATHER__                    State: __CA__        Zip: __95655__

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

1.  **My Representations. I certify, represent to Lender and agree:**

    A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I live in the Property as my principal residence, and the Property has not been condemned;

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.  I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

**Citi never sleeps**



---

81608    "If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this                    FORM 3156
document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3156  3/09 (rev. 8/09) Non-GSE - CMI rev. 09/01/09 (page 1 of 4 pages)                    163727 S22 Escrow 1213

**LOAN WORKOUT PLAN**

    E.   Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

    F.   If Lender requires me to obtain credit counseling, I will do so.

2.  **The Trial Period Plan.** On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $1,667.00 .

| Trial Period Payment # | Trial Period Payment | Due Date On or Before |
|---|---|---|
| 1* | $1,667.00 | 03/01/10 |
| 2 | $1,667.00 | 04/01/10 |
| 3 | $1,667.00 | 05/01/10 |
| 4 | NA | NA |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

**\*I understand that my first payment and this signed Trial Period Plan must be received by the Lender no later than 03/01/10 or I may not be accepted into the Home Affordable Modification Program.**

I agree that during the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

    A.   TIME IS OF THE ESSENCE under this Plan. This means I must make all payments on or before the days that they are due;

    B.   Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action. All rights to such notices are hereby waived by me to the extent permitted by applicable law;

    C.   If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the Lender may foreclose if I have not made each and every Trial Period Payment that is due through the end of the month preceding the month in which the foreclosure sale is scheduled to occur. If a foreclosure sale occurs pursuant to this Section 2.C., this Plan shall be deemed terminated;

    D.   The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. I understand the Lender will not pay me interest on the amounts held in the account. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

    E.   When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

    F.   If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct at any time during the Trial Period; or (iv) I do not provide all information and documentation required by Lender, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and



**LOAN WORKOUT PLAN**

G. I understand that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify or if I fail to meet any one of the requirements under this Plan. If, under the Lender's procedures, a title endorsement(s) and/or subordination agreement(s) are required to ensure that the modified Loan Documents retain first lien position and are fully enforceable, I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement(s) and/ or subordination agreement(s) from other lien holders, as Lender determines necessary.

3. **The Modification.** I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If (1) my representations in Section 1 were and continue to be true in all material respects; (2) I comply with the requirements in Section 2; (3) I provide the Lender with all required information and documentation; and (4) the Lender determines that I qualify, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. The Modification Agreement will provide that, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the loan unless permitted by applicable State or Federal law, rules or regulations. This Plan shall terminate the day before the Modification Effective Date and the Loan Documents, as modified by a fully executed Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan. Provided I make timely payments during the Trial Period and both the Lender and I execute the Modification Agreement, I understand that my first modified payment will be due on the Modification Effective Date (i.e., on the first day of the month following the month in which the last Trial Period Payment is due).

4. **Additional Agreements.** I agree to the following:

   A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Plan, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Plan (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

   B. To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan.

   C. If Lender may establish an escrow account under applicable law, this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, I have been advised of the amount needed to fund my escrow account and I agree to the establishment of an escrow account. If the Loan Documents do not currently have escrow account provisions that govern, among other things, the collection, posting and payment of Escrow Items to and from the escrow account, the Lender will include provisions in my Modification Agreement that are similar to the escrow account provisions in the Fannie Mae/Freddie Mac Uniform Instrument for the state in which I live.

   D. That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.

   E. That I will execute such other and further documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Plan; or (ii) correct the terms and conditions of this Plan if an error is discovered.

   F. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I understand and consent to the disclosure of my personal information and the terms of this Trial Period Plan and the Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.



**LOAN WORKOUT PLAN**

G. That, as of the Trial Period Plan Effective Date, I understand that the Lender will only allow the transfer and assumption of this Trial Period Plan to a transferee of my property in the case of my death, divorce or marriage to the same extent as permitted under the Garn St. Germain Act; 12 U.S.C. Section 1701j-3. This Plan may not, under any other circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

H. Notwithstanding anything herein to the contrary, if my final two Trial Period Payments are received by Servicer after the close of business on the 15th calendar day of the last month of the Trial Period but before the end of the Trial Period, I agree that the Trial Period shall be extended by one calendar month (the "Additional Trial Period"). I agree to abide by all terms and provisions of this Plan during the Additional Trial Period. In addition, I agree to make a Trial Period Payment in the amount of $1,667.00 (the same amount of the other Trial Period Payments) no more than 30 days after the last due date listed in the chart in Section 2 above.

If the Loan Documents provide for the assessment of a penalty for full or partial prepayment of the Note, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note shall be null and void.

In Witness Whereof, the Lender and I have executed this Plan.

CitiMortgage, Inc.
_____
Lender

_____                    _____
By                                              Borrower / Date

_____
Date

Borrower

_____
Date




©2010 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NN. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service marks of Citigroup Inc. Citi Never Sleeps is a service mark of Citigroup Inc.
This is an attempt to collect a debt and any information obtained will be used for that purpose.
The Making Home Affordable program was created to help millions of homeowners refinance or modify their mortgages. As part of this program, Fannie Mae (the owner of your loan), your servicer, and the Federal Government are working to offer you options to help you stay in your home.

66098   HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         160727 S22 Escrow 4   1213
Form 3156  3/09 (rev 8/09) Non-GSE - CMI rev (09/01/09) (page 4 of 4 pages)

# EXHIBIT 7

CitiMortgage

Customer Service: 1-800-283-7918 |

My Mortgage Summary

- My Mortgage Summary
- Mortgage Details
- Tax & Insurance
- Statements

You are currently viewing, XXXXXX3520

## Your Mortgage Modification

View the terms of your modification which will make your payments more affordable. Check your status often to ensure that
your paperwork has been accepted and find new requests for additional documentation.

### Modification Status                                                    Print Page

01/21/2011 Your request for lower mortgage payments is approved. Expect your mortgage solution package within the next 5-7
business days.

### Modification Details

| | Mortgage Information * | |
| --- | --- | --- |
| | Current | Proposed |
| Product | 5/1 ARM I/O | 5/1 ARM I/O |
| Term (months) | 705 | 480 |
| Interest Rate | 5.00% | 2.00% |
| Principal Balance | $402,908.96 | $344,280.81 |

| | Payment Information | |
| --- | --- | --- |
| | Current | Proposed |
| Principal & Interest (P&I) | $1,079.16 | $1,042.51 |
| Taxes & Insurance (escrow) | $ 5,326.42 | $ 945.09 |
| Total Monthly Payment | $6,505.55 | $1,687.59 |

*The sample chart above is based on an interest rate reduction or a principal reduction. Total monthly payments
are based on an estimated mortgage balance including interest, taxes and insurance. The final modification may
vary depending on the review and verification of the financial information you have provided and other
reductions. A mortgage modification may be reported to credit reporting agencies.

### Document Summary
View the status of pending documentation

citigroup.com                                                                                    Top

# EXHIBIT 8

# HELPING YOU STAY IN YOUR HOME.



MAKING HOME AFFORDABLE

*You may be able to make your payments more affordable.*
**Act now to get the help you need!**


citi

February 2, 2011

Charles E Alimena
Cheryl P Alimena
4497 McRoberts Dr
Mather CA 95655-3055

**1st Trial Payment Due: 3/1/11**
**Loan number: 2002973826**

Dear Charles E Alimena and Cheryl P Alimena,

**Congratulations!** You are approved to enter into a trial period plan under the Home Affordable Modification Program. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand all the steps you need to take to modify your mortgage payments.

**What you need to do...**
To accept this offer, you must make your first monthly "trial period payment." To qualify for a permanent modification, you must make the following <u>trial period payments in a timely manner</u>:

|  |  |  |
|---|---|---|
| 1st payment: | $1,687.60 by 3/1/11 |
| 2nd payment: | $1,687.60 by 4/1/11 |
| 3rd payment: | $1,687.60 by 5/1/11 |

After all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified. (Your existing loan and loan requirements remain in effect and unchanged during the trial period.) **If each payment is not received by CitiMortgage, Inc. in the month in which it is due, this offer will end and your loan will not be modified under the Making Home Affordable Program.**

If you have any questions or if you cannot afford the trial period payments shown above but want to remain in your home, or if you have decided to leave your home but still want to avoid foreclosure, please call us at **1-866-272-4749** as we may be able to help you. (Also, please review the attached "Frequently Asked Questions.")

Sincerely,

CitiMortgage Customer Service

The *Making Home Affordable* program was created to help millions of homeowners refinance or modify their mortgages. As part of this program, we – your mortgage servicer – and the Federal Government are working to offer you options to help you stay in your home.

*Attachments: (1) Frequently Asked Questions; (2) Additional Trial Period Plan Information and Legal Notices;*

742070

194246 HAM384.1 1432

**FREQUENTLY ASKED QUESTIONS** : Get the answers you need to some of the most common questions.

**Q. What else should I know about this offer?**

- If you make your new payments timely we will not conduct a foreclosure sale.
- You will not be charged any fees for this trial period plan or a permanent modification.
- If your loan is modified, we will waive all unpaid late charges.
- Your credit score may be adversely affected by accepting a trial period plan. The impact of a permanent modification on a credit score depends on the homeowner's entire credit profile. For more information about your credit score, go to http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.
- You may be required to attend credit counseling.

**Q. Why is there a trial period?**

The trial period offers you immediate payment relief and gives you time to make sure you can manage the lower monthly mortgage payment. The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period.

**Q. How was my new payment in the trial period determined?**

Your trial period payment is approximately 31% of your total gross monthly income, which we determined to be $5,865.00 based upon the income documentation you provided. If the loan is successfully modified, your new payment also will be based on 31% of your gross income. In addition, if your existing payment includes mortgage insurance premiums, this amount will also be added to your payment. If we were able to permanently modify your loan today, we estimate your modified interest rate would be 2.000%. Your final modified interest rate may be different.

The modified payment should be sufficient to pay the principal and interest as well as property taxes, insurance premiums and other permissible escrow fees based on our recent analysis of these costs. Your modified monthly payment may change if your property taxes and insurance premiums change. If you did not have an escrow account before, the timing of your tax and insurance bills may require that you make a payment to cover any such bills when they come due. This is known as an escrow shortage. Your loan has an escrow shortage of $7,075.67; this can either be paid in a lump sum when the loan is modified or over the next 60 months in an amount of $645.09 per month in addition to your modified monthly mortgage payment. If you wish to pay the total shortage as a lump sum, please contact us.

**Q. When will I know if my loan can be modified permanently and how will the modified loan balance be determined?**

Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan. Any difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment as that is determined based on your total monthly gross income, not your loan balance.

**FREQUENTLY ASKED QUESTIONS**   Get the answers you need to some of the most common questions.

**Q. Are there incentives that I may qualify for if I am current with my new payments?**

Once your loan is modified, you can earn a pay-for-success incentive for every month that you make on-time payments beginning with the trial period payments. Depending on your modified monthly payment, you may accrue up to $1,000 each year for five years for a maximum of $5,000. This important benefit, which will be applied to your principal balance each year after the anniversary date of your first trial period payment due date, will help you earn equity in your home by reducing the amount that you owe. However, you must remain current on your loan. You will lose this benefit if your modified loan loses good standing, which means that the equivalent of three full monthly payments are due and unpaid on the last day of any month, at any time during this five year period. If you lose this benefit, you will lose all accrued, unapplied incentive payments.

**Q. Will my interest rate and principal and interest payment be fixed after my loan is permanently modified?**

Once your loan is modified, your interest rate and monthly principal and interest payment will be fixed for the life of your mortgage **unless** your initial modified interest rate is below current market interest rates. In that case, the below market interest rate will be fixed for five years. At the end of the fifth year, your interest rate may increase by 1% per year until it reaches a cap. The cap will equal the market rate of interest being charged by mortgage lenders on the day your modification agreement is prepared (the Freddie Mac Primary Mortgage Market Survey® rate for 30-year fixed-rate conforming mortgages). Once your interest rate reaches the cap, it will be fixed for the remaining life of your loan. Your new monthly payment will include an escrow for property taxes, hazard insurance and other escrowed expenses. If the cost of your homeowners insurance, property tax assessment or other escrowed expenses increases, your monthly payment will increase as well.

**Q. What if I other questions about Home Affordable Modification that cannot be answered by my mortgage servicer?**

Call the Homeowner's HOPE™ Hotline at **1-888-995-HOPE (4673)**. This Hotline can help with questions about the program and offers access to free HUD-certified counseling services in English and Spanish.


888-995-HOPE™
Homeowner's HOPE™ Hotline

**Q. What if I am aware of fraud, waste, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program?**

Please contact SIGTARP at 1.877.SIG.2009 (toll-free), 202.622.4559 (fax) or www.sigtarp.gov and provide them with your name, our name as your servicer, your property address, loan number and reason for escalation. Mail can be sent to: Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L Street NW, Washington, DC 20220.



## Additional Trial Period Plan Information and Legal Notices

The terms of your trial period plan below are effective on the day you make your first trial period payment, provided you have paid it on or before 3/1/11. You and we agree that:

**We will not proceed to foreclosure sale during the trial period, provided you are complying with the terms of the trial period plan**

- Any pending foreclosure action or proceeding that has been suspended may be resumed if you are notified in writing that you failed to comply with the terms of the trial period plan or do not qualify for a permanent modification.

- You agree that the servicer will hold the trial period payments in an account until sufficient funds are in the account to pay your oldest delinquent monthly payment. You also agree that the servicer will not pay your interest on the amounts held in the account. If any money is left in this account at the end of the trial period plan, those funds will be deducted from amounts that would otherwise be added to your modified principal balance.

- The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.

**If your monthly payment did not include escrows for taxes and insurance, you are now required to do so:**

- You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account.

**Your current loan documents remain in effect; however, you may make the trial period payment instead of the payment required under your loan documents:**

- You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

Account Number: 2002973826

Please check box to indicate mailing address/phone number changes and enter on reverse side.
Include account number on check and make payable to:

| | See detail below: | Due Date: 3/1/11 | Total Trial Amount Due: $1,687.60 |

Trial payment: $1,687.60    $    1 6 8 7 . 6 0

Total Amount Enclosed    $                    .

CITIMORTGAGE INC.
PO Box 688950
Des Moines, IA 50368-8950

Please do not send cash. Please allow 7 to 10 days for postal delivery.
To ensure timely processing of your mortgage payment, please use the enclosed envelope and coupon. Do not include account inquiries with your payment.

---

## Return this temporary coupon with payment.

Account Number: 2002973826

Please check box to indicate mailing address/phone number changes and enter on reverse side.
Include account number on check and make payable to:

| | See detail below: | Due Date: 4/1/11 | Total Trial Amount Due: $1,687.60 |

Trial payment: $1,687.60    $    1 6 8 7 . 6 0

Total Amount Enclosed    $                    .

CITIMORTGAGE INC.
PO Box 688950
Des Moines, IA 50368-8950

Please do not send cash. Please allow 7 to 10 days for postal delivery.
To ensure timely processing of your mortgage payment, please use the enclosed envelope and coupon. Do not include account inquiries with your payment.

---

## Return this temporary coupon with payment.

Account Number: 2002973826

Please check box to indicate mailing address/phone number changes and enter on reverse side.
Include account number on check and make payable to:

| | See detail below: | Due Date: 5/1/11 | Total Trial Amount Due: $1,687.60 |

Trial payment: $1,687.60    $    1 6 8 7 . 6 0

Total Amount Enclosed    $                    .

CITIMORTGAGE INC.
PO Box 688950
Des Moines, IA 50368-8950

Please do not send cash. Please allow 7 to 10 days for postal delivery.
To ensure timely processing of your mortgage payment, please use the enclosed envelope and coupon. Do not include account inquiries with your payment.    689124

194246 HAN3841 1432