1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8             FOR THE EASTERN DISTRICT OF CALIFORNIA

9

CHARLES ALIMENA and
10 CHERYL ALIMENA,
                              NO. CIV. S-12-0901 LKK/JFM
11         Plaintiffs,

12      v.
                                   O R D E R
13 VERICREST FINANCIAL, INC.;
CITIMORTGAGE, INC., LSF7
14 NLP VI TRUST; CR TITLE
SERVICES, INC.; LOAN STAR
15 FUND, and DOES 1 through 50,
inclusive,
16
           Defendants.
17 _____/

18      Plaintiffs  Charles  and  Cheryl  Alimena  sue  defendants

19 Citimortgage, Inc. ("Citimortgage") and C.R. Title Services, Inc.

20 ("C.R.  Title,"  and  together  with  Citimortgage,  the  "Citi

21 Defendants")  and  defendants  Vericrest  Financial,  Inc.

22 ("Vericrest"), Lone Star U.S. Acquisitions, LLC ("Lone Star"), and

23 LSF7 NPL VI Trust ("Trust," and together with Vericrest and Lone

24 Star, the "Vericrest Defendants"), alleging that Defendants acted

25 unlawfully  in  failing  to  modify  their  home  mortgage  and

26 subsequently  initiating  foreclosure  proceedings.  Plaintiffs

                                  1

commenced this action on October 6, 2011 by filing a complaint in Sacramento Superior Court. On April 6, 2012, shortly after being named as a "Doe" defendant, Lone Star removed the action to federal court on the basis of diversity jurisdiction. (ECF No. 1.) By order dated December 20, 2012, the court dismissed Plaintiffs' First Amended Complaint without prejudice. (ECF No. 40.) On January 17, 2013, Plaintiffs filed a Second Amended Complaint. ("SAC," ECF No. 41.) The Citi Defendants and Vericrest Defendants now move to dismiss the SAC under Fed. R. Civ. P. 12(b)(6).

        For the reasons set forth below, the motions to dismiss will be granted in part and denied in part.

**I. BACKGROUND**

        Plaintiffs' home is located at 4497 McRoberts Drive in Mather, California. (SAC ¶ 1.) On July 25, 2005, a deed of trust was recorded against the property, which identified Plaintiffs as the "Borrower," Wilson Resources, Inc. as the "Lender," First American Title as the "Trustee," and Mortgage Electronic Registration Systems, Inc. ("MERS") as both a "nominee for Lender and lender's successors and assigns" and as the "beneficiary" under the Deed of Trust. (Citi Defendants' Req. for Jud. Not. ("Citi RJN") Ex. A, ECF No. 45-1; Vericrest Defendants' Req. for Jud. Not. ("Vericrest RJN") Ex. 1, ECF No. 43.)[1]

        In early 2010, Plaintiffs contacted defendant Citimortgage, seeking a modification of their home loan. (SAC ¶ 26.) Citimortgage

--------

        [1] Defendants' requests for judicial notice are addressed below.

2

sent Plaintiffs information regarding the Home Affordable Modification Program ("HAMP").[2] (SAC ¶ 27.) On February 12, 2010, Plaintiffs completed and submitted their HAMP application form, along with required documentation. (SAC ¶ 31.) Soon thereafter, Plaintiffs received four letters from Citimortgage confirming that they were starting a Home Affordable Modification Trial Period Plan ("First TPP").[3] (SAC ¶¶ 33, 34.) Under the terms of the First TPP, Plaintiffs were to submit certain documents and make three monthly payments of $1,667.00, beginning on March 1, 2010. (SAC ¶ 33, 35.)

According to Plaintiffs, the letters from Citimortgage provided that Plaintiffs could call Citimortgage and get an extension of the payment deadline, as they had been given short notice of the commencement of the trial modification. Plaintiffs did so and were given an extension. (SAC ¶ 35.) They made the three required payments on March 8, 2010, April 6, 2010, and May 18, 2010, within the timeframe permitted by the extension. (SAC ¶¶ 36, 39, 49.) Plaintiffs allege that they also timely submitted every

_____

[2] A California Court of Appeals decision summarized HAMP as follows: "The United States Department of the Treasury and other federal agencies created HAMP pursuant to authority granted by the Emergency Economic Stabilization Act, title 12 United States Code section 5201 et seq. Mortgage servicers may voluntarily participate in HAMP. Treasury guidelines set forth threshold criteria to define the class of eligible borrowers. The guidelines also set forth accounting steps using a standardized net present value test to determine whether it is more profitable to modify the loan or allow it to proceed to foreclosure. Calculations under HAMP involve assigning values to certain variables that are largely within the servicers' discretion, thus precluding any entitlement to loan modifications." Nungaray v. Litton Loan Servicing, LP, 200 Cal. App. 4th 1499, 1501 n. 1 (2011).

[3] A copy of the First TPP is attached as Exhibit 6 to the SAC.

1 | document ever requested by Citimortgage. (SAC ¶ 70.)

2 | During the April - June 2010 period, a dizzying series of
3 | communications ensued. On April 5, 2010, April 17, 2010, May 13,
4 | 2010, May 17, 2010, and May 22, 2010, Plaintiffs received
5 | delinquency letters from Citimortgage. (SAC ¶¶ 38, 41, 46, 48, 51.)
6 | On April 27, 2010, Plaintiffs received an email from Citimortgage
7 | demanding more documents. (SAC ¶ 42.) On a May 3, 2010 phone call,
8 | a Citimortgage representative informed Plaintiffs that he needed
9 | their March and April bank statements, as well as a profit & loss
10 | statement.[4] (SAC ¶ 44.) On May 10, 2010, Plaintiffs received a
11 | letter acknowledging that Citimortgage had received all of the
12 | documents requested in connection with their HAMP application. (SAC
13 | ¶ 45.) On May 24, 2010, May 28, 2010, and June 4, 2010, Plaintiffs
14 | received letters again acknowledging that Citimortgage had received
15 | all requested documents from Plaintiffs, but indicating that it
16 | might need more documents in the future. (SAC ¶ 53.) Plaintiffs
17 | also repeatedly called Citimortgage in order to ascertain the
18 | status of their loan modification. They received no helpful
19 | information, and were frequently told to call back in a week. On
20 | many of these calls, Plaintiffs were cut off after being placed on
21 | hold for long intervals. (SAC ¶¶ 37, 39, 40, 42-44, 47.)

22 | On June 11, 2010, Plaintiffs made a fourth trial payment of
23 | $1,667.00. They had not yet received confirmation of a loan
24 | modification. (SAC ¶ 54.)

25 |

26 | [4] Plaintiffs are apparently self-employed.

1    On June 15, 2010, Plaintiffs called Citimortgage to find out

2  the status of their HAMP application, and were told to submit a

3  profit & loss statement within two weeks. (SAC ¶ 55.) On June 28,

4  2010, they did so. (FAC ¶ 57.) Two days later, they received a call

5  from an individual at Citimortgage's Outreach Center, who told them

6  that Citimortgage was still waiting for the statement. (SAC ¶ 58.)

7  When Plaintiffs told him that they had faxed it in, the

8  Citimortgage representative checked the records and acknowledged

9  that Citimortgage had received it. He then informed Plaintiffs that

10  their HAMP application had been canceled, but was unable to explain

11  why. He advised Plaintiffs to open a dispute with Citimortgage

12  regarding the cancellation. (Id.) Finally, on August 10, 2010,

13  Plaintiffs received a letter from Citimortgage, which explained

14  that they were not approved for a loan modification under the First

15  TPP because they had failed to provide requested documents. (SAC

16  ¶ 70.)

17    On July 5, 2010, Plaintiffs called Citimortgage to open a

18  dispute; they were told they could not, but could submit another

19  HAMP application if they wished. (SAC ¶ 59.) After repeated phone

20  calls, a loan modification application package arrived. (SAC ¶ 67.)

21  On July 28, 2010, Plaintiffs submitted this application; a

22  Citimortgage representative subsequently confirmed its receipt.

23  (SAC ¶ 68.)

24    On July 8, 2010, Plaintiffs received a letter stating that

25  their loan was in default, and on July 23, 2010, they received

26  another letter demanding payment of the arrearage on their account.

1  (SAC ¶¶ 61, 67.)

2      Between July and September, the parties exchanged various

3  emails, letters, and phone calls. On August 19, 2010, Plaintiffs

4  were informed by phone that their loan modification application was

5  going to be submitted to underwriting. (SAC ¶ 85.) On September 9,

6  2010, a Citimortgage representative informed Plaintiffs by phone

7  that the company had received all of the requested documents; but

8  on September 16 and September 21, respectively, Plaintiffs received

9  an email and a letter demanding additional documents. (SAC ¶¶ 78,

10  80, 81.) They complied with these demands. (SAC ¶ 81.) On October

11  1, 2010, Plaintiffs were again informed that their loan

12  modification application was going to be submitted to underwriting.

13  (SAC ¶ 85.)

14      In late October, Plaintiffs received a Notice of Default and

15  an Election to Sell under Deed of Trust ("Notice of Default"). (SAC

16  ¶ 93.) They called Citimortgage, and were informed that their HAMP

17  application had been denied due to inadequate income. (Id.)

18  Plaintiffs ultimately determined that Citimortgage had failed to

19  take into account their profit & loss statement, which they had

20  submitted repeatedly, both as part of their first and second loan

21  modification applications. (SAC ¶ 94.) A Citimortgage

22  representative, Sheila Cotell, told Plaintiffs they could not

23  appeal the denial, but could submit another loan modification

24  application. (SAC ¶ 95.) On November 1, 2010, they provided Cotell

25  with financial information over the telephone in support of a new

26  loan modification application. (SAC ¶ 97.) Cotell told Plaintiffs

that they would qualify for a loan modification if they sold their 2006 Chrysler 300C. (Id.) They did so. Because of the speedy sale, they received much less than the car's Blue Book value. (SAC ¶ 98.)

As of November 2, 2010, Citimortgage's website showed that Plaintiffs were to receive a loan modification with the following terms: 5/1 Adjustable Rate Mortgage, amortized over 40 years, with an initial annual interest rate of 2.00% and an approximately $27,000 reduction in principal. The monthly payment would be $1,749.15. (SAC ¶ 100.)

In mid-November 2010, Plaintiffs submitted documents for another loan modification application. (SAC ¶ 102.) For the next two-and-a-half months, Plaintiffs exchanged numerous phone calls, emails, and Internet "chats" with Citimortgage as they sought to verify whether Citimortgage had received the required documents and if their modification had been approved. (SAC ¶¶ 104, 106, 108-112, 115-120.) Plaintiffs were informed at various times that their application had been approved and that it had been denied. (SAC ¶¶ 124, 125, 128.)

Finally, on February 7, 2011, Plaintiffs received a letter from Citimortgage informing them that they were entering a Trial Period Plan ("Second TPP"). (SAC ¶ 130.) Attached to the FAC as Exhibit 8 are a copy of a letter from Citimortgage Customer Service to Plaintiffs describing the required trial period payments; a set of frequently asked questions regarding the TPP; a document entitled "Additional Trial Period Plan Information and Legal Notices"; and three payment slips to be mailed in with the trial

7

1  period payments. The Second TPP required Plaintiffs to make three
2  monthly payments of $1,687.00, beginning on March 1, 2011. (Id.)
3  They made their first payment. (SAC ¶ 135.)

4      On February 24, 2011, Plaintiffs were informed by
5  Citimortgage, on a telephone call, that the trustee's sale of their
6  home had been postponed. (SAC ¶ 134.) On March 2, 2011, they were
7  informed that the servicing of their loan had been transferred to
8  defendant Vericrest. (SAC ¶ 135.)

9      On March 16, 2011, Plaintiffs received a notice from Vericrest
10 stating that defendant Trust now owned their note, and Vericrest
11 was their loan servicer. (SAC ¶ 140.) Plaintiffs called Vericrest
12 that same day, and were informed that Citimortgage had reported to
13 Vericrest that Plaintiffs' HAMP modification had been canceled
14 because they (Plaintiffs) had defaulted. (Id.)

15     On March 25, 2012, Vericrest notified Plaintiffs over the
16 telephone that their account should have been noted as being
17 subject to a HAMP modification, and to make their second trial
18 payment. (SAC ¶ 142.) Plaintiffs did so. (SAC ¶ 143.)

19     On March 28, 2011, Plaintiffs called Vericrest, and were told
20 that they did not qualify for HAMP, and that Vericrest was not
21 bound by any modification offered by Citimortgage. (SAC ¶ 144.) On
22 April 4, 2011, their second payment was returned by mail, along
23 with a statement that the payment was refused due to "insufficient
24 funds to cure default." (SAC ¶ 146.) The next day, Plaintiffs
25 called Vericrest, and were told they would have to re-apply for a
26 loan modification. (SAC ¶ 147.)

On April 8, 2011, Plaintiffs filed for Chapter 13 bankruptcy protection. (SAC ¶ 148.)

On April 15, 2011, a notice was placed on Plaintiffs' home that read: "This Property Has Gone Through Foreclosure And Is Now Owned By The Mortgage Holder." (SAC ¶ 150.) On April 18, 2011, Vericrest served Plaintiffs with a three-day notice to quit the premises, and in so doing, allegedly violated the bankruptcy stay. (SAC ¶ 151.)

Plaintiffs allege that, since July 2005, defendant Lone Star has been the sole owner of the promissory note securing their home loan (they were informed of this fact by a Citimortgage employee on March 30, 2011) (SAC ¶ 145) and the beneficiary of Plaintiffs' deed of trust (SAC ¶ 153). Plaintiffs also allege that Lone Star, along with Trust, is responsible for Citimortgage's and Vericrest's actions as loan servicers.[5] (SAC ¶ 153.) Plaintiffs further allege that the transfer of servicing of their home loan from Citimortgage to Vericrest was for the purpose of denying them a loan modification. (SAC ¶ 154.) Finally, Plaintiffs allege that Lone Star owns Citimortgage, Trust, and Vericrest. (Id.)

The SAC asserts causes of action for deceit, civil conspiracy, promissory estoppel, breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of contract, wrongful

---

[5] Plaintiffs also plead a contradictory allegation, on information and belief: that Citimortgage "is an affiliate of CITIBANK, N.A. and is under the direction and control of CITIBANK, N.A." (SAC ¶ 3.) In effect, plaintiffs are pleading in the alternative. The effect of such a pleading need not be resolved at this time.

foreclosure under Cal. Civ. Code § 2924, and violations of Cal. Bus. & Prof. Code § 17200.

## II. STANDARD ON MOTION TO DISMISS UNDER FED R. CIV. P. 12(b)(6)

A dismissal motion under Fed. R. Civ. P. 12(b)(6)[6] challenges a complaint's compliance with federal pleading requirements. Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must give the defendant "'fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007), quoting Conley v. Gibson, 355 U.S. 41, 47 (1957).

To meet this requirement, the complaint must be supported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, this court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007).[7]

"While legal conclusions can provide the framework of a complaint," neither legal conclusions nor conclusory statements are themselves sufficient, and such statements are not entitled to a presumption of truth. Iqbal, 556 U.S. at 679. Iqbal and Twombly

---

[6] Hereinafter, the term "Rule" refers to the applicable Federal Rule of Civil Procedure.

[7] Citing Twombly, 550 U.S. at 555-56, Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("[w]hat Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations"), and Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test" under Rule 12(b)(6)).

therefore prescribe a two-step process for evaluation of motions to dismiss. The court first identifies the non-conclusory factual allegations, and then determines whether these allegations, taken as true and construed in the light most favorable to the plaintiff, "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

"Plausibility," as it is used in Twombly and Iqbal, does not refer to the likelihood that a pleader will succeed in proving the allegations. Instead, it refers to whether the non-conclusory factual allegations, when assumed to be true, "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 557).[8] A complaint

---

[8] Twombly imposed an apparently-new "plausibility" gloss on the previously well-known Rule 8(a) standard, and retired the long-established "no set of facts" standard of Conley v. Gibson, 355 U.S. 41 (1957), although it did not overrule that case outright. See Moss v. U.S. Secret Service, 572 F.3d 962, 968 (9th Cir. 2009) (the Twombly Court "cautioned that it was not outright overruling Conley ...," although it was retiring the "no set of facts" language from Conley). The Ninth Circuit has acknowledged the difficulty of applying the resulting standard, given the "perplexing" mix of standards the Supreme Court has applied in recent cases. See Starr v. Baca, 652 F.3d 1202, 1215 (9th Cir. 2011) (comparing the Court's application of the "original, more lenient version of Rule 8(a)" in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) and Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), with the seemingly "higher pleading standard" in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), Twombly and Iqbal), cert. denied, 132 S. Ct. 2101 (2012). See also Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011) (applying the "no set of facts" standard to a Section 1983 case).

1  may fail to show a right to relief either by lacking a cognizable

2  legal theory or by lacking sufficient facts alleged under a

3  cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901

4  F.2d 696, 699 (9th Cir. 1990).

5  **III. ANALYSIS**

6      **A. Request for Judicial Notice**

7      As set forth in its December 20, 2012 Order, the court

8  previously took judicial notice of the following documents, and

9  will do so again.

10      1.    Documents recorded with the Sacramento County Recorder's

11          Office: a Deed of Trust recorded on July 25, 2005; an

12          Assignment of Deed of Trust recorded on October 19,

13          2010; a Substitution of Trustee recorded on October 19,

14          2010; a Notice of Default and Election to Sell Under

15          Deed of Trust recorded on October 19, 2010; a Notice of

16          Trustee's Sale recorded on January 20, 2011; an

17          Assignment of Deed of Trust recorded on April 19, 2011;

18          a Trustee's Deed Upon Sale recorded on April 19, 2011;

19          a Notice of Rescission of Trustee's Deed Upon Sale

20          recorded on May 6, 2011; and a Notice of Trustee's Sale

21          recorded on October 11, 2011. (Citi RJN Exs. A-H, L, ECF

22          No. 45-1; Vericrest RJN Exs. 1-7, 11, 13, ECF No. 43,

23          43-1.)

24      2.    Documents filed in the United States Bankruptcy Court

25          for the Eastern District of California, No. 11-28898

26          ("Bankruptcy Case"), a Chapter 13 petition filed by

Plaintiffs as joint debtors: the electronic case docket; Plaintiffs' bankruptcy petition; an amended bankruptcy petition;[9] Plaintiffs' statement of income and summary of schedules; and an order of the bankruptcy court dismissing Plaintiffs' case. (Citi RJN, Exs. I, J, K; Vericrest RJN, Exs. 8-10, 12, 14.)

Plaintiffs object to the court taking judicial notice of the contents of these documents. The court is well aware of the limitations on its ability to accept the truth of matters asserted in the materials of which it takes judicial notice, and will proceed accordingly. See, generally, 21B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 5106.4 ("Facts Judicially Noticeable; Indisputability— 'Ascertainable Facts'—Court Records") (2d ed. 2012).

**B. Allegations of ownership and control**

Defendants dispute Plaintiffs' allegations as to corporate ownership and control. They deny that Lone Star owns Citimortgage, Trust, and Vericrest. They also deny that Citimortgage and Vericrest are owned by the same entity. (Vericrest Mot. Dismiss at 9 n.4; Citi Mot. Dismiss at 8 n.1.) In support of this position, the Vericrest Defendants request that the court take judicial notice of the following documents:

---

[9] Filing of an amended petition appears to have been necessary because the initial petition listed the incorrect debtors' names. Plaintiffs argue against taking judicial notice of the initial petition because of this error, but it is relevant inasmuch as it shows the date on which the Bankruptcy Case was commenced.

13

1.   A publicly-available list of subsidiaries of Citigroup, Inc. filed with the Securities and Exchange Commission ("SEC").

2.   A document prepared by Standard & Poor's entitled "Servicer Evaluation: Vericrest Financial Inc."

3.   A "Hierarchy Report" for CIT Group, Inc., produced by the National Information Center,[10] using data from the Federal Reserve System, publicly available at http://www.ffiec.gov

4.   The Registration/Reporting Status for Lone Star U.S. Acquisitions, LLC, publicly available on the SEC website at http://www.adviserus.sec.gov

As to the first and fourth documents, the court will take judicial notice of the fact that the information relied upon by defendants was filed with the SEC and is available on the agency's website, but not the truth of the information itself. The filing entities produced this information, not the SEC. These entities are not "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A case cited by the Vericrest Defendants in support of its request for judicial notice, Kramer v. Time Warner, 937 F.2d 767 (2nd Cir. 1991), makes exactly this point. The Kramer

_____

[10] According to its website, "The National Information Center (NIC) is a central repository of data about banks and other institutions for which the Federal Reserve has a supervisory, regulatory, or research interest, including both domestic and foreign banking organizations operating in the United States. This web site provides access to NIC data, allowing the public to search for detailed information about banking organizations."

court permitted judicial notice of certain SEC filings because they "are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated." Id. at 774. In other words, filing something with the SEC doesn't make it true.

The court also declines to take judicial notice of the second document, which is essentially one private entity's (Standard & Poor's) description of another private entity (Vericrest). For this type of information, Standard & Poor's is not a source "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

To the extent that its contents were compiled by the Federal Reserve, the court can take judicial notice of the third document. But taken alone, this document has no bearing on Defendants' arguments as to ownership and control.

Therefore, at this time, the court will not take a position on whether Lone Star owns Citimortgage, Trust, and Vericrest, as this determination would require findings of fact only appropriate for a later stage of litigation. Plaintiff's allegations as to ownership and control will stand.[11]

**C. First Cause of Action: Deceit**

Plaintiffs plead three counts of deceit against Citimortgage,

---

[11] The court assumes that, in filing the Second Amended Complaint, Plaintiffs' counsel has complied with Rule 11, particularly the directive that "[b]y presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (3) the factual contentions have evidentiary support . . . ." Fed. R. Civ. P. 11(b)(3).

1  and one against Vericrest. Under California law, "[t]he elements

2  of fraud, which gives rise to the tort action for deceit, are

3  (a) misrepresentation (false representation, concealment, or

4  nondisclosure); (b) knowledge of falsity (or 'scienter');

5  (c) intent to defraud, i.e., to induce reliance; (d) justifiable

6  reliance; and (e) resulting damage." <u>Small v. Fritz Companies,</u>

7  <u>Inc.</u>, 30 Cal. 4th 167, 173 (2003) (<u>quoting</u> <u>Lazar v. Superior Court</u>,

8  12 Cal. 4th 631, 638 (1996)).

9      Justifiable reliance is often the most highly-contested of

10  these elements. "To establish this element of fraud, plaintiffs

11  must show (1) that they actually relied on the defendant's

12  misrepresentations, and (2) that they were reasonable in doing so."

13  <u>OCM Principal Opportunities Fund v. CIBC World Markets Corp.</u>, 157

14  Cal. App. 4th 835, 864 (2007).

15      To show actual reliance, a plaintiff must "'establish a

16  complete causal relationship' between the alleged

17  misrepresentations and the harm claimed to have resulted

18  therefrom." <u>Mirkin v. Wasserman</u> (1993) 5 Cal. 4th 1082, 1092 (1993)

19  (quoting <u>Garcia v. Superior Court</u>, 50 Cal. 3d 728, 737 (1990)).

20  "[R]eliance upon the truth of the fraudulent misrepresentation

21  [need not] be the sole or even the predominant or decisive factor

22  in influencing [plaintiff's] conduct . . . . It is enough that the

23  representation has . . . been a substantial factor, in influencing

24  his decision." <u>Engalla v. Permanente Med. Grp.</u>, 15 Cal. 4th 951,

25  976-7 (1997) (quoting <u>Restatement (Second) of Torts</u> § 546).

26      Reasonableness of reliance on the alleged misrepresentation

1   is demonstrated if "circumstances were such to make it reasonable

2   for the plaintiff to accept the defendant's statements without an

3   independent inquiry or investigation. [Reasonableness] is judged

4   by reference to the plaintiff's knowledge and experience." <u>OCM</u>

5   <u>Principal Opportunities Fund</u>, 157 Cal. App. 4th at 864 (internal

6   quotations and citations omitted).

7        Federal pleading standards require a party alleging fraud to

8   "state with particularity the circumstances constituting fraud...."

9   Fed. R. Civ. P. 9(b). The Ninth Circuit has elaborated on this

10  standard as follows:

11           [A]llegations of fraud based on information and belief
             usually do not satisfy the particularity requirements
12           under Rule 9(b). However, the rule may be relaxed as to
             matters within the opposing party's knowledge. For
13           example, in cases of corporate fraud, plaintiffs will
             not have personal knowledge of all of the underlying
14           facts. In such cases, the particularity requirement may
             be satisfied if the allegations are accompanied by a
15           statement of the facts on which the belief is founded.
             Instances of corporate fraud may also make it difficult
16           to attribute particular fraudulent conduct to each
             defendant as an individual. To overcome such
17           difficulties in cases of corporate fraud, the
             allegations should include the misrepresentations
18           themselves with particularity and, where possible, the
             roles of the individual defendants in the
19           misrepresentations.

20  <u>Moore v. Kayport Package Exp., Inc.</u>, 885 F.2d 531, 540 (9th Cir.

21  1989) (internal quotations and citations omitted).

22           **1. Count One: Intentional Misrepresentation (against**

23              **Citimortgage**)

24        Plaintiffs' Count One alleges deceit by Citimortgage.

25        As addressed in greater detail in the discussion of promissory

26  estoppel below, Plaintiffs have adequately alleged a

                                    17

misrepresentation. Specifically, they allege that if they submitted all of the requested documents and made timely payments to Citimortgage under the First TPP, then Citimortgage would consider them for a permanent loan modification.

Plaintiffs have also adequately pled, on information and belief, Citimortgage's knowledge of falsity and intent to defraud, as follows:

> [E]verything during the modification process, from the written correspondence and oral communications by [Citimortgage] employees to the written Agreement was specifically designed and calculated to induce plaintiffs to rely on the representations and believe they would be given a permanent modification. (SAC ¶ 179.)

> The truth was that [Citimortgage] would not and did not honestly or in good faith review or consider Plaintiffs [*sic*] application for loan modification. Although [Citimortgage] put Plaintiffs into a trial plan, Plaintiffs are informed and believed and thereon allege that [Citimortgage] never had any intention of performing its obligation to provide the permanent modification to which Plaintiffs were entitled . . . . The truth was that [Citimortgage] would manufacture additional requirements [as] the process went on in order to prevent Plaintiffs from satisfying the terms of the trial plan. (SAC ¶ 183.)

Plaintiff's allegations with regard to the element of damages must be examined with care. Plaintiffs claim that they "originally became delinquent on their mortgage payments shortly before seeking the loan modification as a result of the termination of a contract that produced the majority of their self-employment income. During the months that they were spending dozens of hours on the telephone trying to make progress with their loan modification, they could have been spending these same hours obtaining new contracts to

replace their lost income." (SAC ¶ 185.) While "one may recover compensation for time and effort expended in reliance on a defendant's misrepresentation," <u>Block v. Tobin</u>, 45 Cal. App. 3d 214, 220 (1975), "[i]f the existence — and not the amount — of damages alleged in a fraud pleading is too remote, speculative or uncertain, then the pleading cannot state a claim for relief." <u>Small</u>, 30 Cal. 4th at 202. Moreover, "[t]he harm suffered must be one which the defendant must reasonably have contemplated when making fraudulent statements." <u>O'Hara v. Western Seven Trees Corp.</u>, 75 Cal. App. 3d 798 (1977). While plaintiffs' allegations regarding potentially-lost contracts appears to be too speculative to support a claim, the allegations do demonstrate that Citimortgage forced plaintiffs to expend fruitless hours attempting to satisfy demands that apparently could never be satisfied. These hours fruitlessly expended appear to be a compensable injury.

In addition, Plaintiffs have pled sufficient other damages to support their claim. They allege that "they did not take other actions that they would have otherwise taken to save their home from foreclosure but for [Citimortgage's] promises . . . [such as] not filing for bankruptcy protection at a time and in a manner when they would have been able to retain their home without the onus of an unmanageable Chapter 13 repayment plan." (SAC ¶ 161.) At least one California Court of Appeals has held that a misrepresentation which causes a party to forego taking legal action to stop a foreclosure sale, such as retaining an attorney, is sufficient to state a claim for damages for fraud and negligent

1  misrepresentation. See West v. JPMorgan Chase Bank, N.A., 214 Cal.

2  App. 4th 780, 795 (2013).

3      The court is also of the view that Plaintiffs' four trial

4  payments may also constitute damages. Some courts have held that

5  such payments are not damages because borrowers are simply paying

6  on debts they already owe. See, e.g., West, 214 Cal. App. 4th at

7  795 ("As [defendant] argues, [plaintiff] already owed the mortgage

8  payments and was obligated to make them notwithstanding the alleged

9  misrepresentations"). The court disagrees. As the previous Order

10 in this action provides, "Considering that many borrowers seeking

11 loan modifications are in strained financial circumstances and are

12 desperate to retain ownership of their homes, to hold that lenders

13 may  arbitrarily  deny  permanent  loan  modifications  despite

14 borrowers' good-faith compliance with the TPP would arguably invite

15 those lenders to extract what little money these borrowers have

16 left and then foreclose on their homes." (ECF No. 40 at 18 n.

17 13.)[12] Plaintiffs had already breached their contract by failing to

18 make their loan payments. There is no indication that they would

19 have made the four payments unless they were enticed to do so by

20 Citimortgage's misrepresentation. The existence of a debt does not

21 license a creditor to use misrepresentations to collect payments

22 ─────────────────────────

23      [12] One noted blogger made this point more pithily: "HAMP was
   what  the administration offered to get people on board with
24 authorizing the second half of the TARP [Troubled Asset Relief
   Program] funds. HAMP was supposed to help the little guy, not rich
25 people. HAMP became a government blessed predatory lending system."
   See Duncan Black, Broke the Contract, Eschaton (Nov. 17, 2010, 9:15
26 AM), http://www.eschatonblog.com/2010/11/broke-contract.html.

1  that would not otherwise have been made.

2      Finally, plaintiffs have adequately alleged justifiable

3  reliance on Citimortgage's misrepresentations. These

4  misrepresentations appear to have been the sole factor in inducing

5  Plaintiffs to make the trial payments. And, based on Plaintiffs'

6  allegations, the misrepresentations were a substantial factor in

7  causing Plaintiffs to delay seeking bankruptcy protection.

8  Therefore, Plaintiffs have satisfactorily pled actual reliance. As

9  for the reasonableness of this reliance, Plaintiffs allege that

10 Citimortgage "was the servicer of the Subject Loan and made it

11 clear through its numerous written correspondence [*sic*] that it had

12 the ability and authority to approve loan modifications with

13 borrowers such as Plaintiffs." (SAC ¶ 184.) Accordingly, given

14 Plaintiffs' knowledge and experience, it was reasonable for them

15 to accept Citimortgage's representation "without an independent

16 inquiry or investigation." OCM Principal Opportunities Fund, 157

17 Cal. App. 4th at 864.

18     The court therefore concludes that the facts as alleged are

19 sufficient to support Plaintiffs' Count One for deceit.

20     **2. Count Two: Intentional Misrepresentation (against**

21     **Citimortgage)**

22     Plaintiffs' Count Two also alleges deceit by Citimortgage.

23     Plaintiffs have adequately pled facts supporting the following

24 alleged misrepresentations: that between late July 2010 and October

25 29, 2010, Citimortgage represented that "1) it would honestly . . .

26 review Plaintiffs' second HAMP modification application; 2) the

1  complete application package had been submitted to the underwriters

2  for final review and approval; and 3) the application was under

3  review." (SAC ¶ 200.)

4       Plaintiffs have also adequately pled, on information and

5  belief, Citimortgage's knowledge of falsity and intent to defraud,

6  as follows:

7           Plaintiffs are informed and believe and thereon allege
            that the truth was that [Citimortgage] never intended to
8           review Plaintiffs' second modification application,
            honestly or otherwise, and that [Citimortgage] did not
9           review the application honestly or in good faith.
            Plaintiffs are informed and believe and thereon allege
10          that the truth was that Plaintiffs' second modification
            package was never submitted to underwriting for final
11          review and approval. (SAC ¶ 202.)

12      Plaintiffs have adequately pled damages in connection with

13  these misrepresentations. They allege that they "would have had

14  those dozens and dozens of wasted hours [spent following up on the

15  status of their loan modification application] available for them

16  to work on their new self-employment contracts to rebuild their

17  income." (SAC ¶ 203.)  While it may be speculative that they would

18  have obtained other contracts, the hours fruitlessly expended

19  appear to be a compensable injury.

20      Finally, Plaintiffs adequately plead their justifiable

21  reliance on Citimortgage's misrepresentations, which appear to have

22  been the sole factor in inducing Plaintiffs to follow up with

23  Citimortgage regarding the status of their loan modification

24  application. The reasonableness of this reliance is also adequately

25  alleged, as Plaintiffs write that "[t]hey had no reason to believe

26  that [Citimortgage] was not going to be more careful and more

forthcoming with the second [loan modification] application." (SAC ¶ 202.)

Accordingly, Plaintiffs' Count Two will not be dismissed.

### 3. Count Three: Intentional Misrepresentation (against Citimortgage)

Plaintiffs' Count Three essentially rests on misrepresentations made by Citimortgage during the November 2010 – February 2011 period, which led Plaintiffs to sell their car at a loss and to make an initial payment pursuant to the Second TPP.

Plaintiffs have adequately alleged the following misrepresentations:

- Citimortgage representative Sheila Cotell told Plaintiffs that they would qualify for a loan modification if they sold their 2006 Chrysler 300C. (SAC ¶ 97.)

- Plaintiffs received a letter from Citimortgage informing them that they were entering the Second TPP. (SAC ¶ 130.)

Plaintiffs allege on information and belief that Citimortgage made these representations with knowledge of their falsity and an intent to defraud. (SAC ¶ 211, 215.) At the pleading stage, Plaintiffs cannot be expected to have further knowledge of what took place within Citimortgage. As such, Rule 9's pleading requirements have been satisfied as to these elements of the claim. Moore, 885 F.2d at 540.

Plaintiffs have adequately alleged damages stemming from

1  Citimortgage's misrepresentations: the sale of their car (SAC
2  ¶ 98), the trial payment they sent to Citimortgage (SAC ¶ 135), and
3  their failure "to take other actions that they would otherwise have
4  taken to save their home from foreclosure but for [Citimortgage's]
5  promises . . . [such as] not filing for bankruptcy protection at
6  a time and in a manner when they would have been able to retain
7  their home without the onus of an unmanageable Chapter 13 repayment
8  plan." (SAC ¶ 161.)

9      Finally, Plaintiffs have adequately alleged their justifiable
10  reliance on Cotell's and Citimortgage's misrepresentations. (SAC
11  ¶¶ 98, 135, 159, 217.) It appears that Cotell's misrepresentation
12  was the sole factor inducing Plaintiffs to sell their car, and the
13  Second TPP appears to have been the sole factor in inducing them
14  to mail in a trial payment. These misrepresentations also appear
15  to have been a substantial factor in causing Plaintiffs to delay
16  seeking bankruptcy protection. Therefore, Plaintiffs have
17  adequately pled actual reliance. This reliance was ultimately
18  reasonable, as, given their knowledge and experience, it was
19  reasonable for them to accept Cotell's and Citimortgage's
20  representations "without an independent inquiry or investigation."
21  <u>OCM Principal Opportunities Fund</u>, 157 Cal. App. 4th at 864.

22      Accordingly, Plaintiffs have sufficiently pled their Count
23  Three for deceit.

24      **4. Count Four:  Intentional Misrepresentation (against
25         Vericrest)**
26      Plaintiffs' Count Four, unlike the previous three, is alleged

against Vericrest. The only misrepresentation by Vericrest that appears to have induced Plaintiffs' reliance is the following: "On March 25, 2011, Plaintiffs again spoke with Charles at Vericrest. Charles informed Plaintiffs that their account should have been noted as a HAMP modification. Charles provided Plaintiffs with an address to overnight their next trial plan payment." (SAC ¶ 142.) Plaintiffs submitted this payment; ten days later, it was returned for "insufficient funds to cure default." (SAC ¶¶ 143, 146.) Given the short time interval, and the fact that Vericrest did not keep their trial payment, it does not appear that Plaintiffs suffered damages as a result of Vericrest's misrepresentation. They therefore fail to state a claim for deceit against defendant Vericrest.

In sum, the court will deny Defendants' motion to dismiss the first three counts of Plaintiffs' first cause of action, but will grant the motion as to the fourth count.

**D. Second Cause of Action: Civil Conspiracy**

Plaintiffs allege that defendants Citimortgage, Vericrest, Lone Star, and Trust conspired to defraud them.

The elements of a cause of action for civil conspiracy in California are the formation and operation of the conspiracy, wrongful conduct in furtherance of the conspiracy, and damage resulting to the plaintiff from an act or acts done in furtherance of the common design. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 511 (1994). Civil conspiracy is not an independent tort, but rather a means to impose liability on

those who share a common plan with accused tortfeasors. <u>Id.</u> at
510–11.

Of course, the victims of a conspiracy rarely can demonstrate
by direct evidence the existence of a conspiracy.  A conspiracy can
only be inferred from other facts. Here, the unexplained conduct
of each of the Defendants and the relationship between them,
resulting in the Plaintiffs' losses, may be sufficient for a trier
of fact to find a conspiracy — one that resulted in Plaintiffs'
injury.

Accordingly, the motion to dismiss this cause of action is
denied.

**E.   Third  Cause  of  Action:  Promissory  Estoppel  (against
Citimortgage and Lone Star)**

Plaintiff's third cause of action, for promissory estoppel,
is based on the First TPP.

Under California law, "[a] promise which the promisor should
reasonably expect to induce action or forbearance on the part of
the promisee or a third person and which does induce such action
or forbearance is binding if injustice can be avoided only by
enforcement of the promise." <u>Kajima/Ray Wilson v. Los Angeles Cnty.
Metro. Transp. Auth.</u>, 23 Cal. 4th 305, 310 (2000). "Promissory
estoppel is a doctrine which employs equitable principles to
satisfy the requirement that consideration must be given in
exchange for the promise sought to be enforced." <u>Id.</u> The elements
of a promissory estoppel claim are: (1) a promise that is clear and
unambiguous in its terms, (2) reliance on the promise by the party

26

1  to whom the promise is made (3) that is reasonable and foreseeable,

2  and (4) injury to the party asserting estoppel due to his or her

3  reliance. Laks v. Coast Fed. Sav. & Loan Assn., 60 Cal.App.3d 885,

4  890-91 (1976).

5      As discussed at length in the December 20, 2012 Order, the

6  First TPP "sets out various conditions that must be fulfilled

7  before the lender is obligated to provide a permanent loan

8  modification . . . the implication is that upon satisfaction of

9  those conditions, the lender will (and must) provide the borrower

10  with a permanent loan modification agreement." (Order 17:4-9)

11  (quoting Gaudin v. Saxon Mortg. Services, Inc., 820 F. Supp. 2d

12  1051, 1053 (N.D.Cal. 2011) (Seeborg, J.) ("Gaudin I"). Citimortgage

13  relies on Lucia v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 1059,

14  1070 (N.D. Cal. 2011), and its progeny for the proposition that

15  TPPs do not contain clear promises to modify borrowers' loans. The

16  court has already discussed its disagreement with Lucia in the

17  December 20, 2012 Order; as the Ninth Circuit still has yet to rule

18  on Lucia's correctness, I remain of the view that, assuming the

19  borrower satisfies the requirements therein, the TPP constitutes

20  an enforceable agreement to permanently modify a mortgage.[13]

21      A subtle distinction must be drawn here, between

22  Citimortgage's obligation to consider Plaintiffs' application for

23  a loan modification in good faith, and its obligation to actually

24

25  [13] In addition, the California Court of Appeal for the Fourth
    District recently issued an opinion holding that a TPP can give
26  rise to claims for breach of contract and promissory estoppel. See
    West v. JPMorgan Chase Bank, N.A., 214 Cal. App. 4th 780 (2013).

1   grant the Plaintiffs a loan modification. Let us begin with the

2   relevant language in the First TPP:

> If I am in compliance with this Trial Period Plan (the
> "Plan") and my representations in Section 1 continue to
> be true in all material respects, then the Lender will
> provide me with a Home Affordable Modification
> Agreement . . . that would amend and supplement (1) the
> Mortgage on the Property and (2) the Note secured by the
> Mortgage . . . . If I have not already done so, I am
> providing . . . documents to permit verification of all
> of my income . . . to determine whether I qualify for
> the offer described in this Plan (the "Offer"). I
> understand that after I sign and return two copies of
> this Plan to the Lender, the Lender will send me a
> signed copy of this Plan if I qualify for the Offer or
> will send me written notice that I do not qualify for
> the Offer. This Plan will not take effect unless and
> until both I and the Lender sign it, and the Lender
> provides me with a copy of this Plan with the Lender's
> signature. (SAC Ex. 6.)

13  Some courts have treated the language providing that "the Plan will

14  not take effect unless and until both I and the Lender sign it, and

15  the Lender provides me with a copy of this Plan" as dispositive:

16  specifically, that there is no binding offer unless and until the

17  borrower receives a countersigned copy of the TPP.[14] See, e.g.,

18  Brinson v. Bank of America, N.A., No. 3:12-CV-00169, 2013 WL

19  147835, 2013 U.S. Dist LEXIS 6441 (D. Alaska Jan. 13, 2013)

20  (holding that no claim was stated for breach of contract where

21  plaintiff failed to allege receipt of a signed copy of TPP from

22  defendant). I must respectfully disagree, for to do so would

23  elevate form over substance and render illusory the promise to

24  provide the borrower with a Modification Agreement "if [the

25  _____

26  [14] Nowhere in the SAC do Plaintiffs allege that Citimortgage
    provided them with a signed copy of the First TPP.

borrower is] in compliance with [the TPP] and [the borrower's] representations in Section 1 continue to be true in all material respects." (SAC Ex. 6.)

Nevertheless, the court cannot go so far as to say that the First TPP promises that merely making the trial payments and submitting the requested documentation *obligates* Citimortgage to approve a loan modification. The First TPP provides, "I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the lender determines that I do not qualify." Presumably, if Plaintiffs' income was too low or too high, or some other HAMP condition was not met, then no modification would have been forthcoming. This view is in keeping with Judge Seeborg's in <u>Gaudin I</u>, where, despite finding that a HAMP TPP gave rise to an enforceable contract, he dismissed the plaintiff's breach of contract claim without prejudice because "while [she] has alleged that she complied with all of her affirmative obligations under the [TPP] to provide requested documentation and to make timely payments at the trial period rate, she has not alleged that all of the conditions under which [defendant] might be obligated to provide her a lender-executed permanent modification agreement were actually satisfied." 820 F. Supp. 2d at 1054. Subsequently, after the plaintiff amended her complaint to allege (on information and belief) that she had satisfied the conditions for a permanent modification under the TPP, Judge Seeborg allowed the plaintiff's claim to proceed. See <u>Gaudin v. Saxon Mortg. Services, Inc.</u>, No.

1  C 11–1663, 2011 WL 5825144, 2011 U.S. Dist. LEXIS 132957 (N.D. Cal.

2  Nov. 17, 2011) ("Gaudin II"). Here, as in Gaudin I, Plaintiffs have

3  failed to allege that they satisfied all of the conditions for a

4  loan modification under the First TPP.

5      But the First TPP did obligate Citimortgage to consider

6  Plaintiffs' application in good faith, and Plaintiffs have alleged

7  as much:

8      •    "Pursuant to the First [TPP], Plaintiffs and their loan

9            were to be evaluated in good faith and in accordance

10           with HAMP guidelines." (SAC ¶ 36.)

11     •    "Before  Plaintiffs  submitted  their  first  HAMP

12           modification  package,  they  were  told  by  the  CITI

13           representatives  with  whom  they  spoke  that  if  they

14           submitted  the  application  and  the  required  documents,

15           CITI  would  honestly  consider  the  application."  (SAC

16           ¶ 175.)

17 Plaintiffs have also satisfactorily pled Citimortgage's failure to

18 consider their application in good faith, alleging, "The truth was

19 that CITI would not and did not honestly or in good faith review

20 or consider Plaintiff[']s application for loan modification." (SAC

21 ¶ 183.) This allegation is supported by Plaintiffs' receipt of a

22 letter from Citimortgage denying them a loan modification under the

23 First TPP because they had failed to provide requested documents

24 (SAC ¶ 70), even though they had in fact submitted every document

25 they were asked to.

26     In sum, Plaintiffs have adequately pled Citimortgage's promise

to consider in good faith their application for a loan modification under the First TPP. The requirement under California law that a promise be "clear and unambiguous", <u>Laks</u>, 60 Cal. App. 3d at 890, is satisfied, as Citimortgage was required to comply with HAMP guidelines in considering Plaintiffs' application. <u>See</u> <u>Sutcliffe v. Wells Fargo Bank, N.A.</u>, 283 F.R.D. 533, 552 (N.D. Cal. 2012) ("Because Wells Fargo was required to comply with HAMP guidelines in determining the terms of repayment under a modification agreement, the Court concludes, at least at the pleading stage, that the terms of the TPP are sufficiently definite to support the existence of a contract"); <u>see also</u> <u>Lazo v. Bank of America, N.A.</u>, No. C 12-00762, 2012 WL 1831577 at *6, 2012 U.S. Dist. LEXIS 69979 at *18 (N.D. Cal. May 18, 2012) (finding that, in the non-HAMP context, there were "no guidelines for the parties to use to determine the essential terms of a permanent loan modification. And without these essential terms or a way to derive them, Plaintiffs have not alleged the existence of a sufficiently definite, and thus enforceable, contract that requires BANA to permanently modify their loan").

As for the remaining elements of a promissory estoppel claim, Plaintiffs have sufficiently alleged that they relied on Citimortgage's promise by tendering four trial payments of $1667 and submitting the requested documentation. Their reliance was entirely reasonable and foreseeable. Plaintiffs have alleged that they were injured in that they made trial payments that they would not otherwise have made, delayed in filing for Chapter 13

1  bankruptcy protection, and were ultimately foreclosed on.
2  Accordingly, Plaintiffs appear to have sufficiently alleged a
3  promissory estoppel claim against Citimortgage based on the First
4  TPP.

5      However, Plaintiffs fail to adequately plead a claim for
6  promissory estoppel against Lone Star and Trust. There is no
7  allegation of either entity's independent involvement in making the
8  promise embodied in the First TPP, other than conclusory
9  allegations that, *e.g.*, "Defendants Lone Star and Trust are
10 responsible for the actions of the Servicer of the Loan, including
11 Citi and Vericrest." (SAC ¶ 153.) While Plaintiffs have pled that
12 Lone Star owns Citimortgage, standing alone, this allegation is not
13 enough to hold Lone Star liable for Citimortgage's acts. As pled,
14 the SAC lacks "sufficient facts alleged under a cognizable legal
15 theory" on which to proceed against Lone Star or Trust under a
16 promissory estoppel theory. <u>Balistreri</u>, 901 F.2d at 699 (9th
17 Cir. 1990).

18     Accordingly, the court will deny the motion to dismiss
19 Plaintiffs' third cause of action against Citimortgage, and grant
20 the motion as to Lone Star and Trust.

21     **F. Fourth Cause of Action: Promissory Estoppel (against**
22     **Citimortgage and Trust)**

23     Plaintiff's fourth cause of action, for promissory estoppel,
24 is based on a letter, dated February 2, 2011, that they received
25 from Citimortgage. It provides in pertinent part:

26     To qualify for a permanent modification, you must make

32

the following trial period payments in a timely manner:
                1st payment:    $1,687.60 by 3/1/11
                2nd payment:    $1,687.60 by 4/1/11
                3rd payment:    $1,687.60 by 5/1/11
        After all trial period payments are timely made and you
        have submitted all the required documents, your mortgage
        will be permanently modified. (Your existing loan and
        loan requirements remain in effect and unchanged during
        the trial period.) (SAC Ex. 8)

The letter goes on to provide that "[o]nce you make all of your

trial period payments on time, we will send you a modification

agreement detailing the terms of the modified loan." (Id.)

        Again, this promise seems sufficiently clear and unambiguous.

Plaintiffs relied on Citimortgage's promise by making a first trial

payment of $1,687.60[15] and submitting the requested documentation.[16]

Plaintiffs' reliance was entirely reasonable and foreseeable.

Plaintiffs have alleged that they were injured by the loss of the

funds tendered and their lost earnings for the time spent following

up on the status of their loan modification application.

Accordingly, Plaintiffs appear to have sufficiently alleged a

promissory estoppel claim against Citimortgage based on the Second

TPP.

        Turning to the remaining elements of a promissory estoppel

claim, Plaintiffs have sufficiently alleged that they relied on

Citimortgage's promise by tendering one trial payment of $1,687.60.

---

[15] Further performance was frustrated by the transfer of loan
servicing responsibilities from Citimortgage to Vericrest.

[16] In addition, the "frequently asked questions" included with
the letter reference "Home Affordable Modification" and the
"Troubled Asset Relief Program," leading the court to infer that
any loan modification would be subject to HAMP guidelines. (See SAC
Ex. 8.)

33

1  Their reliance was entirely reasonable and foreseeable. Plaintiffs

2  have alleged that they were injured in that they made a trial

3  payment that they would not otherwise have made. Accordingly,

4  Plaintiffs appear to have sufficiently alleged a promissory

5  estoppel claim against Citimortgage based on the Second TPP.

6      Nevertheless, Plaintiffs fail to adequately plead a claim for

7  promissory estoppel against Trust, as there is no independent

8  allegation of Trust's involvement in making the promise embodied

9  in the Second TPP. As pled, the SAC lacks "sufficient facts alleged

10 under a cognizable legal theory" on which to proceed against Trust

11 under a promissory estoppel theory. Balistreri, 901 F.2d at 699

12 (9th Cir. 1990).

13     Accordingly, the court will deny the motion to dismiss

14 Plaintiffs' fourth cause of action against Citimortgage, and grant

15 the motion as to Trust.

16     **G. Fifth Cause of Action: Breach of Contract**

17     Plaintiffs fifth cause of action, for breach of contract, is

18 alleged against Citimortgage, Lone Star, and Trust.

19     The elements of a breach of contract claim are: (1) the

20 existence of the contract, (2) plaintiff's performance or excuse

21 for nonperformance, (3) defendant's breach, and (4) the resulting

22 damages to the plaintiff. Oasis West Realty, LLC v. Goldman, 51

23 Cal. 4th 811, 821 (2011).

24     Plaintiffs contend that a printout of a webpage entitled "Your

25 Mortgage Modification" (SAC Ex. 7) is a written contract. The

26 printout reads, "Your request for lower mortgage payments is

34

approved. Expect your mortgage solution package within the next 5-7 business days." Under the heading "Modification Details," it lists "Current" and "Proposed" payment terms. It also provides, "The final modification may vary depending upon the review and verification of the financial documentation you had provided and other restrictions."

The webpage printout is not a contract. Under California law:

> A contract will be enforced if it is sufficiently definite . . . for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. To be enforceable, a promise must be definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. . . . The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. But if a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.

Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 209 (2006) (internal quotations, citations, and punctuation omitted). The requisite definiteness is lacking, as the payment terms are merely "proposed," and essential terms such as payment due dates are omitted.

As they have failed to adequately allege the existence of a contract, Plaintiffs' claim for breach of contract must be dismissed.

//

//

1  **H. Sixth Cause of Action: Breach of Covenant of Good Faith &**
2  **Fair Dealing**

3  Plaintiffs' sixth cause of action is for breach of the
4  covenant of good faith & fair dealing. "There is an implied
5  covenant of good faith and fair dealing in every contract that
6  neither party will do anything which will injure the right of the
7  other to receive the benefits of the agreement." Comunale v.
8  Traders & General Ins. Co., 50 Cal. 2d 654, 658 (1958). Plaintiffs'
9  claim rests on the assertion that the webpage printout attached as
10  Exhibit 7 is a contract. As discussed above, it is not.
11  Accordingly, the court will dismiss this cause of action.

12  **I. Seventh Cause of Action: Bad Faith Denial of Contract**

13  Plaintiffs' seventh cause of action, for bad faith denial of
14  contract, is also premised on the allegation that the webpage
15  printout attached as Exhibit 7 is a contract. As it is not, this
16  cause of action must be dismissed.[17]

17  **J. Eighth Cause of Action: Wrongful Foreclosure**

18  Plaintiffs' eighth cause of action, for wrongful foreclosure,
19  is alleged against Citimortgage, C.R. Title, Trust, and Lone Star.
20  "California recognizes a cause of action for wrongful foreclosure
21  under equitable principles." Barroso v. Ocwen Loan Servicing, LLC,
22  208 Cal. App. 4th 1001, 1016 (2012).

23  Plaintiffs' basis for alleging wrongful foreclosure is that

24  ───────────────

25  [17] While Plaintiffs characterize this cause of action as being
   for "Bad Faith Denial of Contract," as pled, it merely alleges
26  breach of contract, rather than, say, breach of a promise to
   provide Plaintiffs with a contract.

1    Lone Star was both the holder of the promissory note and the

2    beneficiary under the Deed of Trust after July 2005. (SAC ¶¶ 145,

3    153.)

4         Cal. Civ. Code §§ 2924 *et seq.* govern non-judicial

5    foreclosures pursuant to a deed of trust. Plaintiffs allege that

6    the named defendants violated Cal. Civ. Code § 2924(a), which reads

7    in pertinent part:

8         [T]he power of sale [under a deed of trust] shall not be
         exercised . . . until all of the following apply:
9
         (1) The trustee, mortgagee, or beneficiary, or any of
10       their authorized agents shall first file for record, in
         the office of the recorder of each county wherein
11       the [property] is situated, a notice of default. . .

12       (2) Not less than three months shall elapse from the
         filing of the notice of default.
13
         (3) . . . after the lapse of the three months described
14       in paragraph (2), the mortgage, trustee or other person
         authorized to take the sale shall give notice of
15       sale . . .

16       A brief review of the relevant instruments and Plaintiffs'

17   allegations will be helpful in better understanding this claim:

18       •    On July 25, 2005, a Deed of Trust was recorded against

19            the subject property, naming Plaintiffs as borrower,

20            Wilson Resources as lender, Advantage Title, Inc. as the

21            trustee, and MERS as the beneficiary. (RJN Ex. 1.)

22       •    Plaintiffs allege that, since July 2005, defendant Lone

23            Star has been the sole owner of the promissory note

24            securing their home loan (SAC ¶¶ 145, 153) and the

25            beneficiary under Plaintiffs' deed of trust (SAC ¶ 153).

26            Plaintiffs do not provide any recorded document showing

                                    37

that Lone Star succeeded to MERS's beneficial interest under the deed of trust, but for the purposes of this motion, their allegations must be accepted as true.[18]

- On October 19, 2010, an Assignment of Deed of Trust was recorded which transferred "all beneficial interest" in the Deed of Trust from MERS to Citimortgage. This instrument is signed by Lisa Markham, Assistant Secretary of MERS. (SAC Ex. 2; RJN Ex. 2.)

- On October 19, 2010, a Substitution of Trustee was recorded, which named defendant C.R. Title as the trustee under the Deed of Trust. This instrument is signed by Lisa Markham, Assistant Vice President of Citimortgage. (SAC Ex. 3; RJN Ex. 3.)

- On October 19, 2010, a Notice of Default was recorded. This instrument is signed by C.R. Title "as agent for the beneficiary." (RJN Ex. 4.)

- On January 1, 2011, a Notice of Trustee's Sale was recorded by one Kimberly Lee for C.R. Title. (RJN Ex. 5.)

---

[18] Defendants, too, claim that under California law, the beneficial interest under a deed of trust may be lawfully assigned in an unrecorded document. See Citi Defendants' Supplemental Brief at 3:12-13 (ECF No. 55) ("Assignments of notes and deeds of trust do not need [to] be recorded to (1) be effective or (2) non-judicially foreclose"); Vericrest Defendants' Supplemental Brief at 3:13-14 (ECF No. 54) (same). See also Harry D. Miller & Marvin B. Starr, 4 California Real Estate § 10:39 (3d ed. 2012) ("Assignment of the note and deed of trust need not be recorded to be effective between the assignor and the assignee"). The court is not, at this point, called upon to determine what effect such non-recorded transfers have upon the debtor.

1     •    On April 19, 2011, an Assignment of Deed of Trust was

2               recorded which transferred "all beneficial interest" to

3               defendant Trust. This instrument is signed by Lisa

4               Markham, Assistant Vice President of Citimortgage. (SAC

5               Ex. 4; RJN Ex. 6.)

6     •    On April 19, 2011, a Trustee's Deed Upon Sale was

7               recorded which transferred "all right title and interest

8               [held] under the Deed of Trust" to Trust. This

9               instrument is signed by Lisa Markham, Assistant Vice

10              President of C.R. Title. (RJN Ex. 7.)

11 Plaintiffs specifically allege that "MERS did not have authority

12 from the beneficiary under the deed of trust or the holder of the

13 note to assign the interest in the note and deed of trust to

14 [Citimortgage.]" (SAC ¶ 302.) Accordingly, they allege that the

15 foreclosure and sale of their home was unlawful, as MERS, rather

16 than Lone Star, assigned the Deed of Trust to Citimortgage, which

17 in turn substituted C.R. Title as the Trustee under the Deed of

18 Trust, which in turn issued the Notice of Default, Notice of

19 Trustee's Sale, and Trustee's Deed Upon Sale. (SAC ¶¶ 312, 313.)

20 These facts plausibly state a cause of action for wrongful

21 foreclosure, at least against Citimortgage, C.R. Title, and

22 Trust.[19]

23 _____

24     [19] Plaintiffs also allege that Lone Star "directed the actions involved in the transfer of the note and servicing at a time when it had no authority to do so." (SAC ¶ 300.) The court reads this

25 allegation to mean that Lone Star had no authority to direct Citimortgage (or others) to purport to transfer its interest in the

26 note to MERS (or elsewhere), when in fact, Citimortgage had no such

1    **K. Ninth Cause of Action: Cal. Bus. & Prof. Code § 17200**

2         California's Unfair Competition Law, Cal. Bus. & Prof. Code

3    § 17200 ("UCL") proscribes "unlawful, unfair, or fraudulent

4    business acts and practices." Plaintiffs' UCL claim is alleged

5    against all Defendants.

6         As discussed above, Plaintiffs have pled a cognizable claim

7    for deceit against Citimortgage. Accordingly, Plaintiffs may

8    proceed with their UCL claim against Citimortgage.

9         As Plaintiffs have also pled a cognizable claim for wrongful

10   foreclosure against Citimortgage, C.R. Title, and Trust, they may

11   proceed with their UCL claim against these defendants.

12   **IV. CONCLUSION**

13        In their opposition, Plaintiffs "acknowledge that, upon

14   further review, the factual allegations in the SAC might be

15   somewhat confusing, and are capable of being redrafted to eliminate

16   any such. Therefore, if the judge believes that this cause of

17   action [for wrongful foreclosure] is unclear in anyway [*sic*],

18   Plaintiffs request leave to amend to clarify the allegations."

19   (Opp. to Citi Mot. Dismiss 14:25 - 15:1.) But, as the court made

20   clear in its December 20, 2012 Order, "[i]f Plaintiffs file an

21   amended complaint, they are directed to plead with the requisite

22   specificity, as it is exceedingly unlikely that the court will

23   grant them leave to amend another deficient complaint." (Order at

24   21, ECF No. 40.) Further, Defendants had collectively filed four

25

26   interest to transfer.

1  motions to dismiss by the time Plaintiffs drafted the operative

2  complaint. Finally, Plaintiffs' counsel, John Sargetis, has pled

3  a cause of action for wrongful foreclosure in at least five other

4  cases in this judicial district.[20] These cases also include causes

5  of action for deceit, conspiracy, promissory estoppel, breach of

6  contract, and violations of the UCL. By now, the pleading standards

7  for these causes of action should be abundantly clear. The court

8  will not grant Plaintiffs further leave to amend to cure their

9  deficient pleading.

10      The court is also concerned by Plaintiffs' overpleading in

11  response to the court's December 20, 2012 Order. The primary

12  pleading defect identified in that Order was Plaintiffs' repeated

13  use of "the generic term 'Defendants' to refer to the party

14  allegedly acting . . . [which made it] impossible for the court

15  (and, more than likely, the individual defendants) to determine

16  which defendant is alleged to have done what." (Id. at 19.) Rather

17  than merely amend the First Amended Complaint to more clearly

18  delineate the responsible defendants, Plaintiffs instead more than

19  doubled the complaint's length (from 31 pages to 64 pages) to

20  include a host of completely unnecessary allegations. Wading

21  through this lengthy complaint was a significant drain on the

22  court's resources. And, as demonstrated in the faulty pleading of

23

24      [20]  Grant v. WMC Mortg. Corp., No. 2:10-cv-1117-WBS-KJN;
25  Johnson v. Bank United F.S.B., No. 2:10-cv-2567-GEB-KJM; Dehaven
    v. JP Morgan Chase Bank, N.A., No. 2:10-cv-3039-WBS-DAD; Whatley
26  v. Bank of America, N.A., No. 2:11-cv-2901-MCE-GGH; Menan v. U.S.
    Bank, N.A., No. 2:12-cv-0109-LKK-EFB.

1 their claim for wrongful foreclosure, Plaintiffs' verbosity

2 ultimately limited their ability to proceed against defendant Lone

3 Star. Rather than risk a repeat of this scenario, the court will

4 limit the number of pages that Plaintiffs may include in their

5 Third Amended Complaint.

6      Accordingly, the court hereby orders as follows:

7      [1] Plaintiffs' first (count four), seventh, and ninth causes

8      of action are DISMISSED WITH PREJUDICE as to defendant

9      Vericrest Financial, Inc.

10

11      [2] Plaintiffs' third, fifth, sixth, seventh, eighth, and

12      ninth causes of action are DISMISSED WITH PREJUDICE as to

13      defendant Lone Star U.S. Acquisitions, LLC.

14

15      [3] Plaintiffs' third, fourth, fifth, and seventh causes of

16      action are DISMISSED WITH PREJUDICE as to defendant LSF7 NPL

17      VI Trust.

18

19      [4] Plaintiffs' fifth, sixth, and seventh causes of action

20      are DISMISSED WITH PREJUDICE as to defendant Citimortgage,

21      Inc.

22

23      [5] Plaintiffs are GRANTED leave to file a Third Amended

24      Complaint no more than twenty-one (21) days after entry of

25      this order. The Third Amended Complaint may only include

26      those causes of action, pled against those defendants, which

were not dismissed herein. The Third Amended Complaint may be no longer than thirty (30) pages, exclusive of exhibits.

IT IS SO ORDERED.

DATED:   August 9, 2013.


_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT